JUDGE DANIELS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CIV 9246

-------------------------------------------------------------------X     _____ CV _____

MICHAEL J. PALLADINO, as President of the NEW
YORK CITY DETECTIVES' ENDOWMENT
ASSOCIATION, INC., NEW YORK CITY
DETECTIVES' ENDOWMENT ASSOCIATION,
INC., EDWARD D. MULLINS, as President
of the SERGEANTS BENEVOLENT
ASSOCIATION of the CITY OF NEW YORK,
INC., SERGEANTS BENEVOLENT ASSOCIATION
OF THE CITY OF NEW YORK, INC., THOMAS
DROGAN, as President of the LIEUTENANTS
BENEVOLENT ASSOCIATION of the POLICE
DEPARTMENT of the CITY OF NEW YORK,
LIEUTENANTS BENEVOLENT ASSOCIATION
of the POLICE DEPARTMENT of the CITY OF
NEW YORK, JOHN DOE, JANE ROE and all
POLICE OFFICERS named herein and others
similarly situated,

                                        Plaintiffs,

          -against-

THE CITY OF NEW YORK, the NEW YORK CITY
POLICE DEPARTMENT,  and RAYMOND W. KELLY,
as COMMISSIONER of the NEW YORK CITY POLICE
DEPARTMENT,

                                        Defendants.

-------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## ORDER TO SHOW CAUSE FOR PRELIMINARY INJUCTION

                    CERTILMAN BALIN ADLER & HYMAN, LLP
                    Attorneys for Plaintiffs
                    90 Merrick Avenue
                    East Meadow, New York 11554
                    (516) 296-7000

# TABLE OF CONTENTS

PRELIMINARY STATEMENT....………………………………………….....    1

STATEMENT OF FACTS.…………………………………………………..    1

 POINT I

  THE INTERIM ORDER IS UNCONSTITUTIONALLY
  VOID-FOR-VAGUENESS.…………………………………………    1

POINT II

  THE INTERIM ORDER VIOLATES PLAINTIFFS'
  FOURTH AMENDMENT RIGHTS.…………………………………    8

POINT III

  PLAINTIFFS ARE ENTITLED TO A PRELIMINARY
  INJUNCTION.………………………………………………………    17

 CONCLUSION.………………………………………………………………    19

i

# TABLE OF AUTHORITIES

**Federal Cases**

*Kolender v. Lawson,*
    461 U.S. 352, 103 S. Ct. 1855 (1983)....................................   6,7

*National Treasury Employees Union v. Von Raab,*
    489 U.S. 656 (1989)........................................................   9

*Pankos Diner Corp. v. Nassau County Legislature,*
    321 F. Supp.2d 520 (E.D.N.Y. 2003).............................   17,18,19

*Skinner v. Railway Labor Executives' Assn.,*
    489 U.S. 602 (1989)......................................................   9,10,11,12,13
    14,15,16

**State Cases**

*Matter of Berbenich v. Regan,*
    81 A.D.2d 732 (3d Dept. 1981), aff'd,
    54 N.Y.2d 792 (1981)....................................................   15

*Matter of Lichtenstein v. Board of Trustees of the Police*
*Pension Fund of the Police Department of the City of New York,*
    57 N.Y.2d 1010 (1982)..................................................   15

*People v. New York Trap Rock Corp.,*
    57 N.Y.2d 371, 456 N.Y.S.2d 711, (1982).............................   6,7

*People v Pfluger,*
    6 Misc.3d 1011(A), 800 N.Y.S.2d 354, 2004 WL 3118688,
    2004 NY Slip OP 51770 (U) (N.Y. Dist. Ct. Suffolk Co. 2004).......   7

*People v. Samuels,*
    68 A.D.2d 663 (1st Dept. 1979), aff'd
    50 N.Y.2d 1035 (1980)...................................................   16

*People v. Santiago,*
    64 A.D.2d 355 (1st Dept. 1978)......................................   17

