UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

MICHAEL J. PALLADINO, as President of the New York City Detectives' Endowment Association, Inc., et al.

                                        Plaintiffs,

      -against-

THE CITY OF NEW YORK, et al.,

                                        Defendants.

------------------------------------------------------------------ x

**NOTICE OF MOTION**

07 Civ. 9246 (GBD)(MGD)

      **PLEASE TAKE NOTICE,** that upon the declaration of Charles V. Camipisi, dated November 7, 2007, and the exhibits annexed thereto, the declaration of Suzanne Gimblet, dated November 6, 2007, defendants' memorandum of law in support of the motion to dismiss, dated November 7, 2007, and all prior papers and proceedings had herein, Defendants will move this Court, before the Honorable George B. Daniels, United States District Judge, Southern District of New York, at the Courthouse thereof, 500 Pearl Street, New York, New York, on a date and time convenient to the Court, for an order, pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure, dismissing the complaint in its entirety on the ground that the complaint fails to state a claim upon which relief can be granted, in the alternative, for a judgment , pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting summary judgment dismissing the complaint on the grounds that there is no genuine issue of material fact, and for such other and further relief as the Court deems just and proper.

      **PLEASE TAKE FURTHER NOTICE,** that pursuant to the scheduling order of the Court, answering papers, if any, must be provided to defendant on or before November 16, 2007.

- 2 -

**PLEASE TAKE FURTHER NOTICE,** that pursuant to Rule 12 of the Federal Rules of Civil Procedure, in the event that this motion is denied, in whole or in part, Defendants respectfully request 20 days from docketing of the order denying the motion to answer the amended complaint.

Dated:   New York, New York
         November 7, 2007

                                   **MICHAEL A. CARDOZO**
                                   Corporation Counsel of the
                                      City of New York
                                   Attorney for Defendants
                                   100 Church Street, Room 2-187
                                   New York, N.Y. 10007-2601
                                   (212) 788-0952

                        By:    ECF            /s/
                                      Alan M. Schlesinger
                                   Assistant Corporation Counsel

To:   **CERTILMAN, BALIN, ADLER & HYMAN, LLP**
      Attorneys for Plaintiffs
      9th Floor
      90 Merrick Avenue
      East Meadow, NY 11554
      (516) 296-7000
      Att: Jennifer A. Bentley

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

MICHAEL J. PALLADINO, as President of the New
York City Detectives' Endowment Association, Inc.,
et al.

                                                Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

                                                Defendants.

------------------------------------------------------------------- x

**DECLARATION OF
SUZANNE GIMBLET**

07 Civ. 9246 (GBD)(MGD)

      **SUZANNE GIMBLET**, declares, under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

      1.      I am a detective in the Police Department of the City of New York ("NYPD"). I was appointed to the Department on July 27, 1987, and I was assigned the rank of detective in November, 2001. I am an Alcohol and Substance Abuse counselor certified by the State of New York and I received my certification in 1997. To become certified involves classes, three years of work experience in a credentialed program and the passing of a written test. I have been in the NYPD's Counseling Unit for approximately 15 years.

      2.      I submit this declaration in opposition to plaintiffs' motion for a preliminary injunction prohibiting the enforcement of Interim Order 52 ("IO 52") and in support of defendants' motion to dismiss the complaint in this action. This declaration is based on my own personal knowledge and the books and records of the City of New York, and conversations with employees of the City.

      3.      The Counseling Unit interviews, evaluates, and advises NYPD personnel concerning possible alcohol abuse. Supervisors refer officers to the Counseling Unit for an

- 2 -

interview and evaluation. In addition NYPD officers who believe that they may have a problem with alcohol may seek assistance on their own.

4. An NYPD officer's use of the Counseling Unit is confidential, pursuant to federal law.

5. Some of the NYPD employees that we interview are persons who have appeared at the Counseling Unit before while many are new cases who have never appeared at our unit before.

6. In 2005 the Counseling Unit conducted 194 interviews of NYPD personnel, 105 of those employees were new to the Counseling Unit.

7. In 2006 Counseling Unit conducted 238 interviews of NYPD officers, 135 of those employees were new to the Counseling Unit.

