07 Civ. 9246 (GBD)(MGD)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL J. PALLADINO, as President of the New York City Detectives' Endowment Association, Inc., et al.

Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**MICHAEL A. CARDOZO**
*Corporation Counsel of the City of New York*
Attorney for Defendants
100 Church Street, Room 2-187
New York, NY 10007-2601
Tel: 212-788-0952

**ALAN M. SCHLESINGER,**
Of Counsel

Matter No.: 2007-031620

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 3

ARGUMENT ....................................................................................................... 6

POINT I ............................................................................................... 6

THE COMPLAINT FAILS TO STATE A CLAIM
AND MUST BE DISMISSED. .................................................. 6

A.   The Fourth Amendment And Special Needs ...................................... 6

B.   IO 52 Is Not "Void For Vagueness." ................................................ 21

POINT II ........................................................................................... 24

THE PRELIMINARY INJUNCTION MUST BE
DENIED............................................................................... 24

CONCLUSION.................................................................................................. 28

## PRELIMINARY STATEMENT[1]

Plaintiffs bring this complaint challenging NYPD Interim Order 52 ("IO 52"), which requires that a breathalyzer test be administered to any NYPD officer who is involved in a shooting that results in injury or death to a person in New York City.  Plaintiffs contend that the breathalyzer is an unconstitutional search and that IO 52 is unconstitutional as "void for vagueness."  Plaintiffs move for a preliminary injunction prohibiting enforcement of IO 52.

Defendants now move to dismiss the Complaint, or in the alternative for summary judgment, and oppose the motion for a preliminary injunction.  IO 52 requires that a breathalyzer test be administered under certain narrowly defined circumstances; there must be shooting off the range, in New York City, that injures a person.  This regulation falls squarely within the "special needs" doctrine of the Fourth Amendment and is therefore constitutional.  The search is not primarily for purposes of a criminal investigation but to fulfill the NYPD's important needs.  Among those needs is the NYPD's duty to ensure the integrity of shootings by NYPD officers who have been invested with the power to apply deadly force in the course of their duties.  The NYPD also has a duty to the public and to other officers to assure that NYPD officers are not engaging in deadly force while

---

[1] IO52 is challenged in two cases to date: (1) by the Detectives Endowment Association, the Sergeants' Benevolent Association and the Lieutenants Benevolent Association, unions representing NYPD officers in the ranks of Detective, Sergeant, and Lieutenant in <u>Palladino v. City of New York</u>, 07 Civ. 9246 (GBD)(MGD); and (2) by the Patrolmen's Benevolent Association which represents NYPD in the title of Police Officer in <u>Lynch v. City of New York</u>, 07 Civ. 9337 (GBD)(MGD).  Defendants are the same in both cases.  Both suits contend that IO 52 violates the Fourth and Fourteenth Amendments, although <u>Palladino</u>, adds a "void for vagueness" claim.  Defendants therefore requests that if the complaints in these two cases survive defendants motion to dismiss that they be consolidated for all purposes. Similar papers are being filed in each case, the main difference being that the void for vagueness challenge in <u>Palladino</u> is not present in <u>Lynch</u>, and thus, defendants' memorandum in <u>Lynch</u> does not address that argument.

intoxicated. IO 52 will also deter the use of alcohol on duty and immediately prior to the officer going on duty as well as handling their weapons while off duty. These important, non-criminal needs are all served by the breathalyzer test required by IO 52.

In applying a balancing test required by the special needs doctrine, the breathalyzer test represents a minimal invasion of the already very limited privacy rights of officers. NYPD officers are subject to random testing and are required to be fit for duty in all but narrow circumstances. They are required to safeguard their weapon whenever they may be in a position where alcohol may be consumed. Moreover, every firearms discharge is subject to rigorous investigation and multiple reviews. The breathalyzer is non-intrusive, takes about 5 minutes and IO 52 requires that the test be performed under circumstances that are sensitive to the privacy of the officer. The test is automatic if the criteria in IO 52 are met and this is a bulwark against arbitrary and discriminatory actions. It also serves the purpose of removing any possible stigma that might otherwise adhere to the administration of a breathalyzer test.

NYPD officers are invested by the government with the awesome power of carrying and using deadly weapons. The government has a responsibility to do all it can to make sure that this awesome authority is used wisely and well. In short, in the very narrow circumstances of the instant case, and in view of the awesome authority exercised by officers, the concomitant lessening of their already limited privacy interests especially when they have taken positive action to exercise that awesome authority, and the needs of the public and other officers, the breathalyzer test under IO 52 is reasonable under the Fourth amendment. This is an end to plaintiffs' claim of unconstitutionality and the Complaint must be dismissed.

In the event that some part of the Complaint survives defendants' motion to dismiss, or in the alternative for summary judgment, plaintiffs' motion for a preliminary injunction must be denied.  There is no likelihood of success on the merits of the Complaint and thus, the test for a preliminary injunction has simply not been met.

## STATEMENT OF FACTS[2]

The NYPD is an agency of the City of New York ("City") charged with the protection of the public's safety, health, and property.  In view of this authority, officers of all ranks in the NYPD are required to carry guns and to use deadly force in certain circumstances in the course of their duties.  In recent years there have been between 110 and 130 firearms discharges by NYPD officers each year.  When an NYPD officer discharges his gun, that use is thoroughly and laboriously investigated and reviewed by the NYPD.  There will be an initial report by a Shooting Team Leader which will include information concerning the officers involved, the results of a canvass for witness to the shooting, results of the activity of the Crime Scene Unit, a record of the NYPD notice to the District Attorneys' office and their response, a narrative of the results of the preliminary investigation and recommendations for training, discipline or in rare cases criminal investigation.  The shooting will be reviewed by the Borough Firearms Advisory Board and thereafter by the NYPD's Firearms Discharge Review Board, a citywide board consisting of a variety of Chiefs and Deputy Commissioners of the NYPD.

