UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MICHAEL J. PALLADINO, as President of the NEW
YORK CITY DETECTIVES' ENDOWMENT
ASSOCIATION, INC., NEW YORK CITY
DETECTIVES' ENDOWMENT ASSOCIATION,
INC., EDWARD D. MULLINS, as President
of the SERGEANTS BENEVOLENT
ASSOCIATION of the CITY OF NEW YORK,
INC., SERGEANTS BENEVOLENT ASSOCIATION
OF THE CITY OF NEW YORK, INC., THOMAS
DROGAN, as President of the LIEUTENANTS
BENEVOLENT ASSOCIATION of the POLICE
DEPARTMENT of the CITY OF NEW YORK,
LIEUTENANTS BENEVOLENT ASSOCIATION
of the POLICE DEPARTMENT of the CITY OF
NEW YORK, JOHN DOE, JANE ROE and all
POLICE OFFICERS named herein and others
similarly situated,
                      Plaintiffs,

07-CIV-9246
(GBD) (MGD)

**DECLARATION IN
SUPPORT OF PLAINTIFFS'
CROSS MOTION FOR
SUMMARY JUDGMENT
AND IN OPPOSITION
TO DEFENDANTS'
MOTION FOR
SUMMARY JUDGMENT
AND/OR TO DISMISS
THE COMPLAINT**

      -against-

THE CITY OF NEW YORK, the NEW YORK CITY
POLICE DEPARTMENT, and RAYMOND W. KELLY,
as COMMISSIONER of the NEW YORK CITY POLICE
DEPARTMENT,

                      Defendants.
------------------------------------------------------------------X

      **CANDACE REID GLADSTON**, hereby declares under penalty of perjury pursuant to 28 U.S.C. §1746 as follows:

      1.    I am an attorney admitted to practice in New York and before the United States District Court for the Southern District of New York. I am a member of the firm Certilman Balin Adler & Hyman, LLP, attorneys for Plaintiffs in this action ("Uniformed Members of the Service" or "Uniformed Member"), and

submit this declaration in support of the cross motion of the Uniformed Members of the Service and in opposition to the Government Defendants' motion to dismiss the complaint[1] or for summary judgment.[2]

2.    This case involves suspicionless searches of all Uniformed Members of the New York City Police Department "involved" in the discharge of a firearm causing injury or death of a person.[3] The Government Defendants contend that these suspicionless searches fit within the "special needs" doctrine and are thus reasonable within the meaning of the Fourth Amendment of the Constitution of the United States. The Government Defendants are wrong, as a matter of law.

3.    First, there is no showing that public safety would be placed in jeopardy by continuing to administer the long-standing policy of conducting suspicion-based searches for alcohol intoxication when a Uniformed Member discharges a firearm. Because there is no concrete danger to the public safety demanding a departure from the Fourth Amendment's requirement that searches be, at a minimum, suspicion-based, the Government Defendants have not shown the requisite "special needs."

---

[1] A copy of the Verified Complaint is annexed as Exhibit 1.
[2] By moving for summary judgment pursuant to Rule 56, Fed.R.Civ.P., the Government Defendants acknowledge there are no disputed facts requiring a trial. Indeed, the parties have entered into a stipulation of undisputed facts, which facts are set forth in an accompanying 56.1 Statement.
[3] A copy of the Interim Order mandating suspicionless searches is annexed to the Verified Complaint as Exhibit A.

1945973.1

4.  Additionally, the suspicionless search regime does not have any deterrent effect because all Uniformed Members are well aware that they will be subjected to intense scrutiny to assess their fitness for duty every time they discharge a firearm.[4] Thus, all Uniformed Members of the Service have long been on notice that discharging a weapon while intoxicated will result in discipline, if not, discharge.

5.  Furthermore, there is no evidence linking the discharge of a firearm to alcohol intoxication such as might give rise to a presumption of reasonable suspicion of intoxication. The Government Defendants admit as much.

6.  Second, the real reason for conducting suspicionless searches for alcohol intoxication when a Uniformed Member discharges a firearm, as the Government Defendants admit, is to "enable the NYPD to present evidence" that the type of "rumors" that surfaced after the Sean Bell shooting incident "are false."[5] Not only does this demonstrate that the constitutional rights of Uniformed Members of the Service are being impermissibly sacrificed as a public relations strategy, but it also shows that the Government Defendants do not really believe there is any purported alcohol "problem" within the NYPD in general, or in connection with discharges of firearms, in particular.

