UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X   07-CIV-9246
MICHAEL J. PALLADINO, as President of the NEW   (GBD) (MGD)
YORK CITY DETECTIVES' ENDOWMENT
ASSOCIATION, INC., NEW YORK CITY
DETECTIVES' ENDOWMENT ASSOCIATION,
INC., EDWARD D. MULLINS, as President
of the SERGEANTS BENEVOLENT   **AFFIDAVIT IN**
ASSOCIATION of the CITY OF NEW YORK,   **SUPPORT OF**
INC., SERGEANTS BENEVOLENT ASSOCIATION   **CROSS MOTION**
OF THE CITY OF NEW YORK, INC., THOMAS   **FOR SUMMARY**
DROGAN, as President of the LIEUTENANTS   **JUDGMENT**
BENEVOLENT ASSOCIATION of the POLICE
DEPARTMENT of the CITY OF NEW YORK,
LIEUTENANTS BENEVOLENT ASSOCIATION
of the POLICE DEPARTMENT of the CITY OF
NEW YORK, JOHN DOE, JANE ROE and all
POLICE OFFICERS named herein and others
similarly situated,

                              Plaintiffs,

    -against-

THE CITY OF NEW YORK, the NEW YORK CITY
POLICE DEPARTMENT, and RAYMOND W.
KELLY, as COMMISSIONER of the NEW YORK
CITY POLICE DEPARTMENT,

                              Defendants.
------------------------------------------------------------------X

STATE OF NEW YORK   )
                        ) ss.:
COUNTY OF NEW YORK)

       MICHAEL J. PALLADINO, being duly sworn, deposes and says:

1946650.1

1. I am the President of the New York City Detectives' Endowment Association ("DEA"), a municipal employee organization duly formed under the New York City Administrative Code, which represents all Detectives employed by the Police Department of the City of New York ("NYPD"). I am one of the plaintiffs in this action and submit this affidavit in support of the plaintiffs' cross motion for summary judgment. I also have read and concur with the statements made in the Declaration of Candace Reid Gladston, which is submitted on this cross motion.[1]

2. On September 30, 2007, the Government Defendants issued Interim Order No. 52 ("Interim Order"), which mandates "Alcohol testing for Uniformed Members of the Service involved in Firearms Discharges Resulting in Injury to or Death of a Person."[2] The Interim Order provides, among other things, that Uniformed Members of the Service, whether on or off-duty, who discharge a firearm will be tested using a portable breathalyzer test device ("PBT") even though there is absolutely no suspicion of alcohol intoxication.

3. At no time prior to the issuance of the Interim Order has there ever been alcohol testing of any Uniformed Member of the Service absent reasonable suspicion of intoxication.

---

[1] My affidavit, sworn to on October 9, 2007, is also submitted on this cross-motion for additional background facts.
[2] Interim Order, Exhibit B to Verified Complaint; and Verified Complaint, at ¶¶24-26.

1946650.1

4. There is no provision in the Patrol Guide or more particularly in the Fitness For Duty provisions that permits suspicionless searches after a Uniformed Member of the Service discharges a firearm.

5. The NYPD has for years utilized strict procedures that subject Uniformed Members of the Service to intense scrutiny for fitness for duty following each and every shooting incident involving the discharge of a firearm. In brief, there are numerous high-ranking officers that descend upon the scene of each shooting. In fact, each time a Uniformed Member discharges a firearm, other than at the firing range, an entire "Team" of high ranking officers responds, including personnel from the Borough Investigations Unit, Detective Bureau, Emergency Service Unit, community affairs officers, precinct patrol supervisors and precinct police officers. The "Shooting Team Leader" may request the assistance of personnel assigned to the Internal Affairs Bureau or other personnel.[3]

6. The Patrol Guide also mandates that these high ranking officers assess every Uniformed Member's fitness for duty following the discharge of a firearm. This assessment requires a determination as to whether the Uniformed Member is fit for duty or unfit for duty due to alcohol intoxication. In addition, the Patrol Guide requires that numerous reports and specific findings be made following a Uniformed Member's discharge of a firearm. Among the mandated findings, is a

---

[3] See Patrol Guide Procedure No. 212-29, Exhibit 2 hereto.

finding of whether the Uniformed Member was fit for duty at the time the firearm was discharged.[4]

7. All in all, a very intense investigation and analysis must be made of the situation in a timely fashion by a virtual battalion of experts who are well qualified to determine whether there is a reasonable suspicion that the Uniformed Member who discharged the firearm is under the influence of alcohol. Thus, there are existing procedures whereby suspicion-based searches are employed each and every time a Uniformed Member of the Service discharges a firearm in the line of duty.

