UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

MICHAEL J. PALLADINO, as President of the NEW
YORK CITY DETECTIVES' ENDOWMENT
ASSOCIATION, INC., NEW YORK CITY
DETECTIVES' ENDOWMENT ASSOCIATION,
INC., EDWARD D. MULLINS, as President
of the SERGEANTS BENEVOLENT
ASSOCIATION of the CITY OF NEW YORK,
INC., SERGEANTS BENEVOLENT ASSOCIATION
OF THE CITY OF NEW YORK, INC., THOMAS
DROGAN, as President of the LIEUTENANTS
BENEVOLENT ASSOCIATION of the POLICE
DEPARTMENT of the CITY OF NEW YORK,
LIEUTENANTS BENEVOLENT ASSOCIATION
of the POLICE DEPARTMENT of the CITY OF
NEW YORK, JOHN DOE, JANE ROE and all
POLICE OFFICERS named herein and others
similarly situated,

         Plaintiffs,

   -against-

THE CITY OF NEW YORK, the NEW YORK CITY
POLICE DEPARTMENT,  and RAYMOND W. KELLY,
as COMMISSIONER of the NEW YORK CITY POLICE
DEPARTMENT,

         Defendants.

-------------------------------------------------------------------------X

**07-CV-9246
(GBD) (MGD)**

## BRIEF IN SUPPORT OF PLAINTIFFS' CROSS MOTION AND IN OPPOSITION TO DEFENDANTS' MOTION

      CERTILMAN BALIN ADLER & HYMAN, LLP
      Attorneys for Plaintiffs
      90 Merrick Avenue
      East Meadow, New York 11554
      (516) 296-7000

1945856.1

## TABLE OF CONTENTS

PRELIMINARY STATEMENT….……………………………………….…  1

STATEMENT OF RELEVANT FACTS….……………………………...  2

ARGUMENT…………………………………………………………..  4

POINT I

      THE INTERIM ORDER VIOLATES THE
      FOURTH AMENDMENT…………..……………………………  5

POINT II

      THE INTERIM ORDER IS UNCONSTITUIONALLY VAGUE….  17

CONCLUSION……………………………………………..…………..  24

# TABLE OF AUTHORITIES

## Federal Cases

*Anderson v. Liberty Lobby, Inc.,*
        477 U.S. 242, 248 (1986)…....................................................  4

*Celotex Corp. v. Catrett,*
        477 U.S. 317, 323 (1986)……………………………………………  4

*Chandler v. Miller,*
        520 U.S. 305, 323 (1997)……………………………………………  passim

*Kolender v. Lawson,*
        461 U.S. 352, 357, 103 S. Ct. 1855 (1983)…………………………  22

*National Treasury Employees Union v. Von Raab,*
        489 U.S. 656 (1989)…………………………………………………  6

*19 Solid Waste Dept. Mechanics v. City of Albuquerque,*
        156 F.3d 1068 (10th Cir. 1998)……………………………………  6

*Olmstead v. United States,*
        277 U.S. 438, 479 (1928)……………………………………………  16

*Pankos Diner Corp. v. Nassau County Legislature,*
        321 F. Supp.2d 520 (E.D.N.Y. 2003)………………………………...  17,18,19

*Skinner v. Railway Labor Executives' Assn.,*
        489 U.S. 602 (1989)…………………………………………………  passim

*Terwilliger v. Terwilliger,*
        206 F.3d 240, 244 (2d Cir. 2000)…………………………………  5

*Vernonia Sch. Dist. 47J v. Acton,*
        515 U.S. 646 (1995)…………………………………………………  6,7,8

*Willis II v. Anderson Community School Corp.*,
     158 F.3d 415, 420 (7th Cir. 1998)
     *cert. denied*, 526 U.S. 1019 (1999)..................................... 7,8,13,
     14,15

**State Cases**

*Matter of Berbenich v. Regan*,
     81 A.D.2d 732 (3d Dept. 1981), *aff'd*, 54 N.Y.2d 792 (1981)......... 11,15

*Matter of Lichtenstein v. Board of Trustees of the Police Pension
Fund of the Police Department of the City of New York*,
     57 N.Y.2d 1010, 1012 (1982).............................................. 11

*Matter of Taylor v. Regan*,
     103 A.D.2d 884 (3d Dept. 1984)........................................ 11,15

*People v Pfluger*,
     6 Misc.3d 1011(A), 800 N.Y.S.2d 354, 2004 WL 3118688
     (N.Y. Dist. Ct., Suffolk Co. 2004)..................................... 20

*People v. New York Trap Rock Corp.*,
     57 N.Y.2d 371 (1982)..................................................... 19

