07 Civ. 9246 (GBD)(MHD)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL J. PALLADINO, as President of the New York City Detectives' Endowment Association, Inc., et al.

Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT, AND IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**MICHAEL A. CARDOZO**
*Corporation Counsel of the City of New York*
Attorney for Defendants
100 Church Street, Room 2-187
New York, NY 10007-2601
Tel: 212-788-0952

**ALAN M. SCHLESINGER,**
Of Counsel

Matter No.: 2007-031620

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

ARGUMENT ........................................................................................................ 4

      POINT I ....................................................................................................... 4

      INTERIM ORDER 52 FALLS WITHIN THE
      FOURTH AMENDMENT'S SPECIAL NEEDS
      DOCTRINE. THUS, PLAINTIFFS' SUMMARY
      JUDGMENT MOTION SHOULD BE DENIED
      AND DEFENDANTS' MOTION TO DISMISS
      SHOULD BE GRANTED. ........................................................................ 4

      POINT II ...................................................................................................... 17

      IO 52 IS NOT "VOID FOR VAGUENESS." .......................................... 17

CONCLUSION..................................................................................................... 21

## PRELIMINARY STATEMENT[1]

Plaintiffs, three Police unions and their presidents, bring this complaint challenging NYPD Interim Order 52 ("IO 52"), which requires that a breathalyzer test be administered to any NYPD officer who is involved in a shooting that results in injury or death to a person in New York City.   Plaintiffs contend that the breathalyzer is an unconstitutional search and that IO 52 is unconstitutional as "void for vagueness."  Plaintiffs moved for a preliminary injunction prohibiting enforcement of IO 52.  Defendants moved to dismiss the Complaint, or in the alternative for summary judgment, and opposed the motion for a preliminary injunction.[2]   Plaintiffs have now opposed defendants' motion and also cross-moved for summary judgment.

Defendants now reply in further support of their motion to dismiss, or in the alternative for summary judgment, and also oppose plaintiffs' cross-motion for summary judgment.  IO 52 falls squarely within the "special needs" doctrine of the Fourth Amendment and is therefore constitutional.

Plaintiffs' principal contention in opposition to defendants' motion is that IO

---

[1] IO52 is challenged in three related cases: (1) in this case by the Detectives Endowment Association, the Sergeants' Benevolent Association and the Lieutenants Benevolent Association, unions representing NYPD officers in the ranks of Detective, Sergeant, and Lieutenant in Palladino v. City of New York, 07 Civ. 9246 (GBD)(MHD); (2) by the Patrolmen's Benevolent Association which represents NYPD in the title of Police Officer in Lynch v. City of New York, 07 Civ. 9337 (GBD)(MHD); and (3) by the Captains Endowment Association which represents NYPD officers in the rank of Captain in Driscoll v. City of New York, 07 Civ. 10359 (GBD)(MHD).  Defendants are the same in all three cases.  All three suits contend that IO 52 violates the Fourth and Fourteenth Amendments, although Palladino, adds a "void for vagueness" claim and Driscoll has Due Process Clause claims.  Defendants therefore requests that if the complaints in these cases survive defendants' motion, that all three cases be consolidated for all purposes.

[2] Defendants motion was pursuant to Rule 12(b) to dismiss the complaint or in the alternative for summary judgment.  The Court has not issued an order opting for the latter procedure as is envisaged by the last sentence of Rule 12(b).

52 is solely "symbolic."  In contrast, the PBA in <u>Lynch</u>, has contended, also without evidence, that the primary purpose of IO 52 is to gather evidence in a criminal investigation. IO 52 was instituted to maintain the integrity of shootings by NYPD officers and to deter the ingestion of alcohol while on duty or just prior to a tour.  The authority to use deadly physical force as an expected part of the job is almost unique to the police.  A shooting by an NYPD officer who is under the influence of alcohol that results in injury or death to a person is a betrayal of this enormous responsibility which has been invested in each officer and a gross abuse of governmental power.  This is true even where the shooting is non-criminal and otherwise in accordance with NYPD regulations.  The NYPD has the right, if not the duty, to take reasonable steps to discover and deter any such occurrences and to protect the public, as well as other NYPD officers, from officers who engage in such a shooting.

Public confidence is essential to the mission of the NYPD.  An officer shooting and injuring a person while under the influence of alcohol can have a deleterious effect on that essential public confidence.  While plaintiffs would have it otherwise, this is more than the mere symbolism, this is essential to the mission of the NYPD.

