**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X      **07-CV-9246**
MICHAEL J. PALLADINO, as President of the NEW          **(GBD) (MGD)**
YORK CITY DETECTIVES' ENDOWMENT
ASSOCIATION, INC., NEW YORK CITY
DETECTIVES' ENDOWMENT ASSOCIATION,
INC., EDWARD D. MULLINS, as President
of the SERGEANTS BENEVOLENT
ASSOCIATION of the CITY OF NEW YORK,
INC., SERGEANTS BENEVOLENT ASSOCIATION
OF THE CITY OF NEW YORK, INC., THOMAS
DROGAN, as President of the LIEUTENANTS
BENEVOLENT ASSOCIATION of the POLICE
DEPARTMENT of the CITY OF NEW YORK,
LIEUTENANTS BENEVOLENT ASSOCIATION
of the POLICE DEPARTMENT of the CITY OF
NEW YORK, JOHN DOE, JANE ROE and all
POLICE OFFICERS named herein and others
similarly situated,

                                              Plaintiffs,

           -against-

THE CITY OF NEW YORK, the NEW YORK CITY
POLICE DEPARTMENT, and RAYMOND W. KELLY,
as COMMISSIONER of the NEW YORK CITY POLICE
DEPARTMENT,

                                        Defendants.
------------------------------------------------------------------X

## REPLY BRIEF IN SUPPORT OF PLAINTIFFS'
## CROSS MOTION FOR SUMMARY JUDGMENT

                          CERTILMAN BALIN ADLER & HYMAN, LLP
                          Attorneys for Plaintiffs
                          90 Merrick Avenue
                          East Meadow, New York 11554
                          (516) 296-7000

1958134.1

# TABLE OF CONTENTS

POINT I

    THE INTERIM ORDER VIOLATES
    THE FOURTH AMENDMENT................................................... 2

    A.    The Patrol Guide Procedures Provide An Effective
           Means To Gather Information Regarding the Sobriety
           Of Uniformed Members Who Discharge Firearms....................... 3

    B.    The Patrol Guide Procedures Provide An Effective
           Deterrent to Discharging Firearms While Intoxicated..................... 6

    C.    Suspicion-Based Searches Are Feasible
           And Were Utilized Effectively Long Before
           The Interim Order Was Issued....................................................... 7

POINT II

    THE INTERIM ORDER IS
    UNCONSTITUTIONALLY VAGUE................................................. 10

CONCLUSION................................................................................. 10

1958134.1

The uncontroverted evidence demonstrates three crucial points: (1) The suspicionless searches mandated by the Interim Order are not based on any genuine concern that Uniformed Members discharge firearms while intoxicated; (2) Suspicion-based searches are feasible and have been successfully utilized for years in connection with discharges of firearms; and (3) There is no causal link between firearms discharges and intoxication of a Uniformed Member.[1]

Indeed, the Government Defendants have admitted that the objective of the breathalyzer testing regime under the Interim Order is to "enable the NYPD to present evidence" to prove "false" any potential "rumors" that a police officer discharging a firearm had been drinking, like those that seemingly surfaced after the Sean Bell shooting incident.[2]  This objective -- to **project** an **image** that Uniformed Members **do not** discharge firearms while intoxicated -- has nothing to do with any real or concrete danger to the public.  The Government Defendants' admitted "need" for the suspicionless searches is every bit as "symbolic" as that in *Chandler v. Miller*, 520 U.S. 305, 322 (1997).  Because public safety is **not** genuinely in jeopardy, the suspicionless searches here are precluded by the Fourth Amendment, "no matter how conveniently arranged." *Id.*, at 323.

---

[1] Plaintiffs submit this reply brief in support of their cross motion for summary judgment. The defined terms utilized in Plaintiffs' initial papers are utilized here for brevity and convenience and references to exhibits are to those annexed to the Gladston Decl.

[2] Defendants' Brief, p. 5 (emphasis added); Defendants' Opp. Brief, p. 13; and Ex. 7.

1958134.1

**POINT I**

**THE INTERIM ORDER VIOLATES THE FOURTH AMENDMENT**

The Government Defendants argue that the suspicionless searches mandated by the Interim Order are justified under the "special needs" doctrine for essentially three reasons.[3] First, they argue that the Interim Order is an information gathering device.[4] Second, they argue that the Interim Order acts to protect the "integrity of shootings" by deterring a Uniformed Member from discharging a firearm while intoxicated. Third, they argue, incredibly, that the NYPD's own high-ranking officials, who are present at the scene of each shooting incident, are incapable of determining the sobriety of Uniformed Members.