1935716.1

## PRELIMINARY STATEMENT

The Interim Order is a pervasive and unwarranted intrusion upon Plaintiffs' constitutional rights to be free from unreasonable searches and seizures and to due process. Subjecting uniformed police officers, whether in uniform or out, on duty or off, to automatic alcohol testing when they are somehow "involved in" the discharge of a firearm which results in some unspecified injury to or death of some unspecified "person" constitutes a suspicionless search in violation of the Fourth and Fourteenth Amendments. This is a case of first impression inasmuch as no court has sanctioned suspicionless searches without the existence of "special needs." Moreover, the terms utilized in the Interim Order are so vague or overbroad as to be facially invalid and in violation of the Fifth Amendment. The Defendants should not be permitted to invade and trample Plaintiffs' rights any further pending the outcome of this action.

## STATEMENT OF FACTS

The Court is respectfully referred to the Verified Complaint and the affidavits of Detective and DEA President Michael J. Palladino and Detective Daniel Rivera, and the exhibits annexed thereto for the facts and background herein. Terms defined in the Verified Complaint are used herein.

## POINT I

## THE INTERIM ORDER IS UNCONSTITUTIONALLY VOID-FOR-VAGUENESS

The Interim Order contains language so vague and uncertain as to be unconstitutional.

The Interim Order provides in relevant part as follows:

1. In an effort to ensure the highest levels of integrity at the scene of firearms discharges, all uniformed members of the service involved in firearms discharges, which result in injury to or death of a person, will be subject to Department

1

administered alcohol testing.

2.    Accordingly, when a uniformed member of the service, on or off duty, is involved in a firearms discharge within New York City which results in injury to or death of a person, the following procedure will be complied with:

PURPOSE

To ensure the highest levels of integrity at the scene of police involved firearms discharges which result in injury to or death of a person on or off duty, within New York City.

PROCEDURE

When involved in, or responding to the scene of a police involved firearms discharge which results in injury to or death of a person, on or off duty, within New York City.

\* \* \*

DUTY
CAPTAIN/
INSPECTOR

4.    Inform uniformed member(s) of the service who discharged their firearm that they will be subject to alcohol testing.

5.    Ensure involved member(s) of the service remain on the scene when feasible and consistent with safety (i.e., hospitalization not immediately required); pending arrival of Internal Affairs Bureau personnel assigned to administer alcohol test.

6.    Notify IAB Command Center of location of involved member(s) of the service if they are removed from location of firearms discharge.

2

* * *

INTERNAL
AFFAIRS
BUREAU
DUTY
CAPTAIN

9. Advise the subject member that he or she may be tested by a number of different means, such as the PBT device and the Intoxilyzer.

10. Conduct alcohol test, using a PBT (portable breathalyzer test) device in a private setting, on uniformed member(s) of the service who discharged a firearm.

a. Conduct the testing process in a private setting (e.g. Nearest Department facility, Department auto being used by the supervisor concerned) in a dignified, respectful fashion.

* * *

INTERNAL
AFFAIRS
BUREAU
DUTY
CAPTAIN

14. In order to determine fitness for duty, record and then take into account the Intoxilyzer reading, the PBT reading, and any other related indicia of intoxication, as indicated in Appendix "A".

a. If the member is apparently unfit for duty, be guided by the procedures contained in *P.G. 206-12, "Removal of Firearms from intoxicated Uniformed Member of the Service" and other appropriate Department procedures.*

* * *

ADDITIONAL
DATA

*Members of the service are reminded of the contents of Patrol Guide procedures 203-*

3

*04, "Fitness For Duty" and 204-08, "Firearms – General Regulations" as they relate to the use of alcohol and the possession of firearms while off duty.*

*Members should be aware that it would be prudent not to ingest alcohol beverages up to four (4) hours prior to the commencement of their tour of duty.*

RELATED            *Firearms      Discharge      by*
PROCEDURES         *Uniformed    Members   of   the*
                   *Service (P.G. 212-29) Removal*
                   *of Firearms from Intoxicated*
                   *Uniformed   Member   of   the*
                   *Service (P.G. 206-12)*

* * *

*See,* Exhibit "B" to Verified Complaint.