8. In 2007, through September and into October, we conducted 171 interviews of NYPD personnel, and 135 of those employees were new to the Counseling Unit. Only 36 of the interviews conducted this year have been of employees known to the Counseling Unit.

9. In total for the three years 2005-07, of a total of approximately 600 interviews conducted by the Counseling Unit, 380 were for officers who have not used the Counseling Unit's services before; that is they are new to our unit.

Dated:     New York, New York
           November ___, 2007

                                        _____
                                        Det. Suzanne Gimblet
                                        SUZANNE GIMBLET

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

MICHAEL J. PALLADINO, as President of the New
York City Detectives' Endowment Association, Inc.,
et al.

                                   Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

                                   Defendants.

------------------------------------------------------------------ x

**DECLARATION OF**
**CHIEF CHARLES V. CAMPISI**

07 Civ. 9246 (GBD)(MGD)

      **CHARLES V. CAMPISI**, declares, under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and correct

      1.     I am the Chief of the Internal Affairs Bureau ("IAB") of the Police Department of the City of New York ("NYPD") and I have been Chief of IAB for over 11 years. I have been a uniformed member of the NYPD since 1973  I submit this declaration in opposition to plaintiffs' motion for a preliminary injunction prohibiting the enforcement of Interim Order 52 ("IO 52") and in support of defendants' motion to dismiss the complaint or in the alternative for summary judgment. A copy of IO 52 is annexed hereto as Exhibit "A." This declaration is based on my own personal knowledge and the books and records of the City of New York, and conversations with employees of the City.

      2.     IAB is charged with, among other things, investigating possible corruption, criminality and serious misconduct among NYPD officers and civilians. IAB is also responsible for suggesting improvements to the NYPD's governance of it officers.

### A.  The NYPD Overview

3. The NYPD has about 35,000 uniformed members of the service, that is NYPD officers in all ranks, from Police Officer to Chief. All officers are empowered to make arrests. Most NYPD Officers are required to carry handguns and are authorized to use that firearm, if that becomes necessary in the course of the officer's duties.

4. Due to the responsibilities and powers invested in each NYPD officer, the NYPD closely regulates and monitors its officers.

### B.  Regulation of Police Officers And Fitness For Duty

5. Uniformed members of the police service are required to be fit for duty 24 hours per day. Patrol Guide ("PG") 203-04, entitled "Fitness for Duty," which is annexed hereto as Exhibit "B."

6. PG 203-04 provides that an officer must

   1. Be fit for duty at all times except when on sick report

   2. Do not consume intoxicants to the extent that member becomes unfit for duty.

Id.

7. The NYPD issued IO 9 on May 17, 2002, which is entitled "Department Policy Statement Concerning The Operation Of a Motor Vehicle While Under The Influence of Alcohol." A copy of IO 9, and IO 9-3 entitled "Conducting Ordered Breath Testing Of Uniformed Members Of The Service For The Presence Of Alcohol" both of which are annexed hereto as Exhibit "C."

8.  IO 9 refers to the requirement in PG 203-04 that NYPD officers not consume alcohol to the extent that they are unfit for duty and further provides that consistent with that regulation:

> any uniformed member of the service who causes physical injury to another person while operating a motor vehicle and is determined to be unfit for duty due to the consumption of alcohol will be terminated from the New York City Police Department, absent exigent circumstances.

Id.

9.  IO 9 also provides that any NYPD officer who is found to be driving while unfit for duty due to alcohol consumption will, at the least, be placed on dismissal probation, which means that the officer can be terminated during the probationary period without a hearing or further process. Id.

10.  The officer placed on dismissal probation will be subject to breathalyzer testing while on duty. Under the procedures for an NYPD officer in this position, a breathalyzer test above .02 is cause for a further, more sensitive test, on an "Intoxilyzer." If the officer tests above .04 there will be a presumption that the officer is unfit for duty. Id.; IO 9-3, which is also annexed as part of Exhibit "C."

11.  IO 9 also provides information for the officer who may be experiencing trouble with alcohol including confidential assistance units, including the Counseling Service Unit, emphasizing the Counseling Unit's confidentiality. The NYPD's goal is stated in IO 9 as

> early detection and referral of personnel for evaluation and treatment *before* drinking causes problems in work performance or worse.