IO 52, which was issued September 30, 2007, requires that a breathalyzer test be administered whenever an NYPD officer is involved in a shooting that causes injury or

---

[2]For a more detailed statement of facts the Court is respectfully referred to the Declaration Charles V. Campisi, dated November 7, 2007, and the exhibits annexed thereto, and to the Declaration of Suzanne Gimblet, dated November 6, 2007.  All references to exhibits are to the exhibits annexed to the Campisi Declaration.

death to a person in New York City. IO 52 does not require that a warrant be issued or that there be individualized reasonable suspicion to support the breathalyzer test.

Prior to the issuance of IO 52, NYPD officers were already subject to a variety of restrictions. They were required to submit to drug tests when they enter the NYPD and during their probationary period. NYPD officers are randomly drug tested throughout their NYPD career. In addition, NYPD officers are required to be fit for duty and drug and breathalyzer tests can be ordered for NYPD officers who appear unfit for duty. If an officer believes that he or she may be in a position where alcohol is consumed it is the responsibility of that officer to safeguard the officer's weapon so that the officer is not in possession of a weapon while intoxicated. The NYPD has published a regulation devoted just to the removal of firearms of officers that are unfit for duty due to alcohol consumption.

The NYPD has long had a Counseling Unit which is devoted solely to addressing the alcohol problems of NYPD officers. Officers who appear to have an alcohol problem can be ordered to attend an interview at the Counseling Unit and officers can go to that unit on their own. From 2005-07 the Counseling Unit conducted 380 new interviews of officers, that is, interviews of officers not previously seen by the Counseling Unit. There are 35,000 NYPD officers and the number newly seen by the Counseling Unit therefore represents over 1% of all NYPD officers.

Despite these efforts the NYPD has experienced serious alcohol related problems. There have been 6 suicides from 2005 to present and of these 4 had indicia indicating alcohol use. There have been repeated arrests of officers for driving while intoxicated ("DWI"). In 2005, 10 off duty officers were arrested for alleged DWI. In 2006, 16 off duty officers were arrested for DWI. This year, to date, 12 NYPD off duty officers

were arrested for alleged DWI. Thus, NYPD officers have engaged in illegal and life threatening conduct in connection with alcohol use.

In November, 2006, undercover officers of the NYPD engaged in an on duty shooting that resulted in the death of Sean Bell and the wounding of two companions. Three officers have been indicted in connection with this tragic incident. Rumors circulated that an officer involved had been drinking at a club just prior to the shooting. In the wake of the Sean Bell shooting, the Police Commissioner appointed a high level committee to review undercover operations. The committee, chaired by Chief Charles V. Campisi, who has served for more than a decade as Chief of the NYPD's Internal Affairs Bureau ("IAB"), produced 19 recommendations which were announced in June, 2007. The recommendations were announced prior to the completion of a final report so as not to delay the implementation of the recommendations.

Number 10 of the 19 recommendations was the administration of breathalyzer tests at shootings. A breathalyzer measures alcohol in air exhaled by the individual officer and this information will be lost if the test is not performed soon after the shooting. This recommendation led to the promulgation of IO 52, which requires that a breathalyzer test be administered to any officer involved in a firearm discharge, off the range, in New York City which causes injury to a person. IO 52 uses a cut-off of .08 for the breathalyzer test, which is the limit used in the New York Vehicle and Traffic Law.

IO 52 serves the NYPD's interest in maintaining the integrity of police use of firearms. It will also help assure the public and fellow officers that officers are not discharging their firearms under the influence of alcohol. This will maintain public confidence in the NYPD, which is essential to its mission of serving and protecting the

public.  IO 52 will also deter officers from using alcohol on duty or immediately prior to a tour of duty.  The NYPD does not guarantee that the test will not also be used in a criminal investigation but IO 52 is applicable whenever there is a shooting resulting in injury to a person regardless of whether a criminal investigation ensues.  For example, if an officer accidentally shoots him or herself in New York City, there may be little or no risk of criminal prosecution but IO 52 will be invoked in that situation.  This is not a mere hypothetical but has already occurred in the month since IO 52 became effective.

## ARGUMENT

### POINT I

### THE COMPLAINT FAILS TO STATE A CLAIM AND MUST BE DISMISSED.

**A.     The Fourth Amendment And Special Needs**

The Fourth Amendment to the Constitution prohibits "unreasonable searches and seizures."  U.S. Const. Fourth Amend.  It is by now well-established that the "special needs" doctrine of the Fourth Amendment permits searches without a warrant and without individualized suspicion.  See Cassidy v. Chertoff, 471 F.3d 67, 74-75 (2d Cir. 2006) (reviewing cases); see also Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656 (1989); Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602 (1989); MacWade v. Kelly, 460 F.3d 260 (2d Cir. 2006).  Special needs searches are reasonable under the Constitution. Id.

The special need must be a need beyond general need of ordinary law enforcement although law enforcement may be an additional, or secondary beneficiary of the special needs search.  See, e.g., Illinois v. Lidster, 540 U.S. 419 (2004)(upholding highway checkpoint stops erected to seek information from public); Skinner, 489 U.S. at 620-21, and

n. 5; MacWade, 460 F.3d at 264, (random, unpredictable subway searches upheld against the Fourth Amendment; primary purpose is to deter terrorists and secondary purpose is to uncover such an attempt); United States v. Edwards, 498 F.2d 496, 500-01 (2d Cir. 1974)(purpose of airport search is deterring hijacking).