---

[4] *See* Palladino Aff. submitted herewith.
[5] Defendants' Brief, p. 5, wherein they say that, after the Sean Bell shooting incident, there were rumors that "an officer had been drinking at a club just prior to the shooting."

1945973.1

7.  All in all, the testing procedures mandated by the Interim Order do not fit within the "closely guarded category of constitutionally permissible suspicionless searches," as alleged, but, rather, are, at most "symbolic," not "special" as that term draws meaning from Supreme Court precedent.[6]

8.  Finally, the Interim Order is unconstitutionally vague and internally inconsistent.

## THE INTERIM ORDER VIOLATES THE FOURTH AMENDMENT

9.  On September 30, 2007, the Government Defendants issued Interim Order No. 52 ("Interim Order"), which mandates "Alcohol testing for Uniformed Members of the Service involved in Firearms Discharges Resulting in Injury to or Death of a Person."[7] At no time prior to the promulgation of the Interim Order has there ever been alcohol testing of any Uniformed Member of the Service absent reasonable suspicion of intoxication -- in connection with shooting incidents or otherwise.[8]

10. Indeed, Patrol Guide Procedure No. 206-12, sets forth the procedure for determining if an "on/off duty uniformed member of the service is fit for duty

---

[6] *See* Plaintiffs' Brief.
[7] Interim Order, at Exhibit B to the Verified Complaint; and Verified Complaint, at ¶¶24-26.
[8] *See* Palladino Aff.; and Patrol Guide Procedure No. 206-12, Exhibit 3, which sets forth the procedure for determining if an "on/off duty uniformed member of the service is fit for duty due to intoxication.

due to intoxication."[9]  This procedure clearly calls for a "reasonable suspicion" determination based on observation and "[c]ommon sense standards."[10]

11.  The Government Defendants do not dispute that the breathalyzer tests conducted pursuant to the Interim Order[11] are suspicionless searches, nor could they.  Rather, the Government Defendants allege that the mandated suspicionless breath testing of Uniformed Members of the Service involved in firearms discharges fits within the closely guarded category of constitutionally permissible suspicionless searches justified by "special needs" beyond the normal need for law enforcement.  They are wrong.

### No "Special Needs" Shown

12.  The law is well settled that when "special needs" are alleged as justification for suspicionless searches, as here, the Court must undertake a context-specific inquiry, examining very closely the competing private and public interests involved to determine whether the proffered "special needs" justifies the intrusion.[12]

13.  The Government Defendants' papers make clear that the Interim Order was and is a public relations measure to "enable the NYPD to present evidence" that "rumors" like those surfacing after the Sean Bell shooting incident

---

[9] See Exhibit 3 hereto; and Exhibit G to Defendants' papers.
[10] See Exhibit 3 hereto; and Exhibit G to Defendants' papers.
[11] The Government Defendants refer to the Interim Order as "IO 52".
[12] See Plaintiffs' Brief submitted herewith.

"are false."[13] By their own admissions, the suspicionless searches here are not to deter alcohol abuse nor to protect the public and other officers from Uniformed Members who have the ability to use deadly force, as argued.[14] The Government Defendants' "need" is not "special" and cannot genuinely justify a departure from the Fourth Amendment's requirement that searches be based upon individualized suspicion.

14. The Government Defendants cannot show, as they must, that it would be impractical to utilize suspicion-based searches for alcohol intoxication after a shooting incident or that these suspicionless searches have an alleged deterrent effect.[15]

15. Suspicion-based searches are feasible and, in fact, have long been employed each time a Uniformed Member discharges a firearm, as each Uniformed Member of the Service well knows.