8. All Uniformed Members of the Service are well aware of the procedures mandated by the Patrol Guide, not the least of which are those that apply to a Uniformed Member's fitness for duty. All Uniformed Members of the Service have long been aware that their fitness for duty will be subject to the most intense scrutiny following every shooting incident. The claim that the Interim Order will act as a deterrent to prevent Uniformed Members from discharging their firearms while intoxicated is just ridiculous. All Uniformed Members know quite well that they will be subject to harsh disciplinary action if they discharge a firearm while intoxicated. All the mandatory breath test does is demean and humiliate

---

[4] *See* Patrol Guide Procedure No. 212-29, Exhibit 2. The Government Defendants acknowledge that "every firearms discharge is subject to rigorous investigation and multiple reviews" and "is thoroughly and laboriously investigated and reviewed by the NYPD." Defendants' Brief, pp. 2-3.

1946650.1

Uniformed Members of the Service when there is absolutely no reasonable suspicion of intoxication.

9. Now, every time Uniformed Members enter a situation where they are required to use their firearms, they will be treated as "subjects," presumed to be guilty of wrongdoing and subjected to demeaning breath tests.[5]

10. There is no justifiable reason for subjecting Uniformed Members of the Service to suspicionless searches when there was, and is, already in place, a feasible and timely procedure based on reasonable suspicion for determining a Uniformed Member's fitness for duty following a shooting incident.

11. The NYPD's stated desire to be able to use the "evidence" from the breath tests to prove "false" possible "rumors" that might surface after a shooting incident is not a legitimate reason for trampling the Uniformed Members' constitutional rights. Moreover, this shows that the Government Defendants do not really believe there is an alcohol "problem" within the NYPD related to shooting incidents. The attempt to create a generalized "alcohol problem" within the NYPD by referring to some "interviews" with counselors, a few DWI arrests of "off-duty" officers, and even fewer tragic suicides over the past three years is distressing. The fact is, there are no "statistics" of alcohol abuse within the NYPD and the

---

[5] *See* Affidavit of Daniel Rivera.

1946650.1

Government Defendants do a terrible injustice to the Uniformed Members of the Service by claiming there is in papers that are now a matter of public record.

12. Furthermore, suspicionless searches are being indiscriminately and arbitrarily conducted of all Uniformed Members who are at the scene of a shooting incident irrespective of whether they actually discharged a firearm that caused injury of death of a person, as seemingly required by the Interim Order. On Tuesday, November 13, 2007, for example, 12 Uniformed Members were involved in a shooting incident, which resulted in the "death of a person." All of the Uniformed Members were subjected to a breathalyzer test even though it was unknown which of the weapons discharged caused the death.

13. If the Interim Order is not declared unconstitutional, over 35,000 Uniformed Members of the Service will be irrevocably injured due to repeated violations of their constitutional rights.

14. I mention that in addition to my duties as President of the DEA, I am also the Executive Vice President of the National Association of Police Organizations ("NAPO"), an entity representing Police Officers from police organizations throughout the United States. NAPO represents more than 250,000 law enforcement officers. When the subject of these suspicionless searches was discussed at our recent annual convention in August, 2007, I was advised that none of the presidents of the member units were aware of any police department in the

United States having a similar order mandating the testing of police officers who discharge their firearms which results in the death or injury of a person. In spite of New York City's obvious dangers in police work, we are unfortunately unique in having our Uniformed Members tested for alcohol without any reason to believe they are intoxicated while performing their day-to-day heroic duties.

    WHEREFORE, this deponent requests summary judgment on the complaint to protect the sanctity of our constitutional rights and the further violation thereof, and for such other and further relief as the court's may deem just and proper.

*Michael J. Palladino*
MICHAEL J. PALLADINO

Sworn to before me this
28 day of November, 2007

_____
Notary Public

MICHAEL C. AXELROD
Notary Public, State of New York
No. 30-4604946
Qualified in Nassau County
Commission Expires June 30, 2010

1946650.1