*People v. Samuels*,
     68 A.D.2d 663 (1st Dept. 1979), *aff'd,* 50 N.Y.2d 1035 (1980)........ 17

*People v. Santiago*,
     64 A.D.2d 355, 367-68 (1st Dept. 1978)................................ 17

**Statutes**

Fed. R. Civ. P. 56(c)........................................................ 4

## PRELIMINARY STATEMENT

The constitutional rights of Uniformed Members of the Service have been impermissibly sacrificed as a public relations ploy.[1] The Government Defendants' desire to disprove any "rumors" that a Uniformed Member of the Service was drinking prior to discharging a firearm (like those apparently surfacing after the Sean Bell shooting incident[2]) does not rise to the level of a "special need" such as might justify suspension of the Fourth Amendment's individualized suspicion requirement. Public safety is clearly not in jeopardy and thus the "Fourth Amendment precludes the suspicionless search [here], "no matter how conveniently arranged." *Chandler v. Miller*, 520 U.S. 305, 323 (1997).

When "special needs" are alleged as justification for a suspicionless search regime, as here, controlling precedent requires that the Government Defendants show that public safety would be jeopardized absent the Interim Order. This they cannot do. Suspicion-based searches are feasible and have been utilized successfully for years in connection with discharges of firearms. And, because there is admittedly no causal nexus between firearms discharges and intoxication, no presumption of a reasonable suspicion of intoxication arises.

---

[1] Plaintiffs submit this brief in support of their cross motion for summary judgment and in opposition to Defendants' summary judgment motion and/or to dismiss the Verified Complaint. The defined terms utilized in Plaintiffs' papers are utilized here for brevity and convenience.

[2] Defendants' Brief, p. 5, wherein they say that, after the Sean Bell shooting incident, there were rumors that "an officer had been drinking at a club just prior to the shooting."

1945856.1

The reason for instituting the suspicionless search policy under the Interim Order is, as the Government Defendants candidly admit, to "enable the NYPD to present evidence" that the type of "rumors" which surfaced after the Sean Bell shooting incident "are false."[3] This revelation demonstrates two points: (1) that the proffered "need" for suspicionless searches here is not "special," and (2) that the Government Defendants do not truly believe there is an "alcohol problem" within the NYPD in connection with firearms discharges.

Thus, there is no evidence of any concrete danger to the public which might permit a departure from the Fourth Amendment's requirement that searches be based upon individualized suspicion. And, even if the Interim Order did not run afoul of the Fourth Amendment, which it does, it is unconstitutionally vague and subject to arbitrary enforcement. For all of the reasons discussed herein, the Interim Order cannot stand.

## STATEMENT OF RELEVANT FACTS

The Court is respectfully referred to the plaintiffs' Rule 56.1 Statement of Material Facts; the Declaration of Candace Reid Gladston, dated November 29, 2007, and exhibits thereto; the Affidavits of Michael J. Palladino, sworn to on November 29, 2007 and October 9, 2007; and the Affidavit of Daniel Rivera, sworn to on October 9, 2007, for statements of the relevant facts.

---

[3]Defendants' Brief, p. 5.

2

The following uncontroverted facts bear emphasizing:

•On September 30, 2007, the Interim Order was issued, which mandates suspicionless searches for alcohol intoxication of Uniformed Members involved in firearms discharges resulting in injury to or death of a person."[4]

•Prior to issuance of the Interim Order, Uniformed Members were not subjected to any alcohol testing absent reasonable suspicion of intoxication.[5]

•Patrol Guide Procedure No. 212-29, effective January 1, 2000, sets forth elaborate procedures to investigate, evaluate and record incidents in which Uniformed Members discharge firearms, which mandates an assessment of whether the Uniformed Member who discharged a firearm was fit for duty.[6]

•Uniformed Members have long been aware that their fitness for duty will be subject to "intense scrutiny" after discharge of a firearm.[7]

•There are no studies, no analyses, no factual evidence, nothing at all, linking firearms discharges to intoxication.[8]

•There are no studies, no analyses, no factual evidence, nothing at all, to support allegations of an "alcohol problem" within the NYPD in connection with firearms discharges.

---

[4] *See* Interim Order, Exhibit B to the Verified Complaint; and Verified Complaint, at ¶¶24-26.
[5] *See* November Palladino Aff., ¶3.
[6] *See* Exhibit 2 to Axelrod Decl.
[7] *See* November Palladino Aff., ¶8.
[8] *See* Defendants' Brief, p. 20.