Plaintiffs do not deny that the privacy interests of NYPD officers is greatly diminished and perhaps reaches its nadir when the officer is involved in a shooting.  NYPD officers are subject to drug tests at hiring, at the end of probation, when entering a special operations command, and they are also subject to random drug tests.  The breathalyzer test required here will have little effect on these already diminished privacy rights.  The means chosen by the NYPD is narrowly tailored to meet the NYPD's objectives.  The NYPD has chosen a breathalyzer directed at the most serious event – a shooting which injures or kills a person.  The NYPD's interests are at their height in such circumstances.  The information

sought, whether alcohol was involved in a shooting, will be lost if the breathalyzer is not administered soon after the shooting. The breathalyzer test, which takes about 5 minutes, is limited to alcohol and will not capture more information than is necessary to determine whether the officer is intoxicated. IO 52 requires a breathalyzer test on the happening of an injury to a person from a police shooting thus eliminating discretion that might lead to discriminatory or arbitrary administration. The routine and mandatory nature of IO 52 will also eliminate the possibility of stigma that might otherwise surround the administration of the breathalyzer test. In sum, IO 52 is designed to gather the needed information while at the same time respecting the rights of NYPD officers – it will maintain the integrity of the NYPD without sacrificing the dignity of NYPD officers. IO 52 falls squarely within the special needs doctrine of the Fourth Amendment and is constitutional.

IO 52 is not void for vagueness. A civil regulation of an already highly regulated profession need not meet the specificity that would be required of a criminal statute. Plaintiffs unsuccessfully attempt to construct ambiguities in IO 52 where there are none and this attempt indicates that IO52 is not unconstitutionally vague.

This is an end to plaintiffs' claim of unconstitutionality and the Complaint must be dismissed.

## **STATEMENT OF FACTS**

For a complete statement of facts, the Court is respectfully directed to the Counter Rule 56.1 Statement, dated January 4, 2008, the Declaration of Suzanne Gimblet, dated November 6, 2007, ("Gimblet Decl.") and the Declaration of Charles V. Campisi, dated November 7, 2007, and the exhibits annexed thereto ("Campisi Decl."). [3]

---

[3] Unless otherwise indicated, all references to exhibits are to those annexed to Campisi Decl.

<u>**ARGUMENT**</u>

**POINT I**

**INTERIM ORDER 52 FALLS WITHIN THE FOURTH AMENDMENT'S SPECIAL NEEDS DOCTRINE. THUS, PLAINTIFFS' SUMMARY JUDGMENT MOTION SHOULD BE DENIED AND DEFENDANTS' MOTION TO DISMISS SHOULD BE GRANTED.**

The issue presented in the instant case is whether IO 52 falls within the parameters of the "special needs" doctrine of the Fourth Amendment. If so, the very limited search of IO 52's breathalyzer test is "reasonable" under the Fourth Amendment and therefore constitutional. See <u>Cassidy v. Chertoff</u>, 471 F.3d 67, 74-75 (2d Cir. 2006) (reviewing cases); <u>see</u> <u>also</u> <u>Nat'l Treasury Employees Union v. Von Raab</u>, 489 U.S. 656 (1989); <u>Skinner v. Ry. Labor Executives' Ass'n</u>, 489 U.S. 602 (1989); <u>MacWade v. Kelly</u>, 460 F.3d 260 (2d Cir. 2006). "The touchstone of the Fourth Amendment is reasonableness." <u>United States v. Miller</u>, 430 F.3d 93, 97 (2d Cir. 2005)(citing <u>United States v. Knights</u>, 534 U.S. 112, 118 (2001)). IO 52 is more than reasonable and should be upheld.

The application of the special needs doctrine under the Fourth Amendment necessarily requires a context-specific inquiry. <u>Cassidy</u>, 471 F.3d at 75. It requires that the privacy interests which are protected by the Fourth Amendment be balanced against the public interests advanced by the search. <u>Id.</u>; <u>see</u> <u>Von Raab</u>, 489 U.S. at 665-66. In <u>Cassidy</u>, the Second Circuit used a three-pronged inquiry to perform this balancing test:

> (1) the nature of the privacy interest involved;
> (2) the character and degree of the governmental intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs.