The first two arguments are belied by the unrefuted documents demonstrating that pre-existing Patrol Guide Procedures accomplish both the objective of gathering information concerning Uniformed Members "sobriety" at the scene of a shooting and the objective of deterring Uniform Members from

---

[3]The Government Defendants' references to *Lynch v. City of New York*, a different case, and arguments made therein, are irrelevant. *See* Defendants' Opp. Brief, pp. 2, 8. They also rely on factually distinguishable case law, such as: *Cassidy v. Chertoff*, 471 F.3d 67 (2d Cir. 2006), involving <u>random</u> searches of passengers on certain maritime vessels as means to deter and prevent terrorist attacks; *MacWade v. Kelly*, 460 F.3d 260 (2d Cir. 2006), involving <u>random</u> subway searches of passengers' bags as means to deter and prevent terrorist attacks; *United States v. Knights*, 534 U.S. 112, 114 (2001), involving a warrantless search of a probationer's apartment supported by "<u>reasonable suspicion</u>" of criminal activity; and *Nicholas v. Goord*, 430 F.3d 652, 666 (2d Cir. 2005), involving incarcerated felons' challenge to a DNA-indexing statute.
[4]Defendants' Opp. Brief, pp. 5, 10.

2

discharging firearms while intoxicated.   The argument that the NYPD's high-ranking officials lack the ability to recognize intoxication is not only incredible and unsubstantiated by any admissible evidence, but flies in the face of the many cases upholding the arrests and/or convictions of defendants found to be driving while intoxicated based upon the observations of arresting officers.[5]

## A. The Patrol Guide Procedures Provide An Effective Means To Gather Information Regarding the Sobriety Of Uniformed Members Who Discharge Firearms

The Government Defendants argue that the Interim Order is a means "to collect information of officer's sobriety at the time that the shooting occurs."[6] They claim that without the Interim Order, the NYPD has not been able to "assemble" evidence linking discharges of firearms with alcohol intoxication.[7] This argument is pretextural given the NYPD's own Patrol Guide Procedures, which provide a very effective mechanism to gather information of Uniformed Members' sobriety at the time a firearm is discharged.

Patrol Guide Procedure No. 212-29 has long provided the NYPD with a very

---

[5]*See, e.g., People v. Cooper*, 219 A.D.2d 426 (1st Dept. 1996) (conviction of defendant driver upheld where arresting officers observed defendant to be intoxicated), *aff'd*, 90 N.Y.2d 292 (1997); *People v. Gangale*, 249 A.D.2d 413 (2d Dept. 1998) (conviction of defendant driver upheld where arresting officers observed defendant to be intoxicated); *People v. Bratcher*, 165 A.D.2d 906 (3d Dept. 1990) (arresting officers' observation of defendant driver established probable cause for arrest); *People v. Leary*, 2007 WL 4571185 (N.Y. Just. Ct.) (officers are trained to make arrests based on probable cause of intoxication).
[6]Defendants' Opp. Brief, p. 5.
[7]Defendants' Opp. Brief, p. 10.

effective means to gather information regarding a Uniformed Officer's sobriety at the scene of a shooting. The NYPD has not "assembled" evidence linking discharges of firearms with intoxication, because there is none.

Thus, Patrol Guide Procedure No. 212-29 requires numerous detailed written reports to be prepared and findings to be made by supervisory officials <u>each and every time</u> a Uniformed Officer discharges a firearm.[8] Among the findings to be made by these supervisory officials, are those concerning the Uniformed Officer's fitness for duty, which necessarily includes a finding regarding the Uniformed Officer's "sobriety." The procedures set forth in Patrol Guide Procedure 212-29 unquestionably have provided a very effective means to gather information of "sobriety" at the time that a shooting occurs. The fact that there have not been any "findings" of intoxication speaks volumes.

The Government Defendants' contention that the NYPD could be guilty of "deliberate indifference" to a known risk if they were required to wait until they had evidence of a causal link between firearms discharges and intoxication is nonsense given the pre-existing procedures whereby they would have obtained such "evidence" if it really existed. Clearly, no such evidence exists.[9]

---

[8] *See* Patrol Guide Procedure No. 212-29, Ex. 2.
[9] Defendants' Opp. Brief, p. 10. Defendants' rely on "failure to train" cases, none of which is relevant here. *Canton v. Harris*, 489 U.S. 378, 380 (1989), involves a detainee who sued the city for failure to provide medical attention while in police custody; and *Walker v. City of New York*,

4

The argument that the Interim Order is necessary "to collect information of officer's sobriety at the time that the shooting occurs"[10] is an obvious attempt to avoid the undeniable fact that there is **no** evidence -- none -- linking discharges of firearms with intoxication.