As averred in the Verified Complaint, a non-exhaustive list of examples of the vagueness of the Interim Order follows:

a.   The Interim Order does not define the term "injury" or to whom the terms "injury" or "death" apply.  Thus, for example, suspicionless searches can be conducted where there is an extremely minor injury, or where an injury or death is not proximately caused by the discharge of a Police Officer's firearm, or when the discharge of a firearm results in the injury or death of a Police Officer.

b.   The Interim Order does not define "person."  Thus, for example, an injured or dead uniformed Police Officer could be subject to automatic

4

suspicionless searches.

c.    The Interim Order does not define the terms "Involved in Firearms Discharges", "police involved firearms discharge," or "involved members of the service." Thus, a Police Officer may be subject to a suspicionless search even if he or she does not discharge his or her own firearm.

d.    The Interim Order does not specify "the number of different means" by which the suspicionless searches will be conducted.

e.    The Interim Order does not adequately set forth or establish the "private setting" or "dignified, respectful fashion" in which the suspicionless searches are to be conducted.

f.    The Interim Order does not prescribe the ability to use the test results once administered.

g.    The Interim Order does not discuss or establish right(s) of Police Officer(s) to independently evaluate test samples and results.

h.    The Interim Order does not establish the ability of Police Officer(s) to obtain a copy of a videotaped testing.

i.    The Interim Order references a "specially designed form" and "specially designed checklist" to be utilized in administering the suspicionless searches, but does not annex same thereto. Thus, Plaintiff(s) are wholly deprived of any advance notification or due process in connection with the conduct of the searches.

In addition, the Interim Order does not apply outside the geographic boundaries of New

5

York City notwithstanding that uniformed Police Officer(s) may be "involved" in the discharge of firearm(s) outside New York City limits, and thus the Interim Order may not be applied even-handedly and may result in disparate treatment of Police Officers.

This is a case where a rule or regulation is (i) not sufficiently definite to provide fair notice of the required or prohibited conduct; and (ii) fails to provide explicit and objective standards by which a violation may be readily determined, and must be stricken. *See e.g.,* *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S. Ct. 1855 (1983) (California statute held unconstitutionally vague as it failed to clarify what was contemplated by requirement therein).

In *People v. New York Trap Rock Corp.,* 57 N.Y.2d 371, 456 N.Y.S.2d 711, (1982) the Court of appeals stated:

> Turning then to the void-for-vagueness doctrine, we begin our analysis by a brief review of the reasons why it at times has been called "the first essential of due process of law"....
>
> As we have had occasion to reiterate in recent years, a prime purpose is to meet "the constitutional requisite that a statute be 'informative on its face' (citations omitted) to assure that citizens can conform their conduct to the dictates of the law".... To this end, nothing less than "adequate warning of what the law requires" will do....
>
>            * * *
>
> Of equal concern is the prevention of "arbitrary and discriminatory enforcement by requiring 'boundaries sufficiently distinct' for police, Judges, and juries to fairly administer the law". (citations omitted)
>
>            * * *
>
> As common sense and experience both tell us, unless by its terms a law is clear and positive, it leaves virtually unfettered discretion in the hands of law enforcement officials....

6

1935716.1

*Id.*, 57 N.Y.2d at 378-379, 456 N.Y.S.2d at 714-715. (citations omitted, emphasis added).

The Court of Appeals also acknowledged that if it were a case involving "Bill of Right Freedoms", such as here, the vagueness doctrine serves as a "buffer zone of added protection" (citing Note, Void-for-Vagueness Doctrine in the Supreme Court, 109 U. of Pa.L.Rev., 67, 75), thus requiring "more careful scrutinizing" of the alleged vague ordinance than if no such claims were involved. *Id.* 57 N.Y.2d at 379, 456 N.Y.S.2d at 715. *See People v Pfluger*, 6 Misc.3d 1011(A), 800 N.Y.S.2d 354, 2004 WL 3118688, 2004 NY Slip OP 51770 (U) (N.Y. Dist. Ct. Suffolk Co. 2004).

The Interim Order is unclear and vague on its face. As in *People v. Trap Rock, supra*, the Interim Order "poses special problems of draftsmanship and enforcement." *Ibid.*

The Interim Order does not adequately set forth as to who, when, where, and how it applies.