Id. (emphasis in original).

12. In the event that a NYPD officer believes that he or she may be in a position where alcohol may be consumed while off-duty, the officer is required to take precautions to ensure that the officer does not become intoxicated while in possession of a firearm.

13. The officer can, for example, choose to place his or her firearm in a safety box which is locked to protect against misuse of the officer's firearm while off duty.

14. Officers are also subject to drug tests at a variety of times in the officer's career. First, the officer will be drug tested on entering into NYPD service as a probationary police officer. The officer will also be tested at the end of his or her probationary period.

15. An officer may also apply for various specialty assignments, such as an assignment in the NYPD's Organized Crime Control Bureau ("OCCB"). As part of the screening for OCCB the officer will be administered a drug test.

16. Drug tests may also be administered if there is reasonable suspicion that the officer has ingested a controlled substance. PG 205-30, entitled "Administration of Drug Screening Tests For Cause," which is annexed hereto as Exhibit "D."

17. In addition, all NYPD officers, of all ranks, are subject to random drug testing. NYPD officers are selected at random and without reasonable suspicion to provide samples for analysis for controlled substances. A copy of PG 205-29, entitled "Random Drug Screening" is annexed hereto as Exhibit "E."

18. Drug testing has a variety of goals. It protects the public from officers who may not be completely in control of themselves due to the use of controlled substances. Drug testing also protects the lives of fellow NYPD officers who rely on each other in life threatening situations which can arise suddenly, without warning, and which may require good

judgment under the most difficult of conditions. Drug testing also reinforces the public's confidence in their Police Department and the public's willingness to cooperate fully with that police department. That confidence and cooperation are essential to the mission of the NYPD.

19. The NYPD has long recognized that some NYPD officers may have problems with alcohol consumption. The NYPD maintains a Counseling Unit, which is concerned with possible alcohol abuse and officers may attend the Counseling Unit anonymously, that is, without telling any member of the NYPD.

20. NYPD officers may also be directed to the Counseling Unit for an interview under certain circumstances.

21. Unfortunately, the NYPD has also experienced a problem with officers being arrested for Driving While Intoxicated ("DWI"). In 2005, 10 off duty officers were arrested for alleged DWI. In 2006, 16 off duty officers were arrested for DWI. This year, to date, 12 NYPD off duty officers were arrested for alleged DWI.

22. Tragically, the NYPD has also experienced the suicide of a number of officers. From 2005-07 there were 10 suicides. With respect to 4 of those 10 suicides there was either alcohol present at the scene or a medical examiner's report found alcohol in the body of the deceased officer.

23. These statistics show that there are NYPD officers with alcohol problems that have resulted in illegal or life threatening behaviors. The risk to the public and to fellow officers from an NYPD officer who has an alcohol problem that is not under control is real and the NYPD has responded to that very real risk. These responses have included the use of the Counseling Service, described above, the requirement that officers be fit for duty at all times, and

a requirement that the firearms of a NYPD officer who is intoxicated be removed. See PG-204-08 which is annexed hereto as Exhibit "F."

24. The NYPD requires that firearms be removed from any member of the service that is intoxicated, either on or off duty. The removal prevents the officer from injuring him or herself or another and is preventive. See PG 206-12, ¶ 6, entitled "Removal of Firearms From Intoxicated Uniformed Member of the Service," which is annexed hereto as Exhibit "G."

C. **Firearms Discharges By NYPD Officers**

25. According to NYPD records, in 2004 there were 111 occasions on which an NYPD officer discharged his or her firearm, other than on the range. This figure includes on and off duty firings and incidents in which no one was injured and no property damaged. In 2005, the number of firearms discharges was 130, in 2006, the number was 119, and this year to date, 104 firearms discharges have occurred. While every firearm discharge that is not on the range is a very serious occurrence, it should be noted that the number of firearms discharges is relatively small considering the size and activity of the NYPD.