The application of the special needs doctrine under the Fourth Amendment necessarily requires a context-specific inquiry. Cassidy, 471 F.3d at 75.  It requires that the privacy interests which are protected by the Fourth Amendment be balanced against the public interests advanced by the search. Id.; see Von Raab, 489 U.S. at 665-66.  The Second Circuit has established a three-pronged test to be used in conducting this balancing:

> (1) the nature of the privacy interest involved; (2) the character and degree of the governmental intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs.

Id.

Turning to the first prong of the special needs test, NYPD officers are perhaps the most import public safety agents of the government and have diminished expectations of privacy.  Simply put, a police officer is not like other employees of the government.  Police officers wear uniforms and carry guns.  They possess imposing powers and enormous discretion and are invested with the authority to make arrests and to use deadly force in the course of their duties.  The importance of the police in society cannot be overestimated.  Concomitantly, the police have always been the subjects of the most exacting scrutiny and regulation.  For example, the Supreme Court has approved the regulation of the grooming of police officers.  Kelley v. Johnson, 425 U.S. 238 (1978)(noting that police offices are subject to restraints that would be unconstitutional if applied to other government employees).  Kelley recognizes that police departments acting as employers have broader discretion in the

- 7 -

direction of their employees than would be permitted in the general regulation of society. Here, too, in requiring the breathalyzer test at issue the NYPD acts as employer and not just simply as a criminal investigation agency. In <u>Von Raab</u>, the Supreme Court in evaluating a urine test held that Customs officials have a diminished expectation of privacy by virtue of the fact that they carry guns. 489 U.S. at 671("We think Customs employees ... who are required to carry firearms in the line of duty likewise have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test."). The same is true of NYPD officers here, although the intrusion of a breathalyzer is less than that of the urine test approved in <u>Von Raab</u>.

New York's courts have long recognized that police discipline requires special sensitivity. Unlike the system for disciplining civilian employees, police discipline is a matter left to the discretion of the Police Commissioner and is not subject to the normal constraints of the disciplinary process established for civilian employees. <u>Compare</u> N.Y.C. Admin. Code §§ 14-114, <u>et</u> <u>seq.</u>, <u>with</u> N.Y. Civil Service Law § 75; <u>Montella v. Bratton</u>, 93 N.Y.2d 424, 691 N.Y.S.2d 372, 713 N.E.2d 406 (1999); <u>Pell v. Board of Education</u>, 34 N.Y.2d 222, 56 N.Y.S.2d 833, 313 N.E.2d 321 (1974)(distinguishing the discretion afforded heads of civilian agencies from those of the heads of police agencies). The discretion accorded the Police Commissioner in imposing discipline on the members of the police service has been exceptionally broad under New York law. <u>See</u> <u>Trotta v. Ward</u>, 77 N.Y.2d 827, 828, 566 N.Y.S.2d 199, 567 N.E.2d 241 (1991); <u>Lynch v. Giuliani</u>, 301 A.D.2d 351, 359, 755 N.Y.S.2d 6, 14 (1st Dep't 2003) )("The Commissioner's powers over police discipline arise out of the fact that it is he or she 'and not the courts, [who] is accountable to the public for the integrity of the Department'")(citations omitted).

An NYPD officer is required to be fit for duty at all times except for certain specified occasions. Campisi Decl. ¶ 6. The officer is also required to avoid drinking to the extent that the officer becomes intoxicated even while off duty. Id. If the officer believes that he or she may be drinking alcohol the officer is required to take precautions to safeguard his or her weapon to ensure that they do not carry a firearm while intoxicated. Id.

Drug testing is a constant companion for the NYPD officer. Upon entering the City's police force, the new officer is required to take a drug test. Campisi Decl. ¶ 14. During the officer's probationary period the officer will again be drug tested. Id. An NYPD O\officer applying to special commands, such as the NYPD's Organized Crime Control Bureau ("OCCB"), must pass a drug test as part of the application. Id. ¶ 15. Additionally, throughout their careers, NYPD officers are subject to a program of random drug tests in which tests are done without warrant or individualized suspicion. Id. ¶ 17; see Von Raab 489 U.S. at In this case, plaintiffs challenge IO 52's requirement of a breathalyzer tests occurring after a shooting has caused injury, while NYPD officers are subject to random drug tests, without a triggering event, a warrant, or individualized suspicion. Thus, the privacy expectations of those who serve the public in their police force are, as can be readily seen, highly diminished.

Moreover, nowhere is the expectation of privacy lower than at the scene of a firearm discharge by a NYPD officer. In recent years, there have been between 110 and 130 firearms discharges by NYPD officers each year and the NYPD has elaborate and detailed procedures for addressing each such a shooting incident. Campisi Decl. ¶ 25. Each firearm discharge, whether on or off duty, that is not on the range is investigated by a "Shooting Team Leader," who holds the rank of Captain or above. Campisi Decl. ¶¶ 26, et seq.;

Civilian witnesses are sought out and asked for their accounts of the shooting.  The officer who fired will be asked for a statement as will the officers involved.  The weapons and ammunition of the officers will be examined.  A crime scene unit may respond as may an officer from the NYPD's Internal Affairs Bureau ("IAB").  The District Attorney's office will be notified and may, in their discretion, send personnel to the scene.  Community affairs officers will also be present to determine whether the shooting will require extensive dialogue with the community to explain the actions of the NYPD's officer and to gauge community reaction.  The Patrol Borough will also respond with superior officers.

Each firearm discharge results in detailed reports; an initial report prepared soon after the shooting and a later final report.  The <u>initial</u> report is extremely detailed recording statements, noting the presence of various officers and superior officers at the scene, and reporting their activities.  <u>See</u> Campisi Decl. ¶ 25, <u>et seq.</u>; a sample initial report Exhibit "J."  The initial report may indicate whether the shooting was within NYPD guidelines and whether there should be re-training or discipline of the employee.  The initial report may also indicate whether there is a criminal investigation arising from the incident.  The officer and his or her history at the NYPD may be reviewed as well.