16. These suspicion-based searches have been conducted to determine if Uniformed Members involved in shooting incidents are fit for duty, which includes determining whether the particular Uniformed Member of the Service is under the influence of alcohol.[16] As discussed below, the Government Defendants go to great lengths to detail the elaborate and intense investigations that are conducted

---

[13] *See* Declaration of Charles V. Campisi, dated November 7, 2007, at ¶¶47-57.
[14] *See* Plaintiffs' Brief.
[15] *See* Plaintiffs' Brief.
[16] The Government Defendants do not mention that all alcohol testing within the NYPD has been based upon reasonable suspicion until promulgation of the Interim Order.

every time there is a shooting incident, which involves subjecting each Uniformed Member to intense scrutiny for fitness for duty. There simply is no important government interest that would be placed in jeopardy by continuing to require individualized suspicion of intoxication in connection with firearms discharges.[17] None.

### Suspicion-Based Searches Are Feasible and Have Long Been Employed

17.  Chief Charles V. Campisi admits in his declaration that suspicion-based searches are not only feasible, but have been and are employed each time a Uniformed Member of the Service discharges a firearm (other than at a firing range). Chief Campisi describes the existing, elaborate procedures employed each time there is a shooting incident in the line of duty.[18] He describes how an entire "Team" of high ranking officers responds to the scene -- including personnel from the Borough Investigations Unit, Detective Bureau, Emergency Service Unit, community affairs officers, precinct patrol supervisors and precinct police officers. The "Shooting Team Leader" may also request the assistance of personnel assigned to the Internal Affairs Bureau, among others.[19]

---

[17] *See* Plaintiffs' Brief.
[18] *See* Campisi Decl., at ¶¶26-44 and Exhibit 2 hereto (Exhibit H to Defendants' papers).
[19] *See* Patrol Guide Procedure No. 212-29, Exhibit 2 hereto (Exhibit "H" to Defendants' papers).

18. The Patrol Guide, prescribing these procedures, also describes how high ranking officers will assess whether the Uniformed Member, who discharges a firearm, is fit for duty, which necessarily entails a determination as to whether the Uniformed Member is under the influence of alcohol.[20] These procedures also mandate numerous reports to be prepared and specific findings to be made following a Uniformed Member's discharge of a firearm, including among others, a finding of whether the Uniformed Member was fit for duty.[21] A very intense analysis must be made of the situation in a timely fashion by a contingent of experts who are well qualified to determine whether there is a reasonable suspicion that the Uniformed Member who discharged the firearm is under the influence of alcohol.[22]

19. Thus, there are existing procedures whereby suspicion-based searches of intoxication are employed every time a Uniformed Member of the Service discharges a firearm, other than at a firing range.[23]

20. The Government Defendants simply do not have a legitimate need for employing suspicionless searches for alcohol intoxication whenever a firearm is

---

[20] *See* Patrol Guide Procedure No. 212-29, Exhibit 2 hereto (Exhibit "H" to Defendants' papers).
[21] *See* Patrol Guide Procedure No. 212-29, Exhibit 2 hereto (Exhibit "H" to Defendants' papers). The Defendants acknowledge that "every firearms discharge is subject to rigorous investigation and multiple reviews" and "is thoroughly and laboriously investigated and reviewed by the NYPD." Defendants' Brief, pp. 2, 3.
[22] *See* Patrol Guide Procedure No. 212-29, Exhibit 2 hereto (Exhibit "H" to Defendants' papers).
[23] The Defendants further admit: "The NYPD has elaborate and detailed procedures for addressing each such shooting incident" and that "each firearms discharge is subject to intense scrutiny and high level review...." Defendants' Brief, pp. 9, 10-11.

discharged because there exists a well-established mechanism to conduct suspicion-based searches for alcohol intoxication at the scene of every shooting incident.

21. The Government Defendants undercut their own argument by claiming that Uniformed Members have little expectation of privacy when a firearm is discharged because of the "team" of professionals that swarms the scene. It is because of this "intense" investigation conducted by a "team" of professionals at the scene of each shooting incident that demonstrates why there is no need -- none -- to dispense with suspicion-based searches for alcohol intoxication. Any of the members of this team of professionals is more than capable of assessing whether there is a reasonable suspicion to believe that a Uniformed Member who discharged a firearm is intoxicated. Uniformed Members' privacy interests may be diminished by virtue of their employment -- they are not eliminated thereby.