1945856.1

•The annual Firearms Discharge Reports prepared by the NYPD do not refer to alcohol use in connection with discharges of firearms.[9]

•Uniformed Members are not prohibited from consuming alcohol up to four hours prior to their tour of duty and alcohol consumption is not prohibited in undercover operations (nor could it be, and two drinks per tour have been recommended).[10]

•The Interim Order was admittedly drafted and implemented in response to the Sean Bell incident involving certain undercover officers, and its purpose is to "enable the NYPD to present evidence that [the] type or [sic] rumors [that circulated after Sean Bell incident] are false."[11]

## ARGUMENT

The standard applicable to motions for summary judgment is well settled. Summary judgment may be granted where the moving party shows that there is no genuine issue as to any material fact and that judgment may be rendered as a matter of law. Fed. R. Civ. P. 56(c). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The same standard applies where, as here, the parties file cross-motions for summary judgment. Each party's motion must be examined on its own merits and

---

[9] *See* Copies of Discharge Reports for 2006, 2005, 2002, Exhibits 3, 4, and 5, to the Axelrod Decl.
[10] *See* Exhibit 6, ¶11, to Axelrod Decl.; and Exhibit A to Verified Complaint.
[11] Campisi Decl, ¶¶52-54; Defendants' Brief, p. 5.

1945856.1

4

in each case all reasonable inferences must be drawn against the party whose motion is under consideration.[12] *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir. 2000).

## POINT I

### <u>THE INTERIM ORDER VIOLATES THE FOURTH AMENDMENT</u>

It is undisputed that the breathalyzer tests mandated by the Interim Order constitute suspicionless searches subject to the requirements of the Fourth and Fourteenth Amendments.[13]  Rather, the Government Defendants argue that these suspicionless searches fit within the "closely guarded category of constitutionally permissible suspicionless searches" that may be warranted by "special needs, beyond the normal need for law enforcement." *Chandler v. Miller*, 520 U.S. 305, 313-14 (1997).  They are wrong.14

"When such 'special needs'--concerns other than crime detection--are alleged in justification of a Fourth Amendment intrusion, courts must undertake a

---

[12]The Government Defendants could not have succeeded on a motion to dismiss the verified complaint under the flexible "plausibility standard" applicable to Rule 12(b)(6) motions.  *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007).

[13]*See, e.g., Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. at 616 ("Subjecting a person to a breathalyzer test, which generally requires the production of alveolar or 'deep lung' breath for chemical analysis," ... implicates ... concerns about bodily integrity and, like the blood-alcohol test ... should also be deemed a search.").

[14]The Government Defendants rely on case law that is either distinguishable or stands for principles not in dispute.

1945856.1

5

context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Chandler*, at 314.

The Supreme Court precedents employed for evaluating a specific testing procedure which is not predicated on individualized suspicion are *Chandler* (striking drug testing of candidates for certain designated state offices); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995) (upholding random drug testing of student athletes); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989) (upholding random drug test applicable to United States Customs officers who carry firearms or hold positions directly related to drug interdiction); and *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602 (1989) (upholding drug and alcohol testing of railroad employees who are involved in train accidents causing serious injury or death of a person).

In light of the Supreme Court's analysis in *Chandler*, when "special needs" are alleged as the justification for a suspicionless search policy, the "special needs" showing may be viewed as "a preliminary examination of the government interests at stake." *19 Solid Waste Dept. Mechanics v. City of Albuquerque*, 156 F.3d 1068 (10th Cir. 1998). "Thus, even if the privacy interest is virtually non-existent,[15] the special need requirement prevents suspicionless searches where the government

---

[15] Uniformed Members' privacy interest may be less than that enjoyed by the general citizenry due to the nature of their employment, but that does not mean it is nonexistent.

1945856.1

has failed to show either that it has a real interest in testing or that its test will further its proffered interest." *Id.* at 1073.

A review of the above precedents "strongly indicate that the feasibility of a suspicion-based search is a key consideration in determining whether it is reasonable for the government to implement a suspicionless regime." *Willis II v. Anderson Community School Corp.*, 158 F.3d 415, 420 (7th Cir. 1998), *cert. denied*, 526 U.S. 1019 (1999). The Court observed that