<u>Id.</u>

As apparently agreed by all litigants in the three cases challenging IO 52, NYPD officers have a diminished expectation of privacy. See Von Raab, 489 U.S. at 671. NYPD officers are subject to drug tests when they enter service, at the end of their probation periods, when they enter a specialized command in the NYPD such as the Organized Crime Control Bureau, and they are also subject to random drug tests throughout their NYPD careers. NYPD officers are required to be fit for duty at all times with rare exceptions. PG 203-04, Exhibit "B,"; see Skinner, 489 U.S. at 621 (noting similar restrictions on railroad workers). That expectation of privacy reaches its nadir where the officer is involved in a shooting which injures or kills a person. Firearms discharges by NYPD officers are laborious and thoroughly investigated. There are voluminous reports on each shooting and a review at the borough level and at the Citywide level. An NYPD has no expectation of privacy whatsoever concerning the information at issue, whether the officer was intoxicated when he was involved in the shooting. Thus, the expectations of an NYPD officer to privacy, which are already diminished, are at their lowest in the context of a police shooting which has injured or killed a person.

The information to be collected in this case is the NYPD officer's sobriety at the time that the shooting occurs. The breathalyzer test must be performed soon after the shooting or the information sought will be lost. See Skinner, 489 U.S. at 623 ("…blood and breath samples taken to measure whether these substances were in the bloodstream when a triggering event occurred must be obtained as soon as possible.")(citation omitted). The test takes a few minutes and is, as a matter of law, minimally intrusive. Id. at 625. In short, as the Supreme Court put it in Skinner:

> We said [in Schmerber] also that the intrusion
> occasioned by a blood test is not significant, …

> The breath tests authorized by Subpart D of the
> regulations are even less intrusive than the
> blood tests …

Id. (discussing Schmerber v. California, 384 U.S. 757, 767-768 (1966)).

The testing required by IO 52 is minimally invasive and designed to capture only the information concerning alcohol at the time of the shooting.  The testing is mandatory in the narrow circumstances that trigger IO 52's application and, thus, there is no room for arbitrary or discriminatory enforcement.  The testing here bears a striking resemblance to that permitted in Skinner, the first of the special needs cases:

> Both the circumstances justifying toxicological
> testing and the permissible limits of such
> intrusions are defined narrowly and specifically
> in the regulations that authorize them, and
> doubtless are well known to covered employees.
> **Indeed, in light of the standardized nature of
> the tests and the minimal discretion vested in
> those charged with administering the
> program, there are virtually no facts for a
> neutral magistrate to evaluate**.

Skinner, 489 U.S. at 622 (citation omitted)(emphasis supplied).  It should also be noted that because the breathalyzer test is mandatory will not stigmatize the officer.  See Cassidy 471 F.3d at 80.  As was said of the breath and urine tests examined in Skinner:

> Though some of the privacy interests implicated
> by the toxicological testing at issue reasonably
> might be viewed as significant in other contexts,
> logic and history show that a diminished
> expectation of privacy attaches to information
> relating to the physical condition of covered
> employees and to this reasonable means of
> procuring such information.

Skinner, 489 U.S. at 628.

Policing in New York City is a highly regulated profession.  Shootings by NYPD officers are intensely scrutinized by the NYPD.  IO 52 is introduced into this context

to protect the integrity of the shootings.  The dictionary defines the term "integrity" to mean, inter alia, "an unimpaired condition."  Websters' New Collegiate Dictionary (© 1981).  IO 52 is meant to preserve the integrity of NYPD shootings by ensuring that officers are in an "unimpaired condition" at the time that they are involved in a shooting which injures or kills a person.  IO 52 does this by detecting the presence of alcohol through a breathalyzer test performed soon after the shooting and by deterring the ingestion of alcohol immediately prior to duty or when on duty.  Such integrity is at the heart of the NYPD's ability to perform its mission.  NYPD officers carry guns and are empowered to use them, it is not too much for the public to demand that any exercise of this nearly unique power and authority is done soberly.  See Pappas v. Giuliani, 290 F.3d 143, 149-50 (2d Cir. 2002)(statements by a police officer that undermine public confidence in the police force and the confidence of police officers in one another are disruptive to the NYPD's mission and not protected by the First Amendment).  The governmental need in this case concerns the issue of life and death and there cannot be a more serious or compelling governmental need.  See Skinner, 489 U.S. at 628 (describing the public safety needs there as "compelling"); see also Von Raab, 489 U.S. at 671 (citing Caruso v. Ward, 72 N.Y.2d 432, 441, 530 N.E.2d 850, 854-855, 534 N.Y.S.2d 142 (1988), which permitted random drug tests of NYPD officers seeking assignment to the NYPD's Organized Crime Control Bureau under the special needs doctrine).