Unfortunately, in their zeal to justify the Interim Order, the Government Defendants repeatedly refer to a "long record of alcohol abuse by some NYPD officers" and a "demonstrated history of some NYPD officers abusing alcohol."[11] It bears emphasizing that **there is no evidence** to support these statements,[12] and given the admitted purpose of the Interim Order--to prove "false" any potential rumors that Uniformed Members discharge firearms while intoxicated, it is clear that the Government Defendants do **not** in fact truly believe there is an alcohol problem within the NYPD.

The Interim Order cannot be justified as an information collecting device when the Patrol Guide Procedures serve the same purpose without running afoul of the Fourth Amendment.

---

974 F.2d 293 (2d Cir. 1992), involves a failure to train assistant district attorneys in *Brady* obligations and police officers in impropriety of committing perjury.

[10]Defendants' Opp. Brief, p. 5.

[11]Defendants' Opp. Brief, pp. 10, 12, 13; Campisi Decl., at ¶19.

[12]Six hundred unidentified interviews conducted by the NYPD Counseling Unit, a few DWI arrests and a few suicides not related to alcohol abuse -- over the last three years -- does not constitute evidence of a widespread alcohol problem within the NYPD and has nothing to do with discharging a firearm while intoxicated. *See* Gladston Decl., at ¶¶27-31.

5

## B. The Patrol Guide Procedures Provide An Effective Deterrent To Discharging Firearms While Intoxicated

The Interim Order is not needed to deter Uniformed Members from discharging firearms while intoxicated. Uniformed Members have long been aware that their fitness for duty will be the subject of "intense scrutiny" following the discharge of a firearm.[13] Indeed, there is no dispute that the procedures employed pursuant to Patrol Guide Procedure No. 212-29 mandate findings to be made concerning the Uniformed Officer's fitness for duty which necessarily involves a determination as to the Uniformed Member's sobriety.[14] Thus, Uniformed Members know quite well that if they violate the regulations prohibiting discharge of a firearm while intoxicated, such violation would be discovered.[15] All of the procedures necessary to deter Uniformed Members from discharging firearms while intoxicated were in place long before the Interim Order was issued, and remain in place. The suspicionless searches here, unlike those in *Skinner*, are not necessary to deter a Uniformed Member from discharging a firearm while intoxicated. *See Skinner v. Railway Labor Execs. Assn.*, 489 U.S. 602, 630 (1989) (regulations had deterrent effect).

---

[13] *See* Palladino Aff.
[14] *See* Palladino Aff.; Rivera Aff.; Defendants' Brief, p. 12.
[15] *See* Palladino Aff.; Rivera Aff.

6

Given the Government Defendants' admissions concerning the objective of the Interim Order -- to prove that Uniformed Officers **do not** discharge their firearms while intoxicated -- it is quite clear that the objective of the Interim Order is not and never was truly intended to deter Uniformed Officers from discharging firearms while intoxicated.[16]

### C. Suspicion-Based Searches Are Feasible And Were Utilized Effectively Long Before the Interim Order Was Issued

Astonishingly, the Government Defendants argue that reliance on reasonable suspicion searches of alcohol intoxication is not effective because high-ranking officials of the NYPD at the scene of a shooting incident would not be able to recognize if a Uniformed Member was intoxicated.[17]

There is absolutely **no** evidence whatsoever to support this preposterous remark.[18] Indeed, the uncontroverted documents and case law demonstrate that

---

[16]Defendants' contention that the Interim Order is a means to restore "public confidence" in the NYPD following the Sean Bell shooting incident, is just another way of saying that the real purpose of the Interim Order is to project an image that Uniformed Members **do not** discharge firearms while intoxicated. *See* Defendants' Opp. Brief, at p. 13. Defendants' reliance on *Pappas v. Giuliani*, 290 F.3d 143 (2d Cir. 2002), is misplaced. In this case, where an officer claimed his right to free speech was violated when he was terminated for disseminating anti-black and anti-semitic materials to the public, a general balancing test was applied. Such tests have "never" been applied in suspicionless search cases. *See Nicholas v. Goord*, 430 F.3d 652, 666 (2d Cir. 2005).