The Interim Order does not define or provide specific criteria as to the critical terms used therein, <u>inter alia</u>, "injury", "death", "person", "involved in", "private setting" or "number of different means."

Because the Interim Order fails to satisfy the two prong void-for-vagueness test, it cannot stand.

Moreover, the Interim Order encourages arbitrary enforcement as any Police Officer "involved" in a shooting incident is subject to a suspicionless search, as are Police Officers whose firearms may well be determined after the fact, <u>not</u> to have caused any injury to or death of a person. *See Kolender v. Lawson, supra.* This too is constitutionally infirm.

7

1935716.1

Given the vagueness of the Interim Order and obvious flaws therein which affect, hinder and impair Plaintiff(s)' Constitutional rights, the Interim Order should ultimately be determined to be in violation of the Due Process clause contained in the United States and New York State Constitution(s) and consequently void-for-vagueness.   In the interim, its application should be enjoined.

**POINT II**

**THE INTERIM ORDER VIOLATES PLAINTIFFS'
FOURTH AMENDMENT RIGHTS**

Plaintiffs are already subject to reasonable searches in connection with suspected intoxication as set forth in the Patrol Guide.  *See* Exhibit "A" to Verified Complaint.    Police Officers are already subject to random and reasonable suspicion drug testing as well as drug and alcohol testing in specified, defined circumstances.  Indeed, indicia of intoxication guidelines are published and are part of the Patrol Guide.  Thus, a definite, clear and precise policy is already in effect to adjudge when a uniformed Police Officer may be deemed unfit for duty and thus subject to disciplinary measures.

There is no legal justification to depart from this established standard.  Yet the Interim Order is a complete departure from this policy and procedure and makes this a case of first impression. It subjects Police Officer(s) who discharge a firearm to a warrantless search of their person(s). This is so, despite the fact that the use of alcohol prior to the discharge of the firearm may never be reasonably suspected, or even suspected after the fact.  What is most egregious is that Police Officers who themselves may be injured or even killed while performing their duty, are subject to this demeaning and demoralizing test when alcohol use or intoxication is not even reasonably suspected. *See* Affidavits of Detective and DEA President Michael J. Palladino and

8

Detective Rivera. ~~Police Officer and PBA President Patrick J. Lynch.~~

The act of discharging a firearm in the course of duty by a uniformed Police Officer does not, without more, provide reasonable suspicion of the use of alcohol.

The Interim Order is a complete departure from anything set forth in the Patrol Guide or in actual practice.

Alcohol breathalyzer testing was never before employed after each and every discharge of a firearm by a Uniformed Police Officer which resulted in injury or death of a person. There is no legal justification whatsoever for this trampling upon Plaintiff(s)' rights.

We expect that Defendants will argue that suspicionless searches involving alcohol testing have already been determined to be lawful, and will no doubt attempt to hide behind *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602 (1989), and *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989). Defendants, however, cannot succeed as these cases are readily distinguishable both on their facts and application. A discussion of these cases thus is appropriate to dispel reliance thereon.

*Skinner* involved a Fourth Amendment challenge to regulations promulgated by the Federal Railroad Administration ("FRA") that mandated blood, urine and/or breathalyzer tests of employees involved in certain train accidents and who violated certain safety rules. The regulations were specific, the triggering events well defined. The testing was on notice and conducted in a professional, medical environment <u>independent of the employer</u> after occurrence of an event that activated the test. The regulations entitled "Post-Accident Toxicological Testing" mandated blood and urine testing upon the occurrence of the following specific events: (1) "following a 'major train accident,' which is defined as any train accident that involves (i) a

9

fatality, (ii) the release of hazardous material accompanied by an evacuation or a reportable injury, or (iii) damage to railroad property of $500,000 or more;" or (2) "after an 'impact accident,' which is defined as a collision that results in a reportable injury, or in damage to railroad property of $50,000 or more;" or (3) "after '[a]ny train incident that involves a fatality to any on-duty railroad employee.'" *Id.* at 609. Additionally, the regulations provided a limited exception from testing "if the railroad representative can immediately determine on the basis of specific information that the employee had no role in the causes(s) of the accident/incident;" but no exception applied in the case of "a major train accident." *Id.* at 609, n. 2. The regulations entitled "Authorization to Test for Cause" were permissive and subjected employees to breath and urine tests after a reportable accident or incident where a supervisor had "reasonable suspicion" that an employee's acts or omissions contributed to the occurrence or severity of the accident or incident." *Id.* at 610.