26. Every discharge of a firearm by a NYPD officer, whether on or off duty, that is not on a firearms range, is investigated under a firearms discharge procedure found in the Patrol Guide. See a copy of PG 212-29, entitled "Firearms Discharge By Uniformed Members Of The Service," a copy of which is annexed hereto as Exhibit "H," and PG 212-53, entitled "Command Responsibilities When A Person Dies Or Sustains A Serious Injury In Connection With Police Activity," which is annexed hereto as Exhibit "I."

27. Following the discharge of a firearm, a variety of superior officers and investigators will respond to the scene of the shooting, regardless of whether the shooting is on or off duty and regardless of whether an injury has resulted from the shooting. Those responding

will almost always include the Patrol Borough's "Shooting Team Leader" who is a Captain or above and who leads the initial investigation of any shooting. Id.

28. Included among these will be a ranking IAB officer. A superior office from the Patrol Borough in the command of occurrence will also respond, unless the incident occurs outside the City of New York.

29. A Chief or an Inspector who is on duty specifically to supervise such investigations, called the Duty Inspector or the Duty Chief, will respond to the scene and supervise the investigation into the firearms discharge.

30. The office of the District Attorney for the area in which the shooting occurred will be notified and that office may decide to have personnel respond to the shooting. PG 212-29, ¶ 8.

31. A community affairs officer will also respond to the scene of the shooting to determine whether the shooting will require extensive dialogue with the community to explain the actions of the NYPD's officer and to gauge community reaction at the time of the firearms discharge.

32. The NYPD also maintains a Trauma Counseling Program and that program can offer counseling to the officer or officers who are involved in a firearms discharge and who may, for example, be traumatized by the experience. The officer may also use, or be sent to, the NYPD's Psychological Services Division for evaluation. PG 212-29, ¶ 18(b) and 19.

33. In addition, all shootings are treated as part of a possible criminal investigation in recognition of the fact that criminal charges may result against the NYPD officer or a civilian involved in the shooting incident. Of course, whether criminal charges against anyone will result cannot be determined until the investigation is completed and that is why the

NYPD treats all firearms discharges as an investigation into a possibly criminal matter. Therefore, the Crime Scene Unit often responds to the scene of a shooting. PG 212-53, which is annexed hereto as Exhibit "I."

34. All shooting investigations include an initial report prepared by the Shooting Team Leader. Later, there will be a final report completed by a commanding officer, a review by a Borough Firearms Discharge Advisory Board and a final review by the Chief of Department's Firearms Discharge Review Board. A copy of a sample of such a report is annexed hereto as Exhibit "J."

35. The Shooting Team Leader will investigate and prepare an initial report concerning the discharge. The initial report will contain a narrative of the shooting based on the information obtained in their preliminary investigation

36. The officer or officers who fired their weapons will have those weapons examined and inspected. For example, the number of live and spent shells will be recorded. The ammunition possessed by the officer will be taken for safekeeping.

37. The initial report may also contain a preliminary evaluation, if possible, of whether the discharge was within NYPD guidelines. The report may also include a recommendation of whether corrective action or disciplinary proceedings should be initiated. See PG 212-29.

38. The initial report on the shooting will provide information concerning any arrests made, of civilians or of members of the NYPD, and will record the activities of the Crime Scene Unit, which often recovers and takes custody over physical evidence found at the scene such as spent shell casings and any weapon found that is not from the NYPD officer or officers. The Crime Scene Unit may also take photographs to record the physical layout of the scene.

39. The Commanding Officer of the Borough Investigation Unit or the precinct of occurrence prepares a follow up report within 90 days of the shooting, or as soon thereafter as possible. This report includes findings and recommendations, the Medical Examiner's report (if applicable), the ballistics report, a synopsis of the police officer's statements, and, if applicable, District Attorney or grand jury findings as well as IAB findings. Id.

40. A Borough Firearms Discharge Advisory Board reviews the incident and can sustain or alter findings and recommendations that were made earlier in the investigation. The Borough Firearms Discharge Advisory Board usually has approximately 7 members including one officer who is of the same rank as the officer who discharged his or her firearm. The remaining 6 members will be at or above the rank of Captain and will include the Commander of the Patrol Borough. Id.