The firearms discharge will be reviewed at the borough level by the Borough Firearms Discharge Advisory Board and at the Citywide level by the Firearms Discharge Review Board.  The Firearms Discharge Review Board is a very high level board chaired by the Chief of Department, and includes representatives of the Deputy Commissioner for Training, the Deputy Commissioner for Legal Matters, Chief of Personnel, an Operational Bureau Chief and the Commanding Officer of the Firearms and Tactics Section.  Each

- 10 -

firearms discharge is subject to intense scrutiny and high level review and where criminal activity is suspected there is additional review by IAB and the District Attorney.

In sum, as a general matter, a police officer has a very limited expectation of privacy. Searches of officers have become necessary to ensure the integrity of the NYPD, including random drug tests of officers. Such tests ensure the public and other officers that the critical powers of the NYPD's officers are being used wisely and well. The tests also deter wrongful actions by uniformed members of the police service. That expectation of privacy is, if possible, even more restricted at the scene of a shooting. In this context, the NYPD officer has used, intentionally or accidentally, one of the most important powers granted to a government official, the power to use deadly force. The discharge of a firearm engenders a quick and massive reaction by the NYPD, which is outlined in the declaration of Charles V. Campisi, Chief of IAB who was also the chair of the committee that reviewed undercover operations in the wake of the Sean Bell shooting. As can be seen by that committee, the NYPD is continuing to review and evaluate its firearms procedures to ensure that all that should be done is being done and to assure the public of the integrity of those shootings. The privacy interests of the officer are safeguarded to the extent consistent with both the breathalyzer test and the need to perform that test as soon as possible after the shooting to capture the information sought – whether the officer was fit for duty at the time of the shooting.

Turning to the second of the three-pronged test of the "special needs" doctrine, the intrusion here is quite minimal, especially considering the already diminished expectation of privacy of NYPD officers in general and those involved in a shooting which causes injury in particular. The setting for the intrusion is the "triggering" event, a shooting

by an NYPD officer in the City which results in injury or death to a person. The NYPD officer involved in a shooting is well aware that he or she will be the subject of intense scrutiny concerning the firearms discharge; such scrutiny was thorough and laborious even prior to the issuance of IO 52. One need only review the Patrol Guide regulation existing prior to the issuance of IO 52 to know that the officer has ample warning of this intense scrutiny.

The NYPD already requires that the officer be fit for duty at all times and prohibits the possession of a gun while impaired by alcohol. See Skinner, 489 U.S. at 621 (noting similar restrictions on railroad workers). The added intrusion here is a breathalyzer test, which is minimally intrusive and takes about 5 minutes of time to perform. Campisi Decl. ¶ 61. It involves blowing air into a machine from the officer's lungs. It captures information that will be lost over time and the test must be administered as soon after the shooting as possible. The test will be administered in a manner which provides the officer with as much privacy as can be practically provided under the circumstances. The intrusion here is minimal, about 5 minutes of time and the deep breathing is a function akin to normal breathing which, of course, takes place in public. See Skinner, 489 U.S. at 623 ("…blood and breath samples taken to measure whether these substances were in the bloodstream when a triggering event occurred must be obtained as soon as possible.")(citation omitted).

Under IO 52, the breathalyzer test will be used at all shootings by NYPD officers that result in injury to a person in New York City. There is no discretion and therefore no leeway for arbitrary action or discrimination. See Skinner, 489 U.S. at 622(a purpose of the Fourth Amendment's warrant provision is to avoid arbitrary acts by government); Von Raab, 489 U.S. at 667. Indeed, the standard for intoxication is that

provided by the New York's Legislature for DWI.  See N.Y. Veh. & Traffic L. § 1192; IO 52, ¶ 12, Exhibit "A."

A breathalyzer test is mandatory and routine under the narrow circumstances described in IO 52, thereby eliminating any possible stigma that might arise from that test.  In Cassidy, the Second Circuit noted that the application of a special needs search to everyone relieves all those searched of any stigma that might attach to the search.  471 F.3d at 80. NYPD officers already have notice of the intensive investigation that attends all firearms discharges and will expect the breathalyzer test in the context of this intensive investigation. They are provided notice of the circumstances of the routine and mandatory breathalyzer test at shootings - just as they now expect random drug testing and just as they expect the intense investigation surrounding a shooting.  In addition, IO 52 is at pains to make sure that the privacy of the NYPD officer is protected to the extent possible.  IO 52 provides that the breathalyzer will be used "in a private setting …"  IO 52 t ¶ 10, Exhibit "A."

In sum, in reviewing the nature and character of the breathalyzer test here it can be said, as it was said of similar tests in somewhat similar conditions in Skinner, that

> Both the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically in the regulations that authorize them, and doubtless are well known to covered employees. **Indeed, in light of the standardized nature of the tests and the minimal discretion vested in those charged with administering the program, there are virtually no facts for a neutral magistrate to evaluate**.

489 U.S. at 622 (citation omitted)(emphasis supplied).

The third prong of the three-pronged test looks at the needs of the government and whether the search at issue meets the government's needs.  In the case at bar, the

government's needs would appear to be self-evident.  The police are entrusted with the power to use deadly force in the course of their government employment.  The NYPD has the duty to make sure that this unparalleled power is used wisely and well.  The purpose of IO 52, include:

- protecting the integrity of the NYPD,

- protecting the safety of the public and NYPD officers,

- deterring alcohol intoxication by NYPD officers who are carrying firearms,

- assuring the public that one of the most important and daunting powers of the police, the power to apply deadly force when necessary, is not being abused or used by officers who are under the influence of alcohol.

Campisi Decl. ¶ 70.