## No Deterrent Effect

22. The lack of a legitimate government need for the suspicionless searches is even more obvious when analyzing the Government Defendants' argument that the breathalyzer test is needed to deter potential alcohol abuse. Uniformed Members of the Service are well aware that their fitness for duty will be the subject of "intense scrutiny" following the discharge of a firearm,[24] and they

---

[24] Defendants' Brief, p. 12.

are aware of the procedures employed if they are unfit for duty due to alcohol intoxication.[25]

23. To automatically require a breath test when there is <u>no</u> suspicion of intoxication serves only to demean and humiliate Uniformed Members of the Service.[26]

24. The requirement of individualized suspicion should not yield in this case where there is no legitimate government interest that would be placed in jeopardy by a requirement of individualized suspicion, notwithstanding that Uniformed Members of the Service enjoy lesser Fourth Amendment rights than the general citizenry. There simply is no concrete danger demanding a departure from the Fourth Amendment's requirement that searches be, at a minimum, suspicion-based when a Member of the Service discharges a firearm.

25. The Government Defendants' testing policy set forth in the Interim Order does not pass muster. It does not fall within the "closely guarded category of constitutionally permissible suspicionless searches."[27]

---

[25] See Palladino Aff. and Affidavit of Daniel Rivera, submitted herewith. Notably, Uniformed Members of the Service are not prohibited from consuming alcohol up to four hours prior to their tour of duty and alcohol consumption is not prohibited in undercover operations (nor could it be), and that two drinks per tour have been recommended. See Exhibit 7, ¶11, annexed hereto (and Exhibit K, ¶11 to Defendants' papers).
[26] See Rivera and Palladino Affs.
[27] See Plaintiffs' Brief.

## No Causal Nexus Between Discharge of a Firearm And Alcohol Abuse

26.     Moreover, there is no connection between discharge of a firearm and intoxication. Thus, unlike certain of the cases relied on by the Government Defendants, there is no historical documented problem of alcohol abuse within the NYPD and no connection between the discharge of a firearm and intoxication, such as might give rise to a presumption of reasonable suspicion. In fact, the Government Defendants admit that there is no relationship between a Uniformed Member's discharge of a firearm and alcohol intoxication.[28] Chief Campisi leaps from "some NYPD officers may have problems with alcohol consumption" to "there is a history of alcohol abuse in the NYPD."[29] However, there is no evidence to support either statement. Both claims are based upon speculation and do a great disservice to Uniformed Members of the Service. Moreover, given the stated purpose of the Interim Order--to prove "false" any rumors surfacing after a shooting incident, it is clear that the Government Defendants do not believe there is an alcohol problem within the NYPD.

27.     There are no studies or analyses establishing "alcohol abuse in the NYPD," let alone any historical studies or analyses establishing a causal nexus between Uniformed Members' discharges of firearms and alcohol abuse. The

---

[28] *See* Defendants' Brief, p. 20.
[29] *See* Campisi Decl., at ¶19; Defendants' Brief, p. 20.

1945973.1

Government Defendants, however, attempt to create such a nexus by citing irrelevant facts that cannot credibly be called "statistics."

28. For example, the Government Defendants claim that the NYPD Counseling Unit conducted approximately 600 "interviews" during the last three years.[30] These "interviews" are clearly not evidence of alcohol abuse and they have nothing to do with the discharge of firearms.

29. Similarly irrelevant are the DWI arrests of 38 off-duty Uniformed Members of the Service over nearly a three-year period.[31] Not only do these "arrests" -- not convictions -- fail to show that there is the widespread alcohol abuse problem sought to be portrayed by the Government Defendants, but given the fact that there are over 35,000 Uniformed Members of the Service, the number of off-duty DWI arrests is absolutely negligible: approximately .03% in 2005; .05% in 2006; and .03% in 2007. These allegations are not "statistics" and do not establish a "very real risk" of alcohol abuse within the NYPD in general, and none at all in connection with the discharge of firearms.[32]

30. In fact, while Chief Campisi states "that the NYPD has long recognized that some NYPD Officers may have problems with alcohol consumption,"[33] he does not cite to any authority because none exists.

---

[30] See Declaration of Suzanne Gimblet, dated November 6, 2007, at ¶¶6-9.
[31] See Campisi Decl., at ¶21.
[32] See Campisi Decl., at ¶23.
[33] See Campisi Decl., at ¶19.