> this emphasis on the practicality of a suspicion-based search is unsurprising, since "to be reasonable under the Fourth Amendment, a search must ordinarily be based on individualized suspicion of wrongdoing." *Chandler*, [520 U.S. at 313,] 117 S.Ct. at 1301. Indeed, in *Skinner* and *Von Raab*--the first cases addressing suspicionless drug testing--**included in their articulation of the special needs analysis the requirement that a suspicion-based approach be unworkable**. *Skinner*, for example, instructs courts to "'balance the governmental and privacy interest *to assess the practicality of the [individualized suspicion] requirements in the particular context.*'" 489 U.S. at 619, 109 S.Ct. 1402 (emphasis added). In *Von Raab*, the Court stated, "[o]ur cases establish that where a Fourth amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is *impractical to require a warrant or some level of individualized suspicion in the particular context.*" 489 U.S. at 665-66, 109 S.Ct. 1384 (emphasis added). Then, in *Vernonia*, the Court outlined the contours of the special needs inquiry with greater specificity. *Vernonia* explained that the reasonableness of a suspicionless search depends upon the balance between (A) the nature of the individual's privacy interest and the character of the intrusion, and (B) the nature and immediacy of the government's concern, as well as the efficacy of the means for meeting that concern. *See* 515 U.S. at 654, 658, 660, 115 S.Ct. 2386.

7

1945856.1

Under the *Vernonia* formulation, **courts consider the feasibility of a suspicion-based search when assessing the efficacy of the government's policy.** *See id.* at 663, 115 S.Ct. 2386....

**As a practical matter, it may be that when a suspicion-based search is workable, the needs of the government will never be strong enough to outweigh the privacy interests of the individual. Or, stated slightly differently, perhaps if a suspicion-based search is feasible, the government will have failed to show a special need that is "important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion."** *Id.* [520 U.S. at 318,] 117 S.Ct. at 1303.

*Willis II*, at 420-21 (emphasis added).

A comparison of the instant case with applicable Supreme Court precedent demonstrates that the Government Defendants' concern--to provide evidence to prove "false" any "rumors" that might surface after a shooting incident--does not even come close to rising to the level of concern required to show "special needs" as that term "draws meaning" from governing case law. *Chandler*, 520 U.S. at 322.

*Chandler, Skinner* and *Willis II,* all involved suspicionless searches triggered by a specific event and all asserted a "special needs" concern as justification to suspend the Fourth Amendment's requirement of individualized suspicion requirement.[16]

---

[16]*Vernonia* and *Von Raab* are not applicable inasmuch as those cases involve random drug testing procedures similar to those already employed by the NYPD. Those procedures are not at issue here.

1945856.1

In *Chandler,* a drug testing regime, which required all candidates seeking nomination to certain state offices to undergo drug testing, was held unconstitutional. The Supreme Court found that the statute had not been enacted "in response to any fear or suspicion of drug use by state officials" since there was no evidence of substance abuse by elected officials and thus there was "no indication of a concrete danger demanding departure from the Fourth Amendment's main rule." *Id.,* 520 U.S. at 318-19.

There, the government sought to justify the suspicionless searches by arguing that they would provide evidence "that candidates, if elected, will be fit to serve their constituents free from the influence of illegal drugs." *Id.* at 321. The Court stated: "The need revealed, in short, is symbolic, not 'special,' as that term draws meaning from our case law." *Id.* at 322. Holding the statute unconstitutional, the Court reiterated that "where, as in this case, public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged." *Id.* at 323.

Here, as in *Chandler*, the suspicionless search regime is not based on a genuine concern that Uniformed Members discharge firearms while intoxicated. Here, as in *Chandler*, there is admittedly no evidence linking discharges of firearms with alcohol intoxication. Here, as in *Chandler*, the proffered need--to project an image that Uniformed Members do not discharge firearms while

1945856.1

intoxicated--is, at best symbolic only, and plainly not "special" as that term "draws meaning" from precedent.    *Chandler*, 520 U.S. at 322.    And, like the unconstitutional suspicionless searches involved in *Chandler*, "public safety is not genuinely in jeopardy," nor is it purported to be, and thus "the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged." *Id.* at 323.

Unlike this case, *Skinner's* "special needs" concern was to promote public safety, which was in jeopardy as a result of numerous train accidents caused by railroad personnel under the influence of alcohol or drugs. *Id.*, 489 U.S. at 631. And, because "the scene of a serious rail accident is chaotic," conducting individualized suspicion searches were not practical. *Id.*, 489 U.S. at 631. *See Chandler*, 515 U.S. at 663 (emphasizing the "substantial difficulties" if not impracticability of suspicion-based searches in *Skinner*).

In *Skinner*, unlike here, there was a documented and well-known "problem of alcohol use on American railroads" and "efforts to deter it by carrier rules" had been ongoing for "at least a century." *Id.* at 605. There were historical studies showing the number of significant train accidents and the number of employee fatalities involving alcohol or drug use. *Id.* at 607 ("the FRA 'identified 34 fatalities, 66 injuries and over $28 million in property damage (in 1983 dollars)

1945856.1

that resulted from the errors of alcohol and drug-impaired employees in 45 train accidents and train incidents during the period 1975 through 1983.").