The breathalyzer tests here are not alleged by these plaintiffs to be primarily for criminal investigative purposes.  In any event, as in many of the special needs cases, the breathalyzer has as its "immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation."  MacWade, 460 F.3d at 268(quoting Nicholas v. Goord, 430 F.3d 652, 663 (2d Cir. 2005)).  The NYPD at the scene of a shooting by an

NYPD officer occupies two distinct roles: (1) that of employer monitoring and regulating the actions of its employees and (2) that of police investigator who must determine if there is reason to believe a crime has been committed and if so whether anyone may be criminally responsible. Even where there is little or no possibility of a criminal case, and the NYPD's second role is not implicated, the NYPD's role of employer requires that the NYPD ensure that its officers involved in a shooting that injures or kills have not been impaired by alcohol. For example, in the fall of 2007, an NYPD officer accidentally shot and injured him/herself and was given an IO 52 breathalyzer test even though there was practically no possibility of a criminal case resulting from the incident.[4]  Campisi Decl. ¶ 58.

Furthermore, there is no allegation here that a breathalyzer test is a normal tool of criminal investigation. The NYPD does not, for example, perform breathalyzer tests on members of the public who are arrested for illegally firing guns. Breathalyzer tests are therefore, performed when there is no possibility of criminal prosecution and are not performed when there is an actual prosecution. Thus, IO 52 is not for the routine criminal investigation of officers but is, rather, an NYPD management tool designed, as IO 52 itself states, to protect the integrity of police shootings. Thus, IO 52 fits squarely within the special needs doctrine of the Fourth Amendment and is constitutional.

While the PBA in the Lynch case has alleged, albeit without any evidence, that the primary reason for the promulgation of IO 52 is the gathering by the NYPD of information for a criminal investigation, plaintiffs in the instant case have taken an opposite path to their argument. Plaintiffs contend that there is essentially no reason for the search required by IO 52 and that the only reason for IO 52's existence is "symbolism."

_____

[4] Of course, that the information may be used in a criminal case, if one exists, does not

Symbolism, plaintiffs reason, cannot satisfy the requirements of the Fourth Amendment's special needs doctrine. Plaintiffs rely primarily on two cases: <u>Chandler v. Miller</u>, 520 U.S. 305 (1997) and <u>Willis II v. Anderson Community Sch. Corp.</u>, 158 F.3d 415 (7th Cir. 1998) ("<u>Willis</u>"). Brief In Support of Plaintiffs' Cross-Motion And In Opposition To Defendants' Motion , dated November 29, 2007 ("Pl. Brief") at 7-16. Plaintiffs' reliance is misplaced.

In <u>Chandler</u> the Supreme Court considered a case in which all candidates for public office were required to take drug tests simply to prove that they were not taking illegal drugs. The Supreme Court found that the regulation did not come within the special needs doctrine of <u>Skinner</u> and <u>Von Raab</u>, because there was no immediate threat to human life or health, no "surpassing safety interests," no indication of public corruption flowing from the intake of illegal drugs by Georgia public servants, no record of regulation attempting to confront the issue of elected officials taking drugs, and no real deterrent value to the drug tests. 520 U.S. at 318-19. In short there was no indication that the hazards identified by Georgia were real rather than "hypothetical." <u>Id.</u> at 319. Georgia admitted that there was no particular problem of drug abusers seeking state office. <u>Id.</u> Nor was there a record of lesser measures taken to combat the nonexistent problem of drug abuse by elected public officials. Thus, the Supreme Court concluded that the testing was for purely symbolic reasons.

In the instant case, the NYPD has a long history of attacking the problem of alcohol abuse by its officers. There has been a Counseling Unit in place for decades and that unit is devoted to addressing the possible alcohol problems of officers.[5] Numerous

invalidate a search under the special needs doctrine. <u>Skinner</u>, 489 U.S. at 620-21, and n. 5.

[5] During the years 2005- to present, the Counseling Unit has conducted approximately 600 interviews. Of these, about 380 have been of NYPD personnel who have never been seen by the Counseling Unit before, that is, new interviewees. Gimblet Decl. ¶ 9. There are

regulations of the NYPD's Patrol Guide concern the issue of alcohol intoxication. One Patrol Guide section is concerned solely with the removal of firearms from intoxicated officers. PG 206-12, "Removal of Firearms From Intoxicated Uniformed Member of the Service," Exhibit "G." The NYPD has suffered from officers who are arrested for driving while intoxicated and has issued procedures governing the disciplining of such officers. Tragically, the NYPD also suffers suicides of officers each year and some of those suicides have the indicia of alcohol use or abuse. This long record of alcohol abuse by some NYPD officers and the NYPD promulgation of a variety of regulations and guideline designed to prevent intoxicated officers from possessing guns proves that the public safety threat here is anything but "hypothetical" and distinguishes this case from <u>Chandler</u>.