[17]*See* Defendants' Opp. Brief, p. 11.

[18]On the one hand, Defendants claim that the NYPD officials lack the experience and skills to determine if a Uniformed Member is intoxicated, while on the other, they contend that the NYPD officials are "owed deference" presumably due to their experience and expertise. Defendants' Opp. Brief, p. 11. This case is not about "discipline" and their reliance on

1958134.1

Members of the NYPD are trained to recognize intoxication. For example, Patrol Guide Procedures No. 212-29[19] and 203-04[20] make clear that the NYPD relies greatly upon the professional experience and training of its supervisors and other high-ranking officials to carry out the policies and procedures set forth therein, which include determining when there is reasonable suspicion to believe a Uniformed Member is intoxicated.[21]

To say that police officers, indeed high-ranking officers, are unable to recognize intoxication when they see it is simply astounding. As the Second Circuit in *Krimstock v. Kelly*, 464 F.3d 246 (2d Cir. 2006), noted in the context of a vehicle forfeiture case:

> [I]n the majority of forfeiture cases, the vehicle is seized pursuant to a lawful DWI arrest or other misdemeanor or felony committed by the driver and owner of the vehicle. The risk that such arrests and seizures would be erroneous is reduced by the fact that **officers are trained to recognize intoxication** or criminal conduct.

*Id.* at 253, n.8 (emphasis added).

Indeed, Chief Campisi, in his affidavit submitted by the Government Defendants, goes to great lengths to describe the pre-existing, elaborate procedures

---

disciplinary cases, *Trotta v. Ward*, 77 N.Y.2d 827 (1991), and *Lynch v. Giuliani*, 301 A.D.2d 351 (1st Dept. 2003), is misplaced.

[19] *See* Ex. 2; and Ex. A to Complaint.

[20] *See also* Appendix "A" to the Interim Order, sets forth the "indicia of intoxication" to be employed by officials in face-to-face interaction with Uniformed Members.

[21] *See* Ex. "A" to Interim Order, Ex. B to Complaint.

8

employed by the "Team" of high-ranking officers who respond to each and every incident involving the discharge of a firearm.[22]   Nowhere does he say that these high-ranking officials lack the ability to recognize intoxication (nor could he). Indeed, it is most ironic that while the Government Defendants emphasize the importance of "public confidence" in the NYPD, they make statements that have the effect of undermining "confidence" in the NYPD.

This argument, like the others, is pretextual and an obvious attempt to analogize this case to *Skinner*. However, unlike *Skinner*, the discharge of a firearm in the line of duty is simply **not** comparable to a catastrophic train accident; and, it is **not** "unrealistic" to "require a showing of individualized suspicion" **when police officers are trained to recognize intoxication.**

The Government Defendants cannot avoid the fact that the objective of the Interim Order does not serve any legitimate government purpose, does not involve any "surpassing safety interests," *Skinner*, at 634, and does not even come close to rising to the level of concern required to show "special needs" as that term "draws meaning" from governing case law. *Chandler*, 520 U.S. at 322. The testing policy mandated by the Interim Order does not fall within the "closely guarded category of constitutionally permissible suspicionless searches," *Chandler*, 520 U.S. at 323,

---

[22] *See* Campisi Decl. at ¶¶26-44, and Patrol Guide Procedure No. 212-29, Ex. 2.

9

and the requirement of individualized suspicion should not yield in this case.

## POINT II

## <u>THE INTERIM ORDER IS UNCONSTITUTIONALLY VAGUE</u>

The Government Defendants argue that the Interim Order is narrowly drawn and clear. Not so. One need only compare the Interim Order with the narrowly drawn regulations in *Skinner* to see that Interim Order is vague, uncertain and contains language that is internally inconsistent,[23] and, thus, is unconstitutional.

## <u>CONCLUSION</u>

For all of the reasons set forth in plaintiffs' motion papers, they are entitled to judgment as a matter of law.

Dated:     Ease Meadow, New York
           January 11, 2008

CERTILMAN BALIN ADLER & HYMAN, LLP

By: _____
           Candace Reid Gladston
           Attorneys for Plaintiffs
           90 Merrick Avenue
           East Meadow, New York 11554
           516) 296-7000
           cgladston@certilmanbalin.com

On the Brief:
     Michael C. Axelrod
     Candace Reid Gladston
     Donna-Marie Korth

---

[23] *See* Gladston Decl. at ¶41; Palladino Aff.

10

1958134.1