The *Skinner* Court set the stage for its Fourth Amendment analysis by discussing the well-known "problem of alcohol use on American railroads" and the "efforts to deter it by carrier rules" which "began at least a century ago." *Id.* at 605. The Court cited statistics showing the number of significant train accidents and the number of employee fatalities involving alcohol or drug use. *Id.* at 607 ("the FRA 'identified 34 fatalities, 66 injuries and over $28 million in property damage (in 1983 dollars) that resulted from the errors of alcohol and drug-impaired employees in 45 train accidents and train incidents during the period 1975 through 1983."). It was this well-known and well documented problem which created the "special need" to protect the public.

The Supreme Court first determined that the breath, blood and urine tests prescribed by

1935716.1

the regulations constituted Fourth Amendment searches or seizures. *Id.* at 616 ("Subjecting a person to a breathalyzer test, which generally requires the production of alveolar or 'deep lung' breath for chemical analysis," ... implicates ... concerns about bodily integrity and, like the blood-alcohol test ... should also be deemed a search."). Thus, the Court held that the Fourth Amendment is applicable to the testing prescribed by the FRA regulations.

The Court then reviewed the circumstances and the nature of the search or seizure in question which involved "balancing [the] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Id.* at 619. The Court analyzed "the Government's interest in regulating the conduct of railroad employees to ensure safety ... [which] presents 'special needs' beyond normal law enforcement that may justify probable-cause requirements." *Id.* at 620. It was undisputed that the covered railroad employees were "engaged in safety-sensitive tasks." *Id.* The Court pointed out that the FRA prescribed the toxicological tests, "not to assist in the prosecution of employees, but rather "to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs." *Id.* at 620-21. The question remaining was whether the government's need to "monitor compliance with these restrictions justifies the privacy intrusions at issue absent a warrant or individualized suspicion." *Id.* at 621.

The Court concluded that the searches in *Skinner* were reasonable and the intrusion "minimal" under the circumstances and in the context in which the employment takes place (*Id.* at 625), and that the compelling government interests served by the FRA's regulations outweighed the employees' privacy concerns. The Court thus held that the alcohol and drug tests in the FRA's regulations "are reasonable within the meaning of the Fourth Amendment. *Id.* at

11

1935716.1

633.

What clearly differentiates this case from *Skinner* is the very long and problematic history in the railroad industry of alcohol induced accidents – indeed – there were well documented studies and data establishing the causal link between alcohol use and train accidents.

Contrast here, where there are <u>no</u> studies suggesting, much less establishing, any causal link between intoxication of Police Officers and shootings which result in injury to or death of a person. Without such critical causal link, there is no "special need" to protect the public (as in *Skinner*), and the suspicionless searches under the Interim Order cannot withstand constitutional scrutiny under the Fourth Amendment.

Significantly, the "2006 Firearms Discharge Report" prepared by the Police Academy Firearms and Tactics Section, and upon information and belief, all such Reports for prior years, contain no studies or statistics concerning a relationship between the discharge of firearm(s) by Police Officers and the use of alcohol, because no such relationship exists. Indeed, there is <u>nothing</u> even remotely suggesting that there is a need, let alone an "overwhelming" need, to protect the public from Police Officers who discharge their firearms in the line of duty. Quite the contrary. Police Officers who discharge their firearms in the line of duty are protecting the public. There is <u>no</u> correlation between a Police Officer's discharge of a firearm and a perceived harm to the public. Thus there is no "special need" as in *Skinner* to warrant suspicionless searches of Police Officers whenever they discharge their firearm(s) or are "involved in" the discharge of a firearm, and <u>no</u> rational relationship between the (albeit broad and vague) triggering event in the Interim Order and a justifiable or overwhelming need to protect the public.