41. The Borough Firearms Discharge Advisory Board prepares a report to the Chief of Department's Firearms Discharge Review Board that includes findings and recommendations.

42. The NYPD's Firearms Discharge Review Board is chaired by the Chief of Department and includes the Deputy Commissioner for Training, the Deputy Commissioner for Legal Matters, Chief of Personnel, an Operational Bureau Chief and the Commanding Officer of the Firearms and Tactics Section. Id.

43. The officer who discharges his firearm, whether on duty or off duty and regardless of whether the shooting is justified or not, will attend a tactics review session conducted by the NYPD. PG 212-29, at p. 8 of 9.

44. The Police Department follows the policy outlined above in all instances where a member of the service discharges his or her firearm, whether on or off duty and whether or not there has been an injury to a person resulting from the discharge.

45. From this brief overview of the procedure for investigating a firearms discharge, regardless of whether the discharge is on or off duty and regardless of whether there is an injury, it can readily be seen that the NYPD takes firearms discharges by NYPD officers with the utmost seriousness. The NYPD goes to great lengths to investigate the discharge, treat the scene as a crime scene to ensure prosecutions, and to assure the public and the NYPD's own officers that the truth of the shooting will be brought out and appropriate actions taken.

46. Appropriate action may be additional training of one or more officers. Appropriate action may also include disciplinary action against the officer or, in relatively rare circumstances, a criminal case.

D.  **The November 26, 2006, Shooting**

47. On November 26, 2006, an undercover operation at a club in Queens, New York, conducted by the NYPD's OCCB, ended in the shooting death of Sean Bell and the wounding of two companions as the result of shots fired by NYPD officers. Three of the NYPD officers were indicted by a grand jury with respect to the November 26, 2006, incident and they await a criminal trial.

48. Following the incident, a number of questions were raised by elected officials, the media and community leaders about various aspects of NYPD undercover operations.

49. It is into this most highly regulated environment that IO 52 has introduced breathalyzer test for all NYPD officer involved in a shooting which has caused injury or death to a person.

E.    IO 52

50.    In the wake of the tragic shooting death of Sean Bell and the wounding of two companions in November, 2006, the Police Commissioner convened a committee to review undercover operations procedures and make recommendations for improvements.

51.    I chaired the committee which included the Chief of OCCB, the Deputy Commissioner of Intelligence, the Deputy Commissioner for Training, the Deputy Commissioner for Strategic Initiatives, the Deputy Commissioner for Legal Matters, the Chief of Personnel, and the Chief of Community Affairs. The committee also included Dr. Cedric L. Alexander who is not a member of the NYPD and who was, at the time, the Deputy Commissioner of the New York State Division of Criminal Justice. Dr. Alexander is a former Chief of the Rochester, New York, Police Department, and is currently the Chief of Security for the Transportation Safety Administration in the Dallas/Fort Worth Airport.

52.    On June 18, 2007, the Police Commissioner announced 19 recommendations made by the Committee for Review of Undercover Procedures. The special panel made recommendations to improve how undercover officers are recruited, trained, supervised, and retained. In addition, the special panel recommended mandatory breathalyzer tests of all NYPD officers, on duty and off duty, whose firearm discharge results in injury or death. All 19 recommendations were disseminated to the public through a Police Department press release. The recommendation were announced on June 18, 2007, prior to the completion of the committee's report. The release of the recommendation preceded completion of the final report so that implementation of those recommendations would not be delayed. A copy of the Press Release, dated June 18, 2007, is annexed hereto as Exhibit "K."

53. The recommendations included a recommendation, number 10 of 19 recommendations, that NYPD officers be administered a breathalyzer test at the scene of a shooting which results in injury or death to a person.

54. On September 30, 2007, the Police Commissioner issued IO 52 entitled Alcohol Testing For Uniformed Members of the Service Involved in Firearms Discharges Resulting In Injury To Or Death Of A Person." A copy of IO 52 is annexed hereto as Exhibit "A."

55. The purpose of IO 52 is set forth in that regulation which states its "Purpose" as

> To ensure the highest levels of integrity at the scene of police involved firearms discharges which results in injury to or death of a person, or off duty, within New York City.