On November 26, 2006, undercover NYPD officers shot and killed Sean Bell and wounded two companions.  Following the shooting a number of questions were raised by the public about various aspects of NYPD undercover operations.  Campisi Decl. ¶¶ 47 and 48.  Three NYPD officers were indicted in connection with the shooting of Sean Bell and they await a criminal trial.  In the wake of this tragic shooting, a committee was formed of very high level NYPD officials to review undercover operations procedures and make recommendations for improvements.  This high level committee issued 19 recommendations which were adopted by the Police Commissioner in June, 2007.  <u>See</u> Press Release with recommendations, Exhibit "K."   The importance of these recommendations is amply witnessed by the decision to issue the recommendations before the formal report was issued,

so that implementation of the recommendations would not be delayed. Campisi Decl. ¶ 52. Number 10 of these 19 recommendations was that NYPD officers be tested when involved in a shooting and this was the genesis of IO 52.

Prior to the promulgation of IO 52, NYPD officers were required to be fit for duty at all times, with certain exceptions. Campisi Decl. ¶¶ 5 and 6; PG 203-04, Exhibit "B." The fitness regulation warns officers not to become intoxicated. Id.. Officers are required to safeguard their weapons and cannot carry them if they are going to be in a position where they are going to be drinking so that the officers do not possess guns while intoxicated. Id. ¶¶ 12, 13, and 23; PG-204-08, ¶ 2(e). Regulations have been promulgated that concern the removal of firearms from NYPD officers who are intoxicated. Id. ¶ 23; and PG 206-12, "Removal of Firearms From Intoxicated Uniformed Member of the Service," Exhibit "G."

Despite these regulations, there have 38 arrests of NYPD officers for driving while intoxicated in the period 2005 to present. Campisi Decl. ¶ 22. The NYPD treats such arrests extremely seriously. Those officers who are found to be driving while unfit for duty due to alcohol will be placed on dismissal probation which permits termination without a hearing or further process. Id. ¶ 10. While on dismissal probation, the officer will be tested for alcohol while both on and off duty. Id.; IO 9-3, a part of Exhibit "C." Those who cause injures another person while driving under the influence of alcohol will be terminated from the NYPD absent extraordinary circumstances. Id. ¶¶ 7-9; IO 9 a part of Exhibit "C."

Tragically, in addition to the DWI arrests, there have been 10 suicides in the period 2005 to present and of those 4 occurred where there was alcohol at the scene or a medical examiner found alcohol in the body. Campisi Decl ¶ 22. The DWI arrests and the

suicides prove that there are NYPD officers with drinking problems have engaged in illegal and life threatening behavior. Id. ¶ 23.

The NYPD has long had a Counseling Unit created to address concerns of alcohol abuse by NYPD officers. Officers may be sent to the Counseling Unit or they may visit the unit on their own. In either case it is because they may have an alcohol abuse concern. See Gimblet Decl. ¶ 3. During the years 2005- to present, the Counseling Unit has conducted approximately 600 interviews. Of these, about 380 have been of NYPD personnel who have never been seen by the Counseling Unit before, that is, new interviewees. Id. 9. There are approximately 35,000 NYPD officers and statistically the 380 new interviews amounts to more than 1% of the entire force. Thus, there is ample evidence of alcohol problems by NYPD officers and there is ample evidence that some of those alcohol problems have manifested themselves in illegal and life threatening behaviors.

While plaintiffs argue that there has been no proof that there is a relationship between shootings and alcohol, they do not contend that the NYPD is without significant alcohol problems. Rather, they confine themselves to demanding proof that there have been shootings by officers who were unfit for duty due to alcohol consumption. See Skinner, 489 a6 607-08 ("railroads were able to detect a relatively small number of Rule G violations, owing, primarily, to their practice of relying on observation by supervisors and co-workers to enforce the rule.")(citation omitted). This same sort of argument, that the testing will not catch many employees was made by the employees in Von Raab, and soundly rejected by Supreme Court. 489 U.S. at 673-74. Moreover, the absence of a breathalyzer test means that there was less information collected concerning prior shootings by NYPD to definitively determine that there was no alcohol involvement. Needless to say the NYPD hopes that the

breathalyzer tests administered under IO 52 will <u>always</u> show the NYPD officers to have been fit for duty during the shooting.  However, IO 52 breathalyzer tests demonstrating fitness for duty are important to the NYPD.  The test demonstrates maintains the integrity of the shooting.  <u>See</u> <u>Von Raab</u>, 489 U.S. at 670, 671 (describing the government's interest in maintaining unimpeachable integrity of Customs officers carrying guns to be a "compelling interest.").  Testing assures the public and the NYPD's own officers that the NYPD officer involved in a shooting which injures someone was not under the influence of alcohol.  Such assurances have enormous value in and of themselves.

    The Supreme Court has often recognized the reliance by police on the cooperation of the public.  <u>See</u> <u>Lidster</u>, 540 U.S. at 425 (and cases cited therein).  To maintain the cooperation of the public, the police must be seen as part of and a shield for the community it serves and protects.  <u>See</u> <u>Pappas v. Giuliani</u>, 290 F.3d 143, 149-50 (2d Cir. 2002)(statements by a police officer that undermine public confidence in the police force and the confidence of police officers in one another are disruptive to the NYPD's mission and not protected by the First Amendment).  The NYPD relies on the confidence and cooperation of the public and anything that undermines that confidence endangers the NYPD's mission.  <u>Id.</u>.  For example, in <u>Pappas</u> the NYPD terminated a police officer who sent racist screeds to persons outside of New York City.  The Second Circuit noted that these writings had the capacity "to harm the effective functioning of the employer's enterprise."  290 F.3d 149.  The writings also had the capacity to degrade the relationship of the writer with his fellow officers, which would also harm the NYPD's effectiveness.  <u>Id.</u>  The capacity for harm to the NYPD's mission justified the termination of the police officer despite what might otherwise have been viewed as First Amendment protected speech.  <u>Id.</u>

The same may be said here as was said by the Second Circuit in Pappas and has been said many times before by the Courts.  Public confidence is critical to the NYPD's mission and the integrity of shootings is integral to the public confidence.  Where there is any doubt as to the sobriety of an officer who injures a person (including him or herself) in a shooting, the confidence of the public in the NYPD can be seriously damaged.  Other NYPD officers may also be concerned that the shooting was unjustified and the officer who fired unreliable.  To forestall these damages to public and police confidence, the NYPD must demonstrate that those NYPD officers who discharge their weapons and injure a person are fit for duty when they do so.  See Von Raab, 489 U.S. at 671 (with respect to U.S. Customs employees the "public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force.").