1945973.1

Significantly, as the Government Defendants must concede, there are no studies, historical or otherwise, that establish a causal connection between firearms discharges and intoxication. In fact, it is significant that the annual Firearms Discharge Reports released by the NYPD do not refer to alcohol use in connection with discharges of firearms.[34] If it were such a historical problem, it would no doubt have been addressed therein.[35]

31. It is most unfortunate, indeed reprehensible, that the Government Defendants feel the need to disparage Uniformed Members of the Service and the NYPD in general as a means to try to justify the Interim Order. Indeed, trying to shore up their argument by referencing a few DWI arrests of off-duty Uniformed Members of the Service and even fewer suicides is incredible. Particularly scandalous is the lengths to which the Government Defendants go to portray four of the ten suicides as "involving" alcohol. They say that in these four cases, there was alcohol "present at the scene" or "found in the body of the deceased officer,"[36] whatever that means. These facts are irrelevant and are not even alleged to be evidence of alcohol intoxication. Further, these "facts" have been set forth in papers that are now part of a public record and only serve to discredit the

---

[34] *See* Copies of Discharge Reports for 2006, 2005, 2002, annexed hereto as Exhibits 4, 5 and 6.
[35] *See* Campisi Decl., at ¶25. The number of discharges per year since 2004 are not only irrelevant, but as Campisi admits, the number is "relatively small considering the size and activity of the NYPD."
[36] *See* Campisi Decl., at ¶22.

honorable Uniformed Members of the Service who put themselves on the front line twenty-four hours a day to protect and serve the community.

32. There simply are no facts, no studies, no analyses, no history -- nothing -- linking alcohol intoxication to discharges of firearms.

33. How Chief Campisi can refer to these facts as "statistics" purportedly showing "that there are NYPD officers with alcohol problems that have resulted in illegal or life threatening behaviors," is irresponsible at best.[37] These facts have nothing at all to do with discharge of a firearm and intoxication. Nothing.

34. The Government Defendants have completely failed to demonstrate any causal nexus between alcohol intoxication and the discharge of a firearm, because there is none.

### Public Relations Sound Bites

35. The implementation of the suspicionless searches is <u>not</u> based on any real, legitimate "special need" to protect the public and other officers, or the integrity of the NYPD or to deter alcohol intoxication.[38] Rather, the Interim Order was issued as a result of one incident involving undercover officers -- the Sean Bell incident -- which involved "rumors" that "an officer had been drinking at a club just prior to the shooting."[39] The Government Defendants' discussion of the

---

[37] *See* Campisi Decl., ¶23.
[38] *See* Campisi Decl., at ¶70.
[39] Defendants' Brief, p. 5.

1945973.1

Sean Bell shooting reveals as much. What is nowhere stated, however, is that the Sean Bell incident and resulting indictments, were not based upon alcohol abuse.

36.   Significantly, the Government Defendants admit that the reason for promulgating the Interim Order is to "enable the NYPD to present evidence that these type or [sic] rumors are false."[40] This just shows that the Government Defendants do not believe there is an alcohol problem within the NYPD.

37.   The procedures providing for suspicion-based searches in cases of firearms discharges, before promulgation of the Interim Order, worked just fine. In fact, the Government Defendants repeatedly describe these pre-existing procedures as "elaborate and detailed," and that each shooting incident was and is "subject to intense scrutiny and high level review," "is subject to rigorous investigation and multiple reviews," and "is thoroughly and laboriously investigated and reviewed by the NYPD."[41] The Government Defendants certainly cannot credibly argue that the Interim Order was necessary or serves any legitimate purpose. A desire for media sound bites does not justify dispensing with constitutional rights.

38.   If the special needs doctrine is to remain "closely guarded," it is important to correctly identify the purpose for the government's intrusion.[42] Here, the purpose for the suspicionless searches is not based on a legitimate "special

---

[40] The Government Defendants admit that there were only "rumors" that "an officer had been drinking at a club just prior to the shooting." Defendants' Memorandum of Law, p. 5.
[41] Defendants' Brief, pp. 2, 3, 9, 10-11.
[42] See Plaintiffs' Brief.