All in all, the well-documented causal nexus between alcohol problems among railroad employees and rail accidents and the impracticality of using individualized suspicion searches at the scene of rail accidents created the "special need" to protect the public in *Skinner*.[17] *Id.* at 633.

This case, quite unlike *Skinner*, involves a triggering event that is neither an "accident" nor harmful to the public. Discharges of firearms are "reasonably expected and foreseeable," are related to protection of the public and the maintenance of civil order, and are wholly unrelated to the use of alcohol. *See, e.g.*, *Matter of Taylor v. Regan*, 103 A.D.2d 884 (3d Dept. 1984) (incidents involving discharges of an officer's weapon, resulting in the death of one suspect and the injury of another, "arose in the regular course of duty, are within [the officer's] training, and are reasonably expected and foreseeable duties required of a police officer" and were not "accidental in nature"); *Matter of Berbenich v. Regan*, 81 A.D.2d 732 (3d Dept. 1981), *aff'd*, 54 N.Y.2d 792 (1981) ("police officers are aware that situations calling for the use of deadly force might develop in the course of their work and are trained to deal with them"). *Compare Matter of Lichtenstein*

---

[17]*See* Point II below, discussing the regulations in *Skinner*, which were specific and the triggering events well defined. *Id.* at 609-10.

1945856.1

*v. Board of Trustees of the Police Pension Fund of the Police Department of the City of New York*, 57 N.Y.2d 1010, 1012 (1982) (defining "accident" as "a 'sudden, fortuitous mischance, unexpected, out of the ordinary, and injurious in impact'").

Unlike *Skinner*, suspicion-based searches in the context of firearms discharges are practical and have been successfully employed for years.[18]  Thus, there is no important government interest that would be placed in jeopardy by continuing to employ individualized suspicion searches when there is a shooting incident resulting in the injury or death of a person.

Also unlike *Skinner*, there are no historical studies or analyses linking discharges of firearms with alcohol intoxication.  None.

It is quite clear that the suspicionless testing regime here has nothing to do with any "surpassing safety interests."  *Skinner*, at 634.  Rather, the purpose for the suspicionless regime here is to "enable the NYPD to present evidence" that the type of "rumors" that circulated after the Sean Bell incident "are false."[19]  Clearly, "public safety is not genuinely in jeopardy and thus the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged." *Chandler*, 520 U.S. at 323 (reiterating "substantial and real" public safety concerns

---

[18]*See* Campisi Decl. at ¶¶26-44; Patrol Guide Procedure No. 212-29, Exhibit 2 to Axelrod Decl. and Exhibit H to Defendants' papers.
[19]Defendants' Brief, p. 5.

1945856.1

involved in *Skinner*).

*Willis II, supra,* is instructive. The triggering event there was misconduct, primarily fighting, and the drug testing policy was formulated to address the "growing disciplinary problems" and the "perception of increased drug and alcohol use among students." The school relied on professional literature that "documented a relationship between fighting and the use of unlawful substances," but also listed 31 other indicia of substance use and stated that a list of "possible signs" could be "endless." *Id.* at 419.

The *Willis II* Court stated that

> our determination of whether the Corporation has demonstrated a special need cannot be controlled by the fact that a suspicionless regime casts a wider net than suspicion-based regime. A suspicion based approach might never round up as many wrongdoers as a suspicionless system, since some students may be particularly adept at hiding the signs of their drug and alcohol use. Indeed, one of the most effective means of preventing substance abuse among children may be to require them to provide a urine sample each time they pass through the schoolhouse gate. But, **as we have tried to emphasize, the Supreme Court has not sanctioned blanket testing. Nor has it renounced the proposition that the Fourth Amendment normally requires individualized suspicion.** *See Chandler,* [520 U.S. at 318,] 117 S.Ct. at 1303. And it is hard to imagine a scenario in which the Corporation's school officials are better-situated to make a determination of individualized suspicion than in the wake of student misconduct that warrants a three-day suspension.

*Willis II,* at 423 (emphasis added).

1945856.1

13

In *Willis II*, after the triggering event occurred--student misconduct--the particular student would be required to meet with the principal or other official, such as the Dean of Students. The Court observed:

> This meeting--mandated by state law--provides an opportunity for the designated school official to observe the child and determine whether there is a reasonable suspicion of substance abuse. Indeed, one of the ironies of this case is that even as the corporation endeavors to show a special need that warrants abandonment of the Fourth Amendment's usual requirements, the record shows that the Dean of Students at Anderson High School evaluated Willis without any apparent difficulty and determined that "nothing at that time [created] reasonable suspicion.

*Id*. at 424.

The Court further observed,

> The scenario prescribed by state law—an individual meeting between the wrongdoer and a high-ranking agent of the school district—distinguishes this case from those in which the Supreme Court has permitted suspicionless drug testing.... Moreover, **it is hard to believe that the Dean of Students would have any difficulty justifying a finding of reasonable suspicion in fighting cases. Therefore, the imposition of a suspicionless policy seems to serve primarily demonstrative or symbolic purposes.** *See Chandler* [520 U.S. at 322] 117 S.Ct. at 1305.

*Willis II*, 158 F.3d at 424 (emphasis added). *See Chandler*, 520 U.S. at 322 (explaining the "need" revealed by the government was not "'special,' as that term draws meaning from our case law"). Thus, the Court in *Willis II*, struck the policy of suspicionless searches because there was no evidence that "a suspicion-based system would be unsuitable," and, in fact, "would be highly suitable." *Id*. at 425.

1945856.1

Here, as in *Willis II*, a suspicion-based system is not only "suitable," but has been in place for years.[20]  Just like the examination performed by high-ranking school officials in *Willis II,* high-ranking officers of the NYPD perform an intense investigation and examination of Uniformed Members' fitness for duty, which includes sobriety, every time a firearm is discharged.[21]  Here, as in *Willis II*, it is hard to believe that any of these high-ranking agents of the NYPD would have any difficulty determining whether there was a reasonable suspicion of alcohol use.

Moreover, there is no link at all between firearms discharges and intoxication, not even a tenuous link like the one rejected in *Willis II.*

Nor does the policy formulated here have any deterrent effect since Uniformed Members are well aware that their fitness for duty will be the subject of "intense scrutiny" following firearms discharges.[22]  And, unlike *Willis II* and *Skinner*, the policy here is not to prevent a triggering event from occurring since firearms discharges are reasonably expected in the ordinary course of employment, *see Matter of Taylor v. Regan*, and *Matter of Berbenich v. Regan*, *supra,* but,

---

[20] *See* Campisi Decl. at ¶¶26-44; Patrol Guide Procedure No. 212-29, Exhibit 2 to Axelrod Decl. and Exhibit H to Defendants' papers.
[21] *See* Campisi Decl. at ¶¶26-44; Patrol Guide Procedure No. 212-29, Exhibit 2 to Axelrod Decl. and Exhibit H to Defendants' papers.
[22] Defendants' Brief, p. 12.

1945856.1

15

rather, is simply to prove "false" any hypothetical "rumors" that a Uniformed Member might have discharged a firearm while under the influence of alcohol.[23]

The requirement of individualized suspicion should not yield where there is no genuine substantial government interest that would be placed in jeopardy by a requirement of individualized suspicion, notwithstanding that Uniformed Members may enjoy lesser Fourth Amendment rights than the general citizenry. The requisite concrete danger demanding a departure from the Fourth Amendment's requirement just does not exist here. The testing procedures mandated by the Interim Order do not fit within the "closely guarded category of constitutionally permissible suspicionless searches," as alleged, but, rather, are, at most "symbolic," not "special" as that term draws meaning from Supreme Court precedent. *Chandler*, 520 U.S. at 322.

The Supreme Court long ago warned:

"Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."

*Chandler*, 520 U.S. at 322 (*quoting Olmstead v. United States*, 277 U.S. 438, 479 (1928).

---

[23] *See* Campisi Decl., at ¶¶47-57; Defendants' Brief, p. 5.

1945856.1

In a similar vein, the Court in *People v. Samuels*, 68 A.D.2d 663 (1st Dept. 1979), *aff'd,* 50 N.Y.2d 1035 (1980), observed:

> "Men make good laws as well as bad.  The bad laws most noticeably result when there exists an unfettered, blind devotion to an ideal, an abstract absolute principle which ignores the reality of the individual person. ... In our society we have placed the responsibility of maintaining a reasoned civil order in the first instance on the police. It is only fair, therefore, that we view the policeman as a real person, one imbued with the strengths and weaknesses of his or her fellow man, albeit one possessed of a certain expertise acquired by training and experience.  Ensconced within the safety of our libraries, our courtrooms and our homes, we must not forget the reality that it is the police to whom we look for protection and for succor and whom we place in natural proximity to the criminal world as a line of defense. Entrusting the police officer with a gun, we expect the faithful discharge of duty, even to the death.  Yet when the officer discharges that duty, we sometimes, in examining the correctitude or reasonableness of that discharge, scrutinize the officer not as a real human being, but as an abstract, a myth, the perfectly rational man. This is a danger to be avoided."

*Id.* at 613-14 (*quoting People v. Santiago*, 64 A.D.2d 355, 367-68 (1st Dept. 1978).

Based on the foregoing, Plaintiffs are entitled to summary judgment and an injunction prohibiting enforcement of the Interim Order.  The Government Defendants' motion should be denied in its entirety.

## POINT II

## <u>THE INTERIM ORDER IS UNCONSTITUTIONALLY VAGUE</u>

In *Pankos Diner Corp. v. Nassau County Legislature*, 321 F. Supp.2d 520 (E.D.N.Y. 2003), the plaintiffs sought to enjoin enforcement of amendments to the

1945856.1

2002 Smoking Law promulgated by the Nassau County Legislature based on, *inter alia*, the void-for-vagueness doctrine.

The Court stated:

> The movant's demonstration of irreparable harm comprises the "'single most important prerequisite for the issuance of a preliminary injunction....'" Due to the importance of this factor, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered...." To demonstrate irreparable harm, "[t]he movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages...."

*Id.*, at 523-524 (citations omitted).

Among other things, the plaintiffs in *Pankos Diner* demonstrated infirmities in the language of the amendments. The Court stated:

> A statute is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation, and **encourages arbitrary and erratic behavior on the part of officials charged with enforcing the rule**.... [A] court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and **then consider whether the law provides explicit standards for those who apply it**.... Therefore, the Court first considers the text of the statute to ascertain whether an individual possessed of reasonable intelligence could ascertain its meaning.

*Id.*, 321 F. Supp.2d at 525 (citations omitted, emphasis added).

In analyzing the amendments at issue, the Court acknowledged that the text of the legislation was both unclear and vague and caused confusion (*e.g.*, certain

1945856.1

18

terms not defined; whether certain exemptions were repealed was unclear, contained inconsistency with prior law, etc.). The Court found:

> For the reasons indicated, the Court finds that plaintiffs have demonstrated a clear and substantial likelihood of success on the merits under their void-for-vagueness cause of action, supplemented by a showing of irreparable harm. Accordingly, [a] preliminary injunction is issued pursuant to Federal Rule of Civil Procedure 65....

*Id.*

The Interim Order is even more vague and uncertain that the challenged amendments in *Pankos Diner*, and the irreparable harm to Uniformed Members, by virtue of the suspicionless searches is clearly more important than the mere loss of customers at stake in *Pankos Diner*.

In *People v. New York Trap Rock Corp.*, the Court of Appeals stated:

> Turning then to the void-for-vagueness doctrine, we begin our analysis by a brief review of the reasons why it at times has been called "the first essential of due process of law"....
>
> As we have had occasion to reiterate in recent years, a prime purpose is to meet "the constitutional requisite that a statute be 'informative on its face' ... to assure that citizens can conform their conduct to the dictates of the law".... To this end, nothing less than "adequate warning of what the law requires" will do....
>
> ....
>
> Of equal concern is the prevention of "arbitrary and discriminatory enforcement by requiring 'boundaries sufficiently distinct' for police, Judges, and juries to fairly administer the law".
>
> ....
>
> As common sense and experience both tell us, unless by its terms a law is clear and positive, it leaves virtually unfettered discretion in the hands of law enforcement officials....

1945856.1

19

*Id.*, 57 N.Y.2d 371, 378-79 (1982) (citations omitted, emphasis added).

The Court of Appeals also acknowledged that if it were a case involving "Bill of Right Freedoms", such as here, the vagueness doctrine serves as a "buffer zone of added protection," thus requiring "more careful scrutinizing" of the alleged vague ordinance than if no such claims were involved. *Id.* 57 N.Y.2d at 379. *See People v Pfluger*, 6 Misc.3d 1011(A), 800 N.Y.S.2d 354, 2004 WL 3118688 (N.Y. Dist. Ct., Suffolk Co. 2004).

As in *People v. Trap Rock, supra*, the Interim Order "poses special problems of draftsmanship and enforcement." *Id.* at 379. The Interim Order contains language that is vague and internally inconsistent. For example, paragraph 2 of the Interim Order provides for mandatory breath testing of any Uniformed Member "involved in a firearms discharge within New York City which results in injury to or death of a person...."[24] Whereas paragraph 10 provides for mandatory breath testing of any Uniformed Member "who discharged a firearm"--irrespective of resulting injury to or death of a person.[25] Indeed, the media covered a shooting incident on Tuesday, November 13, 2007 involving 5 Uniformed Members, which resulted in the "death of a person." All of the Uniformed Members were subjected to the breath test even though it was unknown which of the weapons discharged

---

[24]*See* Interim Order, ¶2, Exhibit B to Verified Complaint.
[25]*See* Interim Order, ¶10, Exhibit B to Verified Complaint.

1945856.1

actually caused the death. This inconsistent language leaves room for arbitrary enforcement of what are already vague terms.

Indeed, the Interim Order does not define any of the terms employed therein. Suspicionless searches can be conducted where there is an extremely minor injury, or where an injury or even death is not proximately caused by the discharge of a Uniformed Member's firearm, or when the discharge of a firearm results in the injury of a Uniformed Member. The Government Defendants know how to define terms,[26] they just chose not to in the Interim Order. Thus, the Interim Order appears to have been made deliberately vague.[27]

Similarly, the Interim Order does not specify "the number of different means" by which the suspicionless searches will be conducted and does not adequately set forth or establish the "private setting" or "dignified, respectful fashion" in which the suspicionless searches are to be conducted. Nor does the Interim Order prescribe the ability to use the test results once administered. And the Interim Order does not discuss or establish rights of Uniformed Members to independently evaluate test samples and results or to obtain a copy of a videotaped testing.

---

[26] *See* Patrol Guide Procedure No. 212-53, referring to police activity where a person dies or sustains "serious injury," Exhibit 8 to Axelrod Decl. and Exhibit I to Defendants' papers.

[27] Indeed, it is not known what procedures, if any, are applicable if a breathalyzer test result is greater than zero but less than .08.

1945856.1

While the Interim Order references a "specially designed form" and "specially designed checklist" to be utilized in administering the suspicionless searches, it does not annex same thereto. Thus, Uniformed Members of the Services are wholly deprived of any advance notification or due process in connection with the conduct of the searches.

Furthermore, the Interim Order does not apply outside the geographic boundaries of New York City, but Uniformed Members may in fact be "involved" in the discharge of a firearm outside New York City limits. Thus, the Interim Order will not be applied even-handedly regardless of what the Government Defendants say in their motion papers. Ironically, the Government Defendants are content to rely on reasonable suspicion of intoxication of its Police Officers outside of the five boroughs.

All in all, the Interim Order is not sufficiently definite to provide fair notice of the required or prohibited conduct; and fails to provide explicit and objective standards by which a violation may be readily determined, and must be stricken. *See e.g.*, *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (California statute held unconstitutionally vague as it failed to clarify what was contemplated by requirement therein). The Interim Order does not adequately set forth as to who, when, where, and how it applies.

Significantly, the regulations in *Skinner* were well defined and specifically

1945856.1

22

limited in their scope. For instance, the regulations entitled "Post-Accident Toxicological Testing" mandated blood and urine testing upon the occurrence of: (1) "a 'major train accident,' defined as any train accident that involves (i) a fatality, (ii) the release of hazardous material accompanied by an evacuation or a reportable injury, or (iii) damage to railroad property of $500,000 or more;" or (2) "after an 'impact accident,' which is defined as a collision that results in a reportable injury, or in damage to railroad property of $50,000 or more;" or (3) "after '[a]ny train incident that involves a fatality to any on-duty railroad employee.'" *Id.* 489 U.S. at 609.

Moreover, there was a limited exception from testing "if the railroad representative can immediately determine on the basis of specific information that the employee had no role in the causes(s) of the accident/incident;" but no exception applied in the case of "a major train accident." *Id.* n. 2. The regulations entitled "Authorization to Test for Cause" were permissive and subjected employees to breath and urine tests after a reportable accident or incident where a supervisor had "reasonable suspicion" that an employee's acts or omissions contributed to the occurrence or severity of the accident or incident." *Id.* at 610.

The Interim Order stands in stark contrast to the well-defined regulations in *Skinner*. The terms in the Interim Order are not defined and its application unclear and subject to arbitrary enforcement. Thus, the Interim Order cannot stand.

1945856.1

23

## **CONCLUSION**

For the reasons discussed above, Plaintiffs are entitled to summary judgment; Defendants should be enjoined from further enforcement of the Interim Order; and Defendants' motion should be denied in its entirety.

Dated:      East Meadow, New York
            November 29, 2007

CERTILMAN BALIN ADLER & HYMAN, LLP

By: _____
      Candace Reid Gladston
      Attorneys for Plaintiffs
      90 Merrick Avenue
      East Meadow, New York 11554
      516) 296-7000
      cgladston@certilmanbalin.com

On the Brief:
Candace Reid Gladston
Michael C. Axelrod
Donna-Marie Korth

1945856.1