Plaintiffs seem to contend that the NYPD has not assembled statistics concerning shooting incidents in which an NYPD officer involved in the shooting was so intoxicated from drinking alcohol that the officer was unfit for duty. First, there has never been a requirement that such officers receive a breathalyzer test and thus, the information plaintiffs seeks has yet to be captured. Plaintiffs argument is, in some respects, circular - requiring the NYPD to produce information that will be gathered from the very test they now seek to enjoin due to the absence of that information.

Second, plaintiffs' argument would require the NYPD to await a <u>proved</u> tragedy involving alcohol and a police shooting before taking action. The Constitution does not require such inaction. Quite the contrary, such inaction might be determined to be "deliberate indifference" to a known risk and may, in some circumstances, be held to constitute an unconstitutional municipal policy of the City. <u>See</u> <u>Canton v. Harris</u>, 489 U.S.

approximately 35,000 NYPD officers and statistically the 380 new interviews amounts to

378 (1989); cf. Walker v. City of New York, 974 F.2d 293 (2d Cir. 1992), cert. denied, 507 U.S. 961, 972 (1993)(failure to train may be a violation of § 1983 where government knows to a moral certainty that police officers will confront a situation which requires training because answer is not obvious or there is a history of mishandling such situations and in which the failure to make right choice will frequently cause violation of rights).  As the Supreme Court noted in Skinner, it is difficult for even trained professionals such as doctors to detect alcohol intoxication with accuracy.  489 U.S. at 628-29 ("An impaired employee, the FRA found, will seldom display any outward 'signs detectable by the lay person or, in many cases, even the physician.'").  Therefore, reliance on reasonable suspicion testing here is as impractical as it was in Skinner.  The NYPD cannot, and should not, turn a "blind eye" to the possibility of alcohol involvement in police shootings.  IO 52 is a reasonable and prudent step for the NYPD to take to prevent and detect alcohol influenced shootings by NYPD officers.

Third, NYPD officials are owed deference in determining when the evidence has amounted to the point that action is required.  See Trotta v. Ward, 77 N.Y.2d 827, 828, 566 N.Y.S.2d 199, 567 N.E.2d 241 (1991); Lynch v. Giuliani, 301 A.D.2d 351, 359, 755 N.Y.S.2d 6, 14 (1st Dep't 2003) )("The Commissioner's powers over police discipline arise out of the fact that it is he or she 'and not the courts, [who] is accountable to the public for the integrity of the Department'")(citations omitted).  While the Court should not abandon its role of enforcing the Constitution, neither should it unduly second-guess the judgment of those officials charged with the management of an intrinsically dangerous and difficult operation such as the NYPD.

more than 1% of the entire force.

Fourth, plaintiffs completely ignore the deterrent effect of IO 52 which warns officers that they will be tested for alcohol impairment if they are involved in a shooting and cautions officers not to drink within 4 hours of the beginning of their tour of duty. In short, the instant case has evidence of alcohol abuse by NYPD officers who are in possession of guns and this is sufficient to justify the promulgation of IO 52.

Moreover, the NYPD drug tests each new police officer on entry into its ranks – the very type of test rejected in Chandler and approved in Von Raab for law enforcement officers carrying guns. The elected officials in Chandler were not subject to random drug tests while NYPD officers have long been the subject of just such a regime.

The elected officials in Chandler cannot be equated with the NYPD officers in the instant case. A police officer who is under the influence of alcohol and in possession of a gun is an immediate threat to the life, health and safety of fellow officers and citizens. In sharp contrast, a Georgia public official who is intoxicated does not generally present the same risk to life, health and safety. See Cassidy, 471 F.3d at 81 (the Second Circuit noted that the officials in Chandler were not performing high risk, safety sensitive tasks)(citing Chandler, 520 U.S. at 318, 322). Such an elected official does not have deadly weapons at his immediate command and is not seconds away from unilaterally using such deadly weapons and killing or injuring a member of the public.

The Chandler Court noted that the history of the government's addressing the problem now addressed by the search is part of the context of that search. Thus, a demonstrated problem of drug abuse, while not essential to Georgia's case in Chandler would have helped to justify the testing regime challenged in that case. 520 U.S. at 319 (citing Von Raab, 489 U.S. at 673-75). It should be noted that in Von Raab there was no proof that

Customs Officers had a drug abuse problem but the danger posed by giving a drug abuser a gun, coupled with the opportunity for corruption, caused the testing regimen in Von Raab to fall squarely within the special needs doctrine of the Fourth Amendment.

Here, there is a demonstrated history of some NYPD officers abusing alcohol and of NYPD efforts to address such alcohol abuse as well as to address the problem of intoxicated officers possessing guns. There was a high level committee formed by the NYPD to review the undercover program used by the NYPD. That committee produced 19 recommendations in June, 2007, of which a recommendation concerning breathalyzer tests was recommendation number 10. This history and context also distinguishes the case at bar from Chandler.

Also absent in Chandler was any indication that public confidence in elected officials had been undermined by suspicions that elected officials had taken drugs. In the case at bar, in the wake of the Sean Bell incident, there were published reports that an NYPD officer involved had been drinking just prior to the incident. Public confidence is essential to the mission of the NYPD. Pappas v. Giuliani, 290 F.3d 143, 149-50 (2d Cir. 2002) (statements by a police officer that undermine public confidence in the police force and the confidence of police officers in one another are disruptive to the NYPD's mission and not protected by the First Amendment). That public confidence can be undermined by reports that officers were drinking prior to an incident that ended in the death of a member of the public. IO 52 will maintain the integrity of shootings and vindicate the public's confidence in the NYPD.

Finally, the only event leading to the requirement of a drug test in Chandler was the exercise of the right to run for public office. Here the event that triggers IO 52 is a

shooting resulting in injury or death to a person.  That is, the event causing the breathalyzer test is the exercise by an NYPD officer of the authority to employ deadly force coupled with the injury or death of a human being as a result of that shooting – authority the officer would not have had were it not for the officer's employment by the NYPD.  The danger posed to the public in such circumstances is at its most concrete and immediate – a critical distinction from the Supreme Court's findings in the <u>Chandler</u> case.

In sum, the instant case does not resemble <u>Chandler</u>, in the slightest.  The needs shown by the NYPD involve a threat to human life health and safety.  The officers involved in a shooting have exercised the authority granted them by virtue of their employment to use deadly physical force.  NYPD officers are already the subject of drug screening at the outset of their police career and random drug testing during their service.  The NYPD has a long history of battling alcohol abuse.  Yet NYPD officers still engage in alcohol related, life threatening activities such as DWI and suicide.  The NYPD has a long history of regulations designed to prevent alcohol abuse and intoxication while possessing a gun.  The NYPD's regulations address the procedures for removing the firearms of an intoxicated officer; a regulation designed to prevent alcohol involvement in a police shooting – the very problem now addressed by IO 52.  Thus, <u>Chandler</u> is inapplicable here.

Similarly irrelevant is <u>Willis</u> from the Seventh Circuit.  In that case, students who were involved in fights were required to be drug tested prior to returning to school.  The school defended the policy by analogizing the test to the drug tests approved by the Supreme Court for students participating in athletics in <u>Vernonia School Dist. v. Acton</u>, 515 U.S. 646 (1995).  The <u>Willis</u> Court held that the rights of students in that case were greater than those examined in <u>Vernonia</u>.  <u>Willis</u> 158 F.3d at 421-22.  Indeed, the students in <u>Willis</u> were not

subject to drug testing upon entering school or to random drug testing while attending school.

The Seventh Circuit likened the testing in that case to testing on entering school or random

testing and indicated that such testing was clearly outside the realm of possibility in the case

of school children.  Indeed, the plaintiffs' brief quotes <u>Willis</u> in finding the absence of such

"blanket" tests to be critical.

> Indeed, one of the most effective means of
> preventing substance abuse among children may
> be to require them to provide a urine sample
> each time they pass through the schoolhouse
> gate. But, **as we have tried to emphasize, the
> Supreme Court has not sanctioned blanket
> testing.**

Pl. Brief at 13 ( <u>quoting</u> <u>Willis</u>, 158 F.3d at 423, emphasis supplied by plaintiffs).  That

NYPD officers are subject to just such random testing and to testing upon entering the NYPD

distinguishes this case from <u>Willis</u> and makes this case inapposite.

With all due respect, NYPD officers are not school children.  The children,

like the public officials in <u>Chandler</u>, are not performing high risk, safety sensitive jobs.  <u>See</u>

<u>Cassidy</u>, 471 F.3d at 81.  If it needs stating, NYPD officers carry guns by virtue of their

employment and the testing at issue here occurs when the officer has exercised this most

somber power, the power to use deadly physical force.  In the case at bar, the NYPD seeks to

monitor and regulate the officer's use of a deadly weapon the officer possesses only by virtue

of the officer's employment.  Unlike the school children in <u>Willis</u>, NYPD officers are subject

to random drug tests and their privacy interests are minimal at best in a situation where a

shooting of an individual has occurred.  In such circumstances the NYPD officer correctly

expects to be placed on the most intense scrutiny and has the least privacy expectations.

Further, the government interests in this context are not some generalized and

amorphous anti-drug message but, rather, the capturing of information, whether an officer

was intoxicated at the time of the shooting, that will be unavailable if not immediately preserved. No such showing was, or could be, made in <u>Willis</u> where the drug test was administered when the child was returning to school after a suspension and not at the time of the triggering event, the fight itself. 158 F.3d at 417. Thus, the proffered reason for the testing in <u>Willis</u> was not closely connected to the testing itself. Here, the testing is closely connected to the reason for testing. Thus, <u>Willis</u> is inapplicable to the case at bar.

In sum, IO 52 serves important governmental needs when an NYPD officer is involved in a shooting which injures or kills a person. IO 52 is yet another step undertaken by the NYPD to address the problem of alcohol use and abuse by NYPD officers who possess guns. This problem is not illusory and the solution chosen by the NYPD, IO 52, is not merely symbolic. IO 52 is a minimal intrusion upon the already diminished privacy interests of officers and is narrowly tailored to obtain information critical to the governments' interests. It will deter officers from being under the influence of alcohol while possessing a firearm. Thus, IO 52 falls within the special needs doctrine, is reasonable under the Fourth Amendment, and is constitutional.

**POINT II**

**IO 52 IS NOT "VOID FOR VAGUENESS."**

As was noted in defendants earlier brief, the Supreme Court has recently defined the void for vagueness doctrine:

> "As generally stated, the void-for-vagueness doctrine requires that a **penal** statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."

Gonzales v. Carhart, __ U.S. ___, 127 S. Ct. 1610, 1628 (2007)(citations omitted)(emphasis supplied). In Thibodeau, the Second Circuit explained that there are two separate strands to the vagueness doctrine; one requiring fair warning of prohibited conduct and the second which holds a law unconstitutionally vague if it authorizes or even encourages arbitrary or discriminatory enforcement. Thibodeau v. Portuondo, 486 F.3d 61, 65-66 (2d Cir. 2007). Under this second strand, the law must provide "minimal guidelines to govern law enforcement." Thibodeau, 486 F.3d at 66 (quoting Kolender v. Lawson, 461 U.S. 352, 358 (1983)). The vagueness doctrine varies as the interests at issue change, with criminal cases receiving the closest scrutiny. Id. ("we apply a more stringent analysis when examining laws that impose criminal penalties because the consequences of imprecision are qualitatively more severe.")(citations omitted).

In Grayned v. City of Rockford, the Supreme Court pointed out that "[c]ondemned to the use of words, we can never expect mathematical certainty from our language," and observed that:

> [i]t will always be true that the fertile legal "imagination can conjure up hypothetical cases

- 17 -

in which the meaning of [disputed] terms will be
in nice question."

408 U.S. 104, 110-111 and n.15 (1972) (citing American Comm'ns Ass'n v. Douds, 339 U.S.

382, 412 [1950]).  This admonition has particular relevance here.

Plaintiffs' attempt to create ambiguity where none exists.  IO 52 was created

to provide breathalyzer testing where a shooting has caused injury or death to a person.  See

IO 52 which is entitled "**ALCOHOL TESTING FOR UNIFORMED MEMBERS OF**

**THE SERVICE INVOLVED IN FIREARMS DISCHARGES RESULTING IN**

**INJURY TO OR DEATH OF A PERSON**," Campisi Decal. Exhibit "A," (Bold in

Original).   Yet plaintiffs contend that under paragraph "10" of IO 52 it appears that

breathalyzer tests are to be administered "irrespective of resulting injury to or death of a

person."  Pl. Brief at 20 (footnote omitted).  This is a perfect example of an ambiguity

created by the "fertile legal imagination" of counsel rather than any ambiguity in IO 52 itself.

First, IO 52 is divided into three paragraphs, the second paragraph begins:

> 2.     Accordingly, when a uniformed
> member of the service, on or off duty, is
> involved in a firearms discharge within New
> York City which results in injury to or death of
> a person, the following procedure will be
> complied with:

IO 52 page 1.  As part of this second paragraph, IO 52 sets forth its "Purpose" which is

> To ensure the highest levels of integrity at the
> scene of police involved firearms discharges
> which result in injury to or death of a person, on
> or off duty, within New York City.

Id.  IO 52's second paragraph next proceeds to set forth IO 52's "Procedure," which has 14

subparagraphs, and indicates in the left-hand margin who is to perform the particular

procedure.  Subparagraph 10 of this second part is the phrase cited by plaintiffs and is to be

performed by "Internal Affairs Bureau Duty Captain." However, at very beginning of the "Procedure" section is a paragraph which reads:

> When involved in, or responding to the scene of a police involved firearms discharge which results in injury to or death of a person, on or off duty, within New York City:

IO 52 page 1. This governs all 14 subparts which set forth the procedures of IO 52. In short, there is no confusion or ambiguity either to lay person, lawyer or NYPD personnel – IO 52 applies to "firearms discharges which result in injury to or death of a person, on or off duty, within New York City." Thus, IO 52 is not vague, does not invite arbitrary enforcement, is not void for vagueness and this claim must be dismissed.

Equally fictitious is the claim that the terms "private setting" and "dignified, respectful fashion" are so vague as to require the invalidation of IO 52. IO 52 ¶ 2(10)(a). These terms are easily understood by ordinary lay people and by NYPD officers. They attempt to preserve the dignity of the NYPD officer to be tested and to avoid any possible stigma to that officer. Their inclusion is a direction to the IAB Duty Captain concerning the manner in which the officer is to be tested and is obviously meant to avoid the impression that the officer is to be demeaned. Any discretion granted the IAB Captain is to provide flexibility to ensure that the test is accomplished with little or no injury to the officer's pride and dignity. Again, there is no real ambiguity here and plaintiffs' counsel's "fertile" imagination is not grounds for constitutional invalidation.

As Justice Marshall writing for the majority observed in <u>Grayned</u>, the constitutionality of a statute does not turn on the creativity of challenging counsel. Rather, the usual application of IO 52 is abundantly clear, there will be (1) a shooting (2) by a NYPD officer, (3) resulting in injury or death to a person. IO 52 is narrowly drawn to become active

on the happening of a triggering event. IO 52 is of limited applicability and easily passes the second strand of the vagueness test.

Indeed, plaintiffs argument here, which complains of too much discretion being granted NYPD at the scene of a shooting, seems inconsistent with plaintiffs' contention that reasonable suspicion is sufficient, in their view, to ensure the integrity of firearms discharges by NYPD officers. Certainly, a reasonable suspicion test requires the application of more judgment and discretion than the mandatory testing required by IO 52, which admits of no discretion. This loss of discretion is decried by plaintiffs in Point I of their brief even while discretion is purported to be a constitutional infirmity in Point II of plaintiffs' brief. Compare Pl. Brief at 16 (arguing for requiring individualized suspicion rather than mandatory testing) with Pl. Brief at 21 (contending that IO 52 is unconstitutional because it leaves room for arbitrary enforcement).

In sum, as defendants noted in their original brief, while it may be that a lawyer can always "conjure" room for ambiguity there is little left here. Defendants' Memorandum Of Law In Support Of Defendants' Motion To Dismiss Or In The Alternative For Summary Judgment And In Opposition To Plaintiffs' Motion For A Preliminary Injunction, dated November 7, 2007, at 23-24. Thus, the instant civil regulation of NYPD officers easily passes muster under the "vagueness" doctrine.

## CONCLUSION

**WHEREFORE**, defendants respectfully request that plaintiffs' motion for summary judgment be denied, that defendants' motion to dismiss be granted, or in the alternative, that defendants' motion for summary judgment be granted, that the complaint be dismissed in all respects, that the request for relief be denied in its entirety, that judgment be entered for defendants, and that defendants be granted costs, fees, and disbursements, together with such other and further relief as the Court deems just and proper.

Dated:      New York, New York
           January 4, 2008

           **MICHAEL A. CARDOZO**
           Corporation Counsel of the
            City of New York
           Attorney for Defendants
           100 Church Street, Room 2-187
           New York, N.Y. 10007-2601
           (212) 788-0952
           aschlesi@law.nyc.gov

By:  **ECF**        /s/
           Alan M. Schlesinger
           Assistant Corporation Counsel