There is another critical distinction between *Skinner* and here that proves determinative. Unlike the civilian railroad employees in *Skinner*, who are not trained in the manner or practice of regularly detecting suspected alcohol use, the Police Officers' Supervisors are themselves highly trained in and first charged with analyzing and determining if there is reasonable suspicion to believe a Police Officer is under the influence of alcohol. Thus, there are procedures already in place applicable to Police Officers suspected of using alcohol, i.e. "Removal of Firearms from Intoxicated Uniformed Member of the Service." There is simply no lawful rationale for the Interim Order which infringes upon Police Officers' constitutional rights to be free from unreasonable searches, and no "special needs" exist to justify same.

Similarly inapplicable is *Von Raab, supra,* decided the same day as *Skinner*, and which also upheld suspicionless drug testing of Customs employees "engaged directly in drug interdiction and of those who otherwise are required to carry firearms." *Id.*, 489 U.S. at 668. As in *Skinner*, the *Von Raab* Court set the stage for its Fourth Amendment analysis of the Custom Service's drug-testing program by observing that many Customs Service employees are exposed to drug traffickers, the temptation to take bribes, and have access to "vast sources of valuable contraband seized and controlled by the Service." *Id.* at 669. The Court referenced reports showing that internal investigations for 1987 "resulted in the arrest of 24 employees and 54 civilians; 334 criminal and serious integrity investigations conducted during 1986 "result[ed] in the arrest of 37 employees and 17 civilians; 284 criminal and serious integrity investigations conducted during 1985 "result[ed] in the arrest of 15 employees and 51 civilians." *Id.* at 669-70.[1]

---

[1]It should be noted that the Police Department is already drug testing Police Officers randomly

13

Once again, the causal link between the harm feared in *Von Raab* (customs agents involved in illegal activity) was established by years of documented investigations and compiled data which evidenced a serious problem related to substance abuse. The antithetical situation is present here, where there is <u>no</u> causal link whatsoever between alcohol abuse by Police Officers and the discharge of firearms resulting in injury or death. Indeed, the supposed purpose of the Interim Order ("[t]o ensure the highest levels of integrity at the scene of police involved firearms discharges which results in injury to or death of a person...") sounds in a lofty and self-righteous goal; however, no such "purpose" need be achieved as no direct connection between alcohol use (or abuse) and shootings has ever been established. Thus it cannot rightfully be said that "the highest levels of integrity" are not already maintained. The best evidence of this is the fact that all Police Officers already subject to the warrantless searches have not exceeded the arbitrary alcohol level set forth in the Interim Order.[2] However, even if this were not the case, reasonable suspicion policies already in place provide safeguards against any loss of "integrity". As such, *Von Raab*, like *Skinner*, provide no support for Defendants.

The challenged Interim Order must also promote a legitimate government interest. In *Skinner*, there was significant, documented evidence that employees under the influence of alcohol caused train accidents. In *Skinner*, there was a clear causal connection between the triggering event -- an accident -- and an employee's use of alcohol. And, in *Skinner*, the FRA regulations were narrowly tailored to prevent train accidents by testing employees who were involved in certain specifically defined major accidents.

---

and in circumstances similar to *Von Raab*.)

[2] Indeed, it is wholly unknown as to what is meant by a test result of less than .08 under the Interim Order.

14

1935716.1

In this case, there is no causal connection between the triggering event -- discharge of a firearm -- and a Police Officer's use of alcohol.  Unlike *Skinner*, there is no evidence that Officers fire their weapons because they have been drinking alcohol.  Unlike the regulations in *Skinner*, the Interim Order is triggered by an event that is "reasonably expected and foreseeable" and related to the ordinary risks of employment, and is not caused by employee negligence or inebriation.  *See, e.g., Matter of Taylor v. Regan*, 103 A.D.2d 884 (3d Dept. 1984) (incidents involving discharges of an officer's weapon, resulting in the death of one suspect and the injury of another, "arose in the regular course of duty, are within [the officer's] training, and are reasonably expected and foreseeable duties required of a police officer" and were not "accidental in nature"); *Matter of Berbenich v. Regan*, 81 A.D.2d 732 (3d Dept. 1981), *aff'd*, 54 N.Y.2d 792 (1981) ("police officers are aware that situations calling for the use of deadly force might develop in the course of their work and are trained to deal with them").  *See Matter of Lichtenstein v. Board of Trustees of the Police Pension Fund of the Police Department of the City of New York*, 57 N.Y.2d 1010, 1012 (1982) (defining "accident" as "a 'sudden, fortuitous mischance, unexpected, out of the ordinary, and injurious in impact'").

The Interim Order – automatic alcohol testing after the discharge of a firearm -- does <u>not</u> promote a legitimate government interest.  While the Defendant(s) may well have an interest in preventing Police Officers from discharging firearms while under the influence of alcohol, there is no evidence whatsoever that Police Officers discharge firearms because they are under the influence of alcohol.  This is a critical distinction from the facts in *Skinner* and *Von Raab*.  Unlike the FRA in *Skinner*, the Defendant(s) are not justified in promulgating and implementing the Interim Order.

15

In sum:

Unlike the triggering event in *Skinner* – an unforeseeable event, the triggering event here is a reasonably expected and foreseeable event.

Unlike the employees in *Skinner*, Police Officers are on duty twenty-four hours a day and some are required to work "undercover" as members of gangs and organized crime. *See Wilson v. City of New York*, 173 A.D.2d 276 (1st Dept. 1991) (police officer was acting within the scope of employment when attempting to apprehend individuals breaking into a parked car, notwithstanding the officer was driving a taxicab while off-duty).

Unlike *Skinner*, there is no correlation between the triggering event and the use of alcohol.

Unlike *Skinner*, the Defendant(s) are not promoting a legitimate, compelling governmental interest by promulgating the Interim Order, and there is no justification whatsoever for dispensing with the "individualized suspicion" requirement.

Moreover, and notwithstanding the foregoing, even if the interference with the Police Officers' privacy interests is deemed "minimal" given the employment context (which Plaintiffs dispute), the absence of a legitimate, compelling government interest requires the balance to tip in favor of the Police Officers' privacy interests. There is no justification to dispense with a showing of "individualized suspicion" before subjecting a Police Officer to a breathalyzer test after the discharge of a firearm.

Police Officers must be viewed as real human beings "on duty" twenty-four hours a day. The Court in *People v. Samuels*, 68 A.D.2d 663 (1st Dept. 1979), *aff'd* 50 N.Y.2d 1035 (1980), succinctly stated:

16

> "Men make good laws as well as bad. The bad laws most noticeably result when there exists an unfettered, blind devotion to an ideal, an abstract absolute principle which ignores the reality of the individual person. If freedom is interpreted in an abstract absolute sense as the right to do what one wants, then no one is free. It is the interrelation of rights with their corresponding duties which preserve the dynamics of true freedom and thus mandates the maintenance of a reasoned authority to maximize the true enjoyment of freedom by the individual. In our society we have placed the responsibility of maintaining a reasoned civil order in the first instance on the police. It is only fair, therefore, that we view the policeman as a real person, one imbued with the strengths and weaknesses of his or her fellow man, albeit one possessed of a certain expertise acquired by training and experience. Ensconced within the safety of our libraries, our courtrooms and our homes, we must not forget the reality that it is the police to whom we look for protection and for succor and whom we place in natural proximity to the criminal world as a line of defense. Entrusting the police officer with a gun, we expect the faithful discharge of duty, even to the death. Yet when the officer discharges that duty, we sometimes, in examining the correctitude or reasonableness of that discharge, scrutinize the officer not as a real human being, but as an abstract, a myth, the perfectly rational man. This is a danger to be avoided."

*Id.* at 613-14 (*quoting People v. Santiago*, 64 A.D.2d 355, 367-68 (1st Dept. 1978).

**POINT III**

**PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION**

In *Pankos Diner Corp. v. Nassau County Legislature*, 321 F. Supp.2d 520 (E.D.N.Y. 2003), plaintiffs sought to overturn amendments to the 2002 Smoking Law promulgated by the Nassau County Legislature under, *inter alia*, the void-for-vagueness doctrine. Plaintiff's moved for a preliminary injunction.

The Court stated:

> A party seeking a preliminary injunction "ordinarily must show: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping

17

> decidedly in the movant's favor....
>
> The movant's demonstration of irreparable harm comprises the
> "'single most important prerequisite for the issuance of a
> preliminary injunction....'" Due to the importance of this factor,
> "the moving party must first demonstrate that such injury is likely
> before the other requirements for the issuance of an injunction will
> be considered...." To demonstrate irreparable harm, "[t]he movant
> must demonstrate an injury that is neither remote nor speculative,
> but actual and imminent and that cannot be remedied by an award
> of monetary damages...."

*Id.*, 321 F.Supp.2d at 523-524 (citations omitted).

The plaintiffs in *Pankos Diner* first established irreparable harm by presenting evidence

of loss of customers to Suffolk County.[3]  Plaintiffs next revealed the infirmities in the language

of the amendments.  The Court stated:

> A statute is unconstitutionally vague if persons of common
> intelligence must necessarily guess at its meaning and differ as to
> its application, or if it fails to give a person of ordinary intelligence
> fair notice of conduct proscribed or required by the regulation, and
> <u>encourages arbitrary and erratic behavior on the part of officials</u>
> <u>charged with enforcing the rule</u>....  [A] court must first determine
> whether the statute gives the person of ordinary intelligence a
> reasonable opportunity to know what is prohibited and <u>then</u>
> <u>consider whether the law provides explicit standards for those who</u>
> <u>apply it</u>....  Therefore, the Court first considers the text of the
> statute to ascertain whether an individual possessed of reasonable
> intelligence could ascertain its meaning.

*Id.*, 321 F. Supp.2d at 525 (citations omitted, emphasis added).

In analyzing the subject amendments, the Court acknowledged that the text of the

legislation was both unclear and vague and caused confusion (*e.g.*, certain terms not defined;

whether certain exemptions were repealed was unclear, contained inconsistency with prior law,

---

[3]Although this correlates to a monetary injury, the Court considered same as plaintiffs could not
be recompensed for same by Nassau County due to Eleventh Amendment immunity.

18

etc.).  The Court thus found: "[f]or the reasons indicated, the Court finds that plaintiffs have demonstrated a clear and substantial likelihood of success on the merits under their void-for-vagueness cause of action, supplemented by a showing of irreparable harm.  Accordingly, [a] preliminary injunction is issued pursuant to Federal Rule of Civil Procedure 65…."

The Interim Order is even more vague and uncertain that the challenged amendments in *Pankos Diner*, and the irreparable harm to Plaintiffs, namely, the invasion of their constitutional rights and protected privacy interests, is certainly more onerous than the mere loss of customers at stake therein.  As such, a preliminary injunction order should likewise be issued herein.

Unquestionably, Plaintiffs are, have been, and will be harmed by the continued implementation of the Interim Order mandating suspicionless searches upon Police Officers.  Plaintiff(s)' injury cannot be adequately calculated or compensated by monetary damages.

Under no scenario can it be said that Plaintiffs' compelling claims of constitutional violations do not warrant immediate injunctive relief.

## CONCLUSION

For the reasons discussed, *supra*, Plaintiff(s) are wholly entitled to a preliminary injunction enjoining Defendant(s) from further implementation and/or application of the Interim Order providing for automatic breathalyzer testing upon the discharge of firearm(s) by uniformed Police Officer(s) which results in death or injury of a person, without reasonable suspicion of the use of alcohol by specific Police Officer(s) utilizing procedures and policies already in place.

Dated: East Meadow, New York
       October 15, 2007

1935716.1

CERTILMAN BALIN ADLER & HYMAN, LLP

By: _____ 4950

MICHAEL C. AXELROD, Esq.
Donna-Marie Korth, Esq.
Candace Gladston, Esq.
Jennifer A. Bentley, Esq.
Attorneys for Plaintiffs
90 Merrick Avenue
East Meadow, New York 11554
(516) 296-7000

20