IO 52 ¶ "2," "Purpose."

56. IO 52 is only applied if

- there is a shooting;
- in New York City;
- by a uniformed member of the NYPD;
- resulting in injury or death;
- to a person.

57. IO 52 is in addition to, not in place of, the investigation of firearms discharges described above and in PG 212-29.

58. The procedures of IO 52 are applicable even when there is little or no risk of criminal prosecution as long as there has been a shooting by an NYPD officer in New York City that has injured a person. For example, where an officer accidentally discharges the

- 12 -

officer's weapon injuring the officer there is generally very little risk of criminal prosecution and yet IO 52 is to be followed in that situation. This situation is far from hypothetical. Indeed, there has been such an accidental discharge since IO 52 became effective and a breathalyzer was taken of that officer (who was not intoxicated).

59. It is my understanding that a breathalyzer test will not detect alcohol as of the shooting unless it is administered very soon after the shooting event. The information will be lost if not collected and preserved quickly. Therefore IO 52 requires that the breathalyzer test be administered at the scene in a way that maximizes the privacy of the officer to whom the test is administered.

60. The NYPD has experience in administering breathalyzer tests, especially in the NYPD's Highway Patrol Unit which administers breathalyzers to civilians who are suspected of driving while intoxicated.

61. Procedures in IO 52 will take advantage of this expertise to ensure that the breathalyzer is administered properly so that the results are reliable. The breathalyzer test itself takes about 5 minutes to perform.

62. Under the New York State Vehicle and Traffic Law ("VTL") an individual cannot drive while under the influence of alcohol and a score of .08 on a breathalyzer test indicates that the driver is under the influence. IO 52 incorporates the standard applied by the VTL.

63. If the officer scores less than a .08 no further testing is done. IO 52, ¶ "12."

64. If the officer scores a .08 or greater on the breathalyzer then further testing will be done to determine whether the officer is intoxicated. Id.

65. The officer scoring greater than .08 will be tested on an Intoxilyzer by the Highway Patrol District's Intoxicated Driver Testing Unit ("IDTU") which has experience in administering that test. The Intoxilyzer is a more sensitive testing instrument for the assessment of alcohol consumption.

66. The results of the alcohol testing may result in discipline of the officer who has been involved in a shooting while under the influence of alcohol. The results may also be used in the criminal investigation of the shooting.

67. IO 52 also notes that "Members should be aware that it would be prudent not to ingest alcoholic beverages up to four (4) hours prior to the commencement of their tour of duty." IO 52 at p. 3 of 4.

68. The NYPD has recognized that some NYPD officers may be experiencing problems with alcohol. Those problems may manifest themselves in being unfit for duty, either on duty or off duty. The alcohol problem may also manifest itself in a more extreme manner like a DWI arrest or, tragically as a possible factor in the suicide of an officer. The NYPD recognizes its obligation to the public and to fellow NYPD officers by requiring fitness for duty and the removal of weapons of an intoxicated officer. The NYPD also recognizes its duty to the officer by providing counseling services on a confidential basis and encouraging the use of those services.

69. The NYPD also recognizes that public confidence in the NYPD is critical to the accomplishment of the NYPD's mission of preserving and protecting the health, safety and welfare of the public. The possibility that a NYPD officer might be involved in a shooting while under the influence of alcohol undermines that trust and risks the integrity of the NYPD.

70. IO 52 serves the NYPD's interests in

- protecting the integrity of the NYPD,

- protecting the safety of the public and NYPD officers,

- deterring alcohol intoxication by NYPD officers who are carrying firearms,

- assuring the public that one of the most important and daunting powers of the police, the power to apply deadly force when necessary, is not being abused or used by officers who are under the influence of alcohol.

Any use of the results of the testing in criminal cases will be an added effect of the testing's primary purpose of ensuring that NYPD officers entrusted with the immense power of carrying and using a firearm do not misuse that authority.

For all of the above reasons, defendants respectfully request that plaintiffs' motion for a preliminary injunction prohibiting the continued enforcement of IO 52 be denied and that the complaint be dismissed.

Dated:     New York, New York
           November __7__, 2007

_____
CHARLES V. CAMPISI