The test may also deter any officer who might be tempted to go on duty or to use his or her weapon after having been drinking.  IO 52 recommends that the officer not drink during the four hours immediately preceding the officer going on duty.  This is in keeping with the requirement that officer always be fit for duty.  An officer who is under the influence of alcohol is a danger to him or herself as well as to fellow officers.  The possibility of a breathalyzer will deter officers from taking any chances with their alcohol consumption and this will help ensure the safety of the public and fellow officers.  Here, as in so many of the special needs cases, the search has as its "immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation."  MacWade, 460 F.3d at 268(quoting Nicholas v. Goord, 430 F.3d 652, 663 (2d Cir. 2005)).  This separate objective

of the NYPD more than justifies the invocation of the special needs doctrine in vindicating the constitutionality of IO 52.

Plaintiffs seem to be saying that the special needs doctrine cannot support the promulgation of IO 52 because the results of the breathalyzer test may be used in a criminal proceeding.  This contention must be rejected outright.  First, as noted above, the possible use of the results of a breathalyzer in a criminal case is not determinative, or even indicative, of the test's constitutionality.  In <u>Skinner</u>, the results of a breathalyzer could have been used in a criminal prosecution and yet the Supreme Court held that they were constitutional.  489 U.S. at 620-21, and n. 5.  Indeed, in <u>Skinner</u>, the Court held that there was no proof that the drug and alcohol tests were pretexts for assisting criminal prosecutions and resolved to leave such issues as pretext for another day.  <u>Id.</u>  Similarly, in <u>MacWade</u> and <u>Cassidy</u>, the Second Circuit approved random searches designed to deter terrorism even though the results of the search could have been used in a criminal prosecution.

Further, IO 52 applies to an accidental shooting with no real risk of criminal prosecution.  Campisi Decl. ¶ 10.  Indeed, in the month since IO 52 promulgation on September 30, 2007, there has been an accidental shooting by an NYPD officer and the officer whose firearm discharged was injured.  <u>Id.</u> ¶ 58.  A breathalyzer test was administered under IO 52 to that officer.  <u>Id.</u>  This is proof positive that the purpose of IO 52 is not simply for the purpose of gathering evidence for a criminal investigation but is, rather, to maintain the integrity of police shootings in the City, ensure the public and the NYPD's officers that the authority to use deadly force is not being abused by officers involved in a shooting.

The search in the instant case is closely analogous to the search found reasonable and constitutional in <u>Skinner</u>.  There as here the employees were highly regulated

public safety personnel. However, there is no evidence in <u>Skinner</u> that the railroad employees were subject to random drug testing as are the NYPD officers. The privacy interests of NYPD officers are, if anything, even more limited than those of the railway employees of <u>Skinner</u>. Here the employees are NYPD officers who are employees of the government and are invested with power and discretion by the government, while in <u>Skinner</u> the employees were private employees subject to a government impelled search.

The testing in <u>Skinner</u> was triggered by an accident and here the testing is triggered by certain firearms discharges. In <u>Skinner</u> there was a history of alcohol abuse. Here there is a history of alcohol abuse in the NYPD, even though there is no history of alcohol involvement in shootings other than suicides. In <u>Skinner</u>, the needs justifying the testing, which was not limited to a breathalyzer, was the integrity of the railroad and the confidence of the public in the railways. Here the need justifying the search, which is restricted to a breathalyzer, is the integrity of shootings by the NYPD and confidence in the City's police force. In both <u>Skinner</u> and the instant case testing program was expected to deter alcohol use on duty or immediately prior to duty. In both <u>Skinner</u> and the instant case, the information sought, whether there was alcohol use at the time of the incident, would be lost absent an immediate breathalyzer test and the incident triggering the test was narrowly defined in the regulation. Thus, here as in <u>Skinner</u> the breathalyzer constitutes a special needs search which is reasonable under the Fourth Amendment and constitutional.

The diminished expectation of privacy of NYPD officers, especially those involved in a shooting which injures another, is critical in making the balance under the special needs doctrine. See <u>Board of Education v. Earls</u>, 536 U.S. 822, 831 n. 3 (2002) (public school student's limited privacy interest was "a hefty weight on the side of the

school's balance" in evaluating special needs).  The breathalyzer is a limited intrusion on the diminished privacy of police officers who are involved in a shooting.  Moreover, the circumstances in which a breathalyzer will be administered are sharply delineated and limited, thus preventing arbitrary action.  The government's needs in maintaining the integrity of the police when they discharge their firearms, in maintaining the public trust as well as the trust of other NYPD officers, and in the deterrence of alcohol use and abuse while carrying guns or immediately prior to doing so all provide more than ample "special needs" for the administration of the breathalyzer.  These special needs preceded the promulgation of IO 52 and were demonstrated by the extensive regulation of the use of alcohol by NYPD officers.  The existence of the Counseling Unit and the volume of officers interviewed at the unit testifies to the serious alcohol concerns of the NYPD and the efforts of the Department to address those concerns.  IO 52 is "reasonable" as that term is used by the Fourth Amendment and the breathalyzer tests at issue constitutional.

**B.      IO 52 Is Not "Void For Vagueness."**

The Supreme Court has recently defined the void for vagueness doctrine:

> "As generally stated, the void-for-vagueness doctrine requires that a **penal** statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."

Gonzales v. Carhart, __ U.S. ___, 127 S. Ct. 1610, 1628 (2007)(citations omitted)(emphasis supplied); see Thibodeau v. Portuondo, 486 F.3d 61, 65-66 (2d Cir. 2007).  Thibodeau notes that there are two separate strands to the vagueness doctrine.  Id.  One requiring fair warning of prohibited conduct and the second which holds a law unconstitutionally vague if it authorizes or even encourages arbitrary or discriminatory enforcement.  Id.  Under this

second strand, the law must provide "minimal guidelines to govern law enforcement." <u>Id.</u> at

66(quoting <u>Kolender v. Lawson</u>, 461 U.S. 352, 358 (1983)).  The vagueness doctrine varies

as the interests at issue change:

> "[t]he degree of vagueness that the Constitution tolerates - as well as the relative importance of fair notice and fair enforcement - depends in part on the nature of the enactment."  While economic regulations economic regulations are "subject to a less strict vagueness test," we apply a more stringent analysis when examining laws that impose criminal penalties because the consequences of imprecision are qualitatively more severe.

<u>Thibodeau</u>, 486 F.3d at 66 (citations omitted).

Here the challenge is to a regulation, not a statute.  The regulation is civil, and

not penal, in nature.  IO 52 regulates public safety employees whose expectations of privacy

are involved in shooting and are significantly diminished.  Moreover, IO 52 does not create

prohibited conduct or speech at all but merely states when a test for prohibited conduct will

be triggered.  That is, the NYPD already prohibits their officers from discharging their

weapons while under the influence and IO 52 provides for a triggering event for testing

whether the pre-existing prohibition has been violated.  Thus, if the vagueness test has any

application here whatsoever, the most permissive version of the constitutional vagueness test

must be applied and under that test IO 52 easily passes constitutional muster.

In the Supreme Court case of <u>Grayned v. City of Rockford</u>, the Court pointed

out that "[c]ondemned to the use of words, we can never expect mathematical certainty from

our language," and noted further that "[i]t will always be true that the fertile legal

'imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will

be in nice question.'"  408 U.S. 104, 110-111 and n.15 (1972) (citing American Comm'ns Ass'n v. Douds, 339 U.S. 382, 412 [1950]).

Plaintiffs' challenge here appears to proceed under the second strand of the vagueness test, that is, they contend that the regulation leaves too much latitude and encourages arbitrary and discriminatory enforcement.  Thibodeau 486 U.S. at 65-66; Grayned, 408 U.S. at 108.  However, even a cursory review of IO 52 shows that it leaves little or no latitude, all officers involved in a shooting which injures or kills a person are given a breathalyzer test.  While plaintiffs' counsel attempts to weave possible scenarios where there might somehow be discretion exercised, as Justice Marshall writing for the majority noted in Grayned, the constitutionality of a statute does not turn on the creativity of challenging counsel.  Rather, the usual application of IO 52 will be abundantly clear, there will be (1) a shooting (2) by a NYPD officer, (3) resulting in injury or death to a person.  IO 52 is narrowly drawn to become active on the happening of a triggering event.  It is of limited applicability and easily passes the second strand of the vagueness test.  Indeed, officers also complain that the application of IO 52 is automatic, not requiring any assessment of, or suspicion that, the officer is under the influence of alcohol.

Moreover, prior to IO 52, using one's firearm while under the influence of alcohol was barred, both by NYPD regulation and generally applicable statutes.  The regulation here merely warns NYPD officers of a triggering event causing testing for the influence of alcohol in a shooting in which the officer was involved, conduct that was already prohibited prior to IO 52.  Moreover, the regulations warns NYPD officers not to drink within four hours of their tour in order to be sure that they are not under the influence while on duty.  While it may be that a lawyer can always "conjure" room for ambiguity there is

little left here.  Thus, the instant civil regulation of NYPD officers would easily pass muster under the vagueness doctrine.

## POINT II

## THE PRELIMINARY INJUNCTION MUST BE DENIED.

Assuming, <u>arguendo</u>, that the Court finds that the Compliant need not be dismissed, plaintiff's motion for a preliminary injunction must be denied.  The minimum standard for preliminary injunctive relief is well-settled.  The Second Circuit requires a clear showing that: (1) plaintiffs will suffer irreparable harm in the absence of the injunction, and (2) there is either: (a) a likelihood of success on the merits; or (b) sufficiently serious questions going to the merits making them a fair ground for litigation, and the balance of hardships tips decidedly in plaintiffs' favor.   See <u>Jolly v. Coughlin</u>, 76 F.3d 468, 473 (2d Cir. 1996).  However, when a party seeks to enjoin government action, she may not rely on the less rigorous "serious questions" alternative of the second prong, but instead must demonstrate a likelihood of success on the merits.  See <u>Time Warner Cable of New York City v. Bloomberg</u>, 118 F.3d 917, 923 (2d Cir. 1997)(noting that the heightened standard applies "where the injunction stays governmental action taken in the public interest pursuant to a statutory . . . scheme") (internal quotations and citation omitted).  Preliminary injunctive relief is an extraordinary remedy which is always within the Court's discretion even where the minimum standard is met.  Courts should be reluctant to utilize this extraordinary remedy and it should be granted only in rare circumstances.  <u>Medical Society v. Toia</u>, 560 F.2d 535, 538 (2d Cir. 1977).

Generally, the purpose of a preliminary injunction is to maintain the *status quo* pending the ultimate outcome of the underlying action.  <u>Arthur Guiness & Sons, PLC v.</u>

Sterling Publishing Co., 732 F.2d 1095, 1099 (2d Cir. 1984).  Where, as here, the preliminary relief sought is identical to the ultimate relief sought, a greater showing is necessary. Plaintiffs must demonstrate either "'a clear showing that [they are] entitled to the relief requested,' . . . or . . . 'extreme or very serious damage will result' from a denial of relief[.]" Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985) (citations omitted).  The instant complaint must be dismissed, either on the motion to dismiss or on summary judgment, and, for the same reasons, the preliminary injunction motion must be denied.

In the instant case, the Complaint does not state a claim on which relief can be granted.  IO 52 falls squarely within the special needs doctrine of the Fourth Amendment and is constitutional.   NYPD officers are invested with the most important power that a government can confer, the power to apply deadly force in the course of their employment. As a corollary, the NYPD is invested with the duty to closely regulate the police force to ensure that this awesome power is used wisely and well.  The NYPD has taken action to make its regulations more effective and to maintain the integrity of police discharge of firearms.  The NYPD already requires that officers be fit for duty except in very narrow circumstances.  The NYPD warns officers not to become unfit for duty due to alcohol consumption.  In the event that alcohol consumption is possible, NYPD officers are required to safeguard their guns to ensure that they will not be in possession of firearms while intoxicated.  The NYPD maintains a Counseling Unit just to deal with officers who may have an alcohol problem.  That unit conducted new interviews with 380 officers since 2005, testifying to the legitimacy of the NYPD's concern with alcohol abuse.  Still NYPD officers have engaged in illegal and life-threatening conduct such as suicide and driving while intoxicated, which are connected to alcohol.  IO 52 will maintain the integrity of police

shootings, ensuring that no officer has discharged his weapon while under the influence of alcohol.  It will deter officers from imbibing alcohol while on the job or when they are about to go on duty.  It will assure the public and other officers that NYPD officers who discharge their weapons were fit for duty at the time that the discharge occurred.  Following the tragic shooting of Sean Bell and his two companions there were rumors that the one or more officers were under the influence of alcohol at the time of the shooting.  IO 52 will enable the NYPD to present evidence that these type or rumors are false.  All of these needs that are served by IO 52 are non-criminal in nature.  IO 52 will be applied, and has been applied, when there is little or no risk of criminal prosecution, such as when an officer accidentally discharges his or her weapon injuring him or herself.  Thus, IO 52 serves the critical needs of the NYPD and is primarily non-criminal in nature.

In the balance against these needs are the privacy interests of NYPD officers. Those officers are already subject to random drug tests and have very limited privacy interests.  NYPD are subject to a variety of regulations that are directed at their fitness for duty.  Moreover, if the breathalyzer test is not performed soon after the shooting its utility will rapidly decrease.  This was recognized by the Supreme Court in Skinner.  The circumstances under which the test will be administered is narrowly limited to serve the needs described above.  The officer must be involved in a shooting, off the shooting range, in New York City and the shooting must have resulted in injury or death to a person.  This narrow focus guarantees that there will not be arbitrary or discriminatory action.  The use of the test cut-off prescribed by the Vehicle and Traffic Law also removes subjectivity to the testing under IO 52.  The test itself is performed under conditions that maximize the officer's privacy to the extent possible.  The requirement of a breathalyzer test in all cases that meet

this narrow interest removes the stigma that might otherwise attach to the test. Indeed, there would be more stigma possible prior to IO 52 if a superior officer ordered a breathalyzer test for it might be thought that the officer was suspected of being intoxicated because the test was administered. The intrusion on privacy from a breathalyzer test are minimal and the duration for the test short, about 5 minutes for the test. IO 52 represents a minimal incremental intrusion on the already extremely limited privacy rights of NYPD officers. In the balance, IO 52 meets the test of reasonableness under the Fourth Amendment. Thus, there is no likelihood of success on the merits of the Complaint in this case and plaintiffs' motion for a preliminary injunction must be denied.

While the balance of hardships prong is not applicable to the instant case, if the Court considers the balance of hardships the preliminary injunction should be denied. Plaintiffs similarly fail to demonstrate that a balance of hardships tips decidedly in their favor. To show that the balance of hardships tips in their favor, plaintiffs must show that " . . . the harm [they] would suffer absent the relief sought is substantially greater than the harm [their] opponent would suffer if relief was granted." Clemente Global Growth Fund, Inc. v. Pickens, 705 F. Supp. 958, 971 (S.D.N.Y. 1989) (citing Buffalo Forge Co. v. Ampco Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981). The minimal intrusion of a breathalyzer administered to NYPD officers in the course of an already thorough and intensive investigation is barely a hardship. On the other hand, IO 52 is important to the integrity of NYPD shootings, the confidence of the public and fellow officers, and will deter alcohol use impairing the NYPD officers. The balance here tips decidedly in the government's favor and thus the injunction must be denied.

## CONCLUSION

**WHEREFORE**, defendants respectfully request that plaintiffs' motion for a preliminary injunction be denied, that defendants' motion to dismiss be granted, or in the alternative, that defendants' motion for summary judgment be granted, that the complaint be dismissed in all respects, that the request for relief be denied in its entirety, that judgment be entered for defendants, and that defendants be granted costs, fees, and disbursements, together with such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            November 7, 2007

                                          **MICHAEL A. CARDOZO**
                                          Corporation Counsel of the
                                            City of New York
                                          Attorney for Defendants
                                          100 Church Street, Room 2-187
                                          New York, N.Y. 10007-2601
                                          (212) 788-0952


                              By:  **ECF**              /s/
                                          Alan M. Schlesinger
                                          Assistant Corporation Counsel