1945973.1

need" of government, but, rather, as a public relations ploy to obtain media sound bites following shooting incidents.[43]

39. The interests in human dignity and privacy protected by the Fourth Amendment forbid the intrusions mandated by the Interim Order.[44] Simply put, the suspicionless searches mandated by the Interim Order do not pass constitutional muster.

## THE INTERIM ORDER IS UNCONSTITUTIONALLY VAGUE

40. The Interim Order is vague and is internally inconsistent.

41. For example, paragraph 2 of the Interim Order provides for mandatory breath testing of any Uniformed Member "involved in a firearms discharge within New York City which results in injury to or death of a person...."[45] Paragraph 10, however, provides for mandatory breath testing of any Uniformed Member "who discharged a firearm" -- irrespective of resulting injury to or death of a person.[46] In fact, there was a shooting incident on Tuesday, November 13, 2007 involving 5 Uniformed Members, which resulted in the "death of a person". All of the Uniformed Members were subjected to the breath test even though it was unknown which of the weapons discharged actually caused the death.[47]

---

[43] It is undisputed that not one Police Officer has tested .08 or greater since the implementation of the Interim Order and the mandated breath testing.
[44] *See* Plaintiffs' Brief.
[45] *See* Exhibit B to Complaint, ¶2.
[46] *See* Exhibit B to Complaint, at ¶2.
[47] *See* Palladino Aff.

42. Nor does the Interim Order define the term "injury" or to whom the terms "injury" or "death" apply. Thus, suspicionless searches can be conducted where there is an extremely minor injury, or where an injury or death is not proximately caused by the discharge of a Uniformed Member's firearm, or when the discharge of a firearm results in the injury or death of a Uniformed Member of the Service. Tellingly, the Government Defendants know how to define "injury,"[48] they just chose not to in the Interim Order. Thus, the Interim Order appears to have been made deliberately vague.[49]

43. Nor does the Interim Order define "person." Thus, for example, an injured Uniformed Member of the Service could be subject to an automatic suspicionless search.[50]

44. The Interim Order does not define the terms "Involved in Firearms Discharges," "police involved firearms discharge," or "involved members of the service."

45. The Interim Order does not specify "the number of different means" by which the suspicionless searches will be conducted.

---

[48] *See* Patrol Guide Procedure No. 212-53, referring to police activity where a person dies or sustains "serious injury," Exhibit 8 hereto (Exhibit I to Defendants' papers).
[49] Indeed, it is not known what procedures, if any, are applicable if a breathalyzer test result is greater than zero but less than .08.
[50] *See* Rivera Aff.

46. The Interim Order does not adequately set forth or establish the "private setting" or "dignified, respectful fashion" in which the suspicionless searches are to be conducted.

47. The Interim Order does not prescribe the ability to use the test results once administered.

48. The Interim Order does not discuss or establish rights of Uniformed Members of the Service to independently evaluate test samples and results.

49. The Interim Order does not establish the ability of Uniformed Members of the Service to obtain a copy of a videotaped testing.

50. The Interim Order references a "specially designed form" and "specially designed checklist" to be utilized in administering the suspicionless searches, but does not annex same thereto. Thus, Uniformed Members of the Services are wholly deprived of any advance notification or due process in connection with the conduct of the searches.

51. Additionally, the Interim Order does not apply outside the geographic boundaries of New York City, however, Uniformed Members of the Service may in fact be "involved" in the discharge of a firearm outside New York City limits. Thus, the Interim Order will not be applied even-handedly regardless of what the Government Defendants say in their motion papers. Ironically, the Government

1945973.1

Defendants are content to rely on reasonable suspicion of intoxication of its Police Officers outside of the five boroughs.

## CONCLUSION

52. Not only does the Interim Order fail to pass muster under the Fourth Amendment, but it is unconstitutionally vague.[51]

53. For the reasons set forth in Plaintiffs' papers, Plaintiffs are entitled to summary judgment, which includes the requested injunctive relief, and the Government Defendants' motion should be denied in its entirety.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
CANDACE REID GLADSTON

Dated: East Meadow, New York
November 29, 2007

---

[51] *See* Plaintiffs' Memorandum of Law submitted herewith